IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

SENTRY DATA SYSTEMS, INC.

               Plaintiff,

    v.

CVS HEALTH, CVS PHARMACY, INC.,
WELLPARTNER INC., and
WELLPARTNER, LLC,

               Defendants.

C.A. No. 18-___

**JURY TRIAL DEMANDED**

Plaintiff Sentry Data Systems, Inc. ("Sentry") by and through its undersigned attorneys, brings this action for trebled compensatory damages and injunctive relief under the antitrust laws of the United States, and for compensatory and punitive damages and injunctive relief under state law, against the above-named Defendants, demanding a trial by jury.  For its Complaint against Defendants, Plaintiff alleges the following:

## NATURE OF THE ACTION

1.    Plaintiff Sentry is an innovator and a leader in the healthcare information technology field.  Sentry provides platform software and technology solutions to hospitals and pharmacies participating in the 340B Drug Pricing Program, a vital federal program designed to expand access to health care to underserved patient populations.  Defendants CVS Health, CVS Pharmacy, Inc. (together, "CVS"), and Wellpartner, Inc. and Wellpartner, LLC (together, "Wellpartner"), developed their businesses using Sentry's proprietary, confidential and trade secret business information, information protected by non-disclosure agreements and other contracts between the parties.  In violation of federal antitrust law, and following CVS's recent acquisition of Wellpartner, Defendants began forcing Plaintiff's customers to switch from using

Sentry's platform and technology solutions to using Wellpartner's services as a condition of access to CVS's pharmacy services, a "must have" for many hospitals and health clinics participating in the 340B program.  Defendants also misappropriated Sentry's trade secrets in violation of state and federal law, breached their contracts with Sentry, violated the Florida Deceptive and Unfair Trade Practices Act, and committed numerous other state law torts at Sentry's expense.

## THE PARTIES

2.      Plaintiff Sentry Data Systems, Inc. is incorporated under the laws of Florida, with its principal place of business at 800 Fairway Drive, Suite 400, Deerfield Beach, Florida, 33441.

3.      Defendant CVS Health is incorporated under the laws of Delaware, with its principal place of business at One CVS Drive, Woonsocket, Rhode Island, 02895.

4.      Defendant CVS Pharmacy, Inc. ("CVS Pharmacy") is incorporated under the laws of Rhode Island, with its principal place of business at One CVS Drive, Woonsocket, Rhode Island, 02895.

5.      Defendant Wellpartner Inc. is incorporated under the laws of Delaware, with its principal place of business at 20800 S.W. 115th Avenue, Suite 100, Tualatin, Oregon, 97062.

6.      Defendant Wellpartner, LLC, is organized under the laws of Delaware, with its principal place of business at 20800 S.W. 115th Avenue, Suite 100, Tualatin, Oregon, 97062.

7.      Although CVS acquired Wellpartner in 2017, Wellpartner continues to operate as a legally separate, distinct entity from CVS.

## STANDING, JURISDICTION, AND VENUE

8.     Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, as well as injunctive relief, arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.     This Court has subject matter jurisdiction of the Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1337 (commerce and antitrust regulation).

10.    Plaintiff has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

11.    This Court has subject matter jurisdiction of the Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367, and pursuant to 28 U.S.C. § 1332.  Each of the Plaintiff's state law claims arises out of the same factual nucleus as the Plaintiff's federal law claims.

12.    This Court has personal jurisdiction over each Defendant and venue is proper in the Southern District of Florida under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, and under Florida's long-arm statute, Fla. Stat. § 48.193.  Both Defendants do business in Florida, and the acts and practices alleged herein were committed in part in Florida, causing injury to Sentry and to third parties within Florida.  Certain contracts between Plaintiff and certain of the Defendants require those Defendants to consent to the jurisdiction of, and venue in, this Court for purposes of all legal proceedings arising out of those agreements, which are at issue in this action.

13.    Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.

## THE 340B DRUG PRICING PROGRAM

14.    The Veterans Health Care Act of 1992 established the 340B program in section 340B of the Public Health Service Act, 42 U.S.C. § 256b.  The 340B program requires drug

manufacturers participating in Medicaid to provide discounts on certain outpatient drugs to certain eligible health care entities, known as covered entities. Covered entities include hospitals and community health centers serving a significantly disproportionate share of low-income patients (called disproportionate share hospitals or "DSHs"), among other provider types. More than 6,000 covered entities participated in the 340B program in 2017.

15.     Congress intended for the savings from 340B-purchased drugs "to enable [covered] entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384 (Part 2), at 12 (1992) (Conf. Rep.). The benefits available through participation in the 340B program support and further the safety net mission of covered entities, allowing covered entities to save and generate revenues that will offset losses incurred in other areas of their business such as Medicare, charitable patient care, and care provided to underinsured, uninsured, and indigent patients. The 340B program is budget-neutral for the federal government.

16.     To participate in the 340B program, covered entities must register with the Health Resources and Services Administration ("HRSA"), the agency responsible for administering the program via the Office of Pharmacy Affairs. HRSA adds covered entities to its database after receiving and approving their registration forms. Covered entities must annually sign an agreement re-certifying that they meet 340B program requirements and that their information in the database is correct.

17.     Once approved, covered entities may purchase covered outpatient drugs under the 340B Program from drug manufacturers at or below the 340B ceiling price, which is typically well below prevailing wholesale prices. According to an analysis by Pembroke Consulting, more than $16 billion of discounted drugs were sold under the 340B program in 2017. Although

the workflows associated with the 340B program can be complex, as described in detail below, in general the program allows covered entities to purchase covered drugs at the 340B ceiling price, and to dispense them (either directly or through third-party contract pharmacies) at the negotiated contract price with third-party payers.  The difference between the ceiling price and the negotiated third-party contract price, minus any fees paid to third-party program administrators and/or contract pharmacies, is the surplus realized by the covered entity through participation in the 340B program.

18.     Covered entities may dispense 340B drugs to their patients either directly or through third-party contract pharmacies.  Because hospital-owned retail pharmacies are often not convenient to the public, have limited hours, and serve only a small part of a covered entity's patient mix, many covered entities engage contract pharmacies to dispense 340B-purchased drugs on their behalf.  Engaging with contract pharmacies can allow covered entities to reach a greater percentage of their patient population, creating a continuum of care and potentially enhancing the revenues available through participation in the 340B program.

19.     Covered entities must comply with the 340B statute and relevant HRSA guidance, and are responsible for the compliance of their contract pharmacies as well.

20.     Covered entities may dispense 340B-purchased drugs only to eligible patients, meaning among other things that the covered entity has established a relationship with the individual, and that the individual receives health care services from a health care professional affiliated with the covered entity such that the covered entity is responsible for the care provided. Dispensing 340B-purchased drugs to ineligible patients, a practice known as diversion, is prohibited by law.

21.     To prevent diversion, covered entities identify which prescriptions filled at their contract pharmacies will be categorized as 340B-eligible.  Covered entities and their contract pharmacies may dispense 340B-purchased drugs only to individuals who meet all applicable components of HRSA's patient definition.  Those individuals can, however, fill any of their prescriptions at a covered entity's contract pharmacy, and not just those that originate from the covered entity.  As a result, if a covered entity does not consider all prescriptions for an individual to be 340B-eligible, the covered entity must determine 340B eligibility at the prescription level.

22.     Subjecting drug manufacturers to duplicate discounts on 340B-purchased drugs is also prohibited by law.  Duplicate discounts occur when a drug manufacturer pays a State Medicaid agency a rebate under the Medicaid drug rebate program on a drug sold at the already-discounted 340B price.  To avoid Medicaid duplicate discounts in contract pharmacy arrangements, covered entities must either not dispense 340B-purchased drugs to Medicaid beneficiaries through their contract pharmacies, or make arrangements with relevant State Medicaid agencies to prevent duplicate discounts.

23.     HRSA guidance recommends that covered entities conduct oversight activities for their contract pharmacy arrangements, including monitoring their contract pharmacy arrangements by periodically comparing the covered entity's prescribing records with the contract pharmacies' dispensing records to detect irregularities (e.g., potential diversion or duplicate discounts), and retaining independent auditors to perform annual audits.  HRSA also audits covered entities to ensure compliance with the requirements of the 340B program.

24.     Third parties, often known as 340B Solutions Providers, often assist covered entities in the complex task of identifying 340B-eligible prescriptions through specialized

6

tracking software to prevent diversion and duplicate discounts, and in maintaining an auditable record of 340B workflows and payments.

25.     A sample 340B workflow involving a covered entity utilizing the services of contract pharmacies may proceed as follows, although the specific workflow between a covered entity, contract pharmacy, and 340B Solutions Provider will vary based on the terms of their relationship.  When a covered entity's patients fill their prescription at a contract pharmacy, the contract pharmacy will (if the patient is insured) send a payment request to a third-party payer, such as a Pharmacy Benefits Manager ("PBM").  The third-party payer will reimburse the contract pharmacy for the prescribed drugs at the standard contractual price, which is typically higher than the 340B price.  On an agreed upon schedule, the contract pharmacy will send to the 340B Solutions Provider records of all drugs dispensed.  Using tracking software, the 340B Solutions Provider will match the data from the covered entity and the contract pharmacy to determine which dispensed drugs are eligible for 340B pricing.  The 340B Solutions Provider will send a report, often called an accumulation report, of the eligible dispensed drugs to the covered entity, which is used by the covered entity to re-order or replenish the 340B eligible drugs dispensed by the contract pharmacy. The ordering or replenishment is usually done by the 340B Solutions Provider on behalf of the covered entity. The covered entity (or the contract pharmacy or 340B Solutions Provider acting on behalf of the covered entity) will purchase the replenishment drugs at 340B prices using the covered entity's 340B purchasing account.  An invoice will be sent to the covered entity for payment, while the replenishment drugs will be shipped by the 340B wholesale drug distributor directly to the contract pharmacy.  This is known as a bill to/ship to arrangement.  At an agreed upon schedule, the contract pharmacy will report to the 340B Solutions Provider the amounts it has collected for the 340B drugs sold.  The

contract pharmacy will, after withholding a negotiated fee, pay to the covered entity the remaining amount.  The covered entity will use the amount received to pay the 340B invoices, and use the amount remaining, which are the 340B savings to the covered entity, to provide other services to its patients.

### CONTRACT PHARMACIES

26.     Covered entities pay a fee to contract pharmacies for their services, commonly known as an enhanced dispensing fee.  The contract between a covered entity and a contract pharmacy is often known as a Pharmacy Services Agreement ("PSA").

27.     According to a Pembroke Consulting analysis, there were nearly 20,000 separate pharmacy locations participating in the 340B program as contract pharmacies in 2017.  However, not all contract pharmacies are equally attractive candidates for inclusion in a covered entity's network.  The costs of setting up and administering contract pharmacy relationships drives covered entities to look for relationships with the pharmacies with the highest volume, broadest access to 340B-eligible drugs, and most convenient locations for their patients.  According to a 2017 Pembroke Consulting Analysis, six retail pharmacy chains—Walgreens, CVS, Walmart, Rite Aid, Kroger, and Albertsons—account for two-thirds of 340B contract pharmacy locations. Although Walgreens is the single largest contract pharmacy, it is among the slowest growing of the major contract pharmacy chains, increasing its number of contract pharmacy locations by just 19 percent since 2013.  CVS, the second largest contract pharmacy, has increased its contract pharmacy locations by 281 percent over the same period.

28.     Both Walgreens and CVS are regarded by many covered entities interested in assembling networks of contract pharmacies to be "must have" providers of 340B contract pharmacy services.  According to a 2017 Pembroke Consulting analysis, each of the top ten DSHs with the largest 340B contract pharmacy networks included CVS within their network.

Other than Walgreens, no other pharmacy chain appeared in the contract pharmacy networks of each of the top ten DSHs with the largest 340B contract pharmacy networks.

29.     One cause of CVS's status as a "must have" contract pharmacy provider is its large market share in the retail pharmacy market.  In its 2016 Securities and Exchange Commission Form 10-K filing, CVS stated that it "held approximately 23.8% of the United States retail pharmacy market."  Because covered entities seek to deal with contract pharmacies located in close proximity to their patient population, CVS's national market share understates its competitive significance as a 340B contract pharmacy.  According to CVS, 76 percent of the population of the United States lives within 5 miles of a CVS pharmacy.  In its 2015 Securities and Exchange Commission Form 10-K filing, CVS disclosed that it operated in "98 of the top 100 United States drugstore markets" and held "the number one or number two market share in 93 of these markets."  For example, CVS controls over 50 percent of the retail pharmacy market in Washington DC, Boston, Providence, and Honolulu.

30.     CVS's dominant position in many regional retail pharmacy markets makes it an essential trading partner for covered entities seeking to establish a network of contract pharmacies in those areas.   For example, CVS makes up 30 percent or more of the contract pharmacies in Maryland and Washington DC, and over 40 percent of the contract pharmacies in the Metropolitan Statistical Areas ("MSA") comprising Wilkes-Barre, Scranton, Harrisburg and Carlisle, Pennsylvania.

31.     CVS's pending merger with Aetna, a leading health insurer, will further solidify CVS's status as a "must have" contract pharmacy, as insurers can and do steer patients of covered entities toward specific pharmacies, including 340B contract pharmacies.

32.     Another cause of CVS's status as a "must have" contract pharmacy provider is its growing dominance in the dispensing of so-called specialty pharmaceuticals, including high-cost treatments for rare or uncommon diseases that have special development, handling, administrative and monitoring requirements.  According to a 2016 Pembroke Consulting analysis, CVS was the single largest dispenser of specialty pharmaceuticals in 2016, accounting for 28 percent of all specialty pharmaceutical revenues.  CVS's dominance in dispensing specialty pharmaceuticals covered by the 340B program is even greater, as the next largest retail pharmacy chain in the dispensing of specialty pharmaceuticals was Walgreens, with a 10 percent market share of all specialty pharmaceutical revenues, followed by Kroger and Walmart, each with 1 (one) percent market shares.  Other major dispensers of specialty pharmaceuticals, such as pharmacy benefit managers, health plans, pharmaceutical wholesalers, hospital systems, and physician practices lack physical infrastructure located close to large percentages of a covered entity's patient population, and are not well-suited to serve as 340B contract pharmacies.  Thus, CVS's market share of specialty pharmaceuticals sold through 340B contract pharmacies is, upon information and belief, approximately 60 percent, a figure which has remained relatively constant for several years.

33.     CVS's dominant position in dispensing specialty pharmaceuticals to 340B plan participants is protected by substantial barriers to entry confronting new competitors.  For many specialty drugs, manufacturers limit and manage the specialty pharmacies eligible to dispense these expensive medications.  According to CVS, it offers covered entities unmatched access to specialty drugs, with 99 percent of specialty drugs available through CVS.  In addition, PBMs and health plans typically require patients to use the specialty pharmacy that the plan or PBM owns and operates.  CVS's status as the second largest PBM (through CVS's Caremark business)

allows it to force patients and third-party payers to utilize CVS as their specialty pharmacy, as demonstrated by more than one thousand exclusive or preferred arrangements that CVS has with third-party payers.

34.    Industry participants widely agree that access to specialty pharmaceuticals is becoming increasingly important in selecting contract pharmacies in 340B plans.  In 2017, Defendant Wellpartner informed covered entities that "the recent and anticipated growth of specialty pharmacy necessitates adding specialty pharmacy to your existing pharmacy services," and estimated that spending on expensive specialty pharmaceuticals would quadruple from $87.1 billion in 2012 to $401.7 billion in 2020.  Thus, according to Wellpartner, "The 340B program will remain vitally important for safety-net providers and their patients because expensive specialty drugs are a quickly growing share of the pharmaceutical market."  According to Wellpartner, although "Health systems want to develop specialty pharmacy services" and "Understand the potential for 340B impact", "Most" covered entities "lack product access [and] payer contracts" to develop these programs on the their own, thereby making them reliant on contract pharmacies, and especially CVS, for access to specialty pharmaceuticals for their 340B programs.

35.    Many covered entities regard access to CVS retail or specialty pharmacies as necessary in order to assemble a network of contract pharmacies in the specific local geographic markets served by those covered entities.  Nationwide, CVS makes up 30 percent or more of the contract pharmacy networks of over 180 covered entities, 40 percent or more of the contract pharmacy networks of over 110 covered entities, 50 percent or more of the contract pharmacy networks of over 75 covered entities, 60 percent or more of the contract pharmacy networks of over 40 covered entities, 70 percent or more of the contract pharmacy networks of over 30

covered entities, 80 percent or more of the contract pharmacy networks of over 20 covered entities, 90 percent or more of the contract pharmacy networks of 18 covered entities, and 100 percent of the contract pharmacy networks of at least 13 covered entities.  A listing of these covered entities, and CVS's share of their contract pharmacy networks, is attached as Exhibit A. (Because Exhibit A provides the number of pharmacies in a covered entity's network, rather than the prescription volumes associated with each pharmacy, Exhibit A likely understates CVS's importance as a contract pharmacy.  In fact, and as alleged at greater length below, several covered entities not appearing on Exhibit A have reported to Sentry that they feel compelled by CVS's importance as a contract pharmacy to accede to its illegal and coercive conduct.)  CVS has market power in the market for contract pharmacy services to these more than 180 covered entities located in specific local geographic markets around the country, including Baltimore, Maryland, Washington, D.C., and the MSAs of Harrisburg-Carlisle, Pennsylvania, and Scranton-Wilkes-Barre-Hazleton, Pennsylvania.  These covered entities are among the customers that CVS has targeted for anticompetitive conduct, as alleged at greater length herein.

## 340B PROGRAM ADMINISTRATORS

36.     Covered entities utilizing contract pharmacies remain responsible for the compliance of their contract pharmacies with the 340B statute and relevant HSRA guidance. This can be a complex and data-intensive task, and covered entities typically utilize computer software and technology provided by 340B Solutions Providers to achieve this goal.  340B software and technology solutions provided by 340B Solutions Providers allow covered entities to help track 340B eligibility, inventory, and replenishment, and to maintain the detailed audit trail HRSA requires.  340B Solutions Providers also assist covered entities in selecting contract pharmacies for inclusion in their networks, and at times by assisting in the negotiating of

enhanced dispensing fees and other contract terms with contract pharmacies on behalf of their covered entity customers. 340B Solutions Providers charge covered entities a fee for their services through various models.

37. For covered entities seeking to participate in the 340B program and to utilize contract pharmacies, there are no close substitutes for the services, specialized software and technology provided by 340B Solutions Providers. Because the data required to track and monitor eligible dispensations often resides in different databases within a covered entity, manually gathering, reconciling and interpreting these databases to ensure compliance is costly and increases the risk of non-compliance with the 340B statute and relevant HSRA guidance. Software programs and technology not designed and optimized for 340B workflows can bring covered entities into non-compliance, impose additional expense, or both. As a result, covered entities seeking to participate in the 340B program and to utilize contract pharmacies typically purchase services and software and technology solutions from 340B Solutions Providers rather than attempt to self-provide the services necessary to comply with the 340B statute and HRSA guidance.

38. Sentry is a leading provider of software and technology solutions for 340B administration and compliance. Through its Sentinel™ product, Sentry provides software and technology for covered entities that dispense 340B program drugs directly to eligible patients within the hospital setting. Through its Sentrex™ service Sentry assists covered entities in selecting contract pharmacies for inclusion in their networks, and provides the software and technology that defines and facilitates the relationship between covered entities and contract pharmacies through the covered entity's policies and procedures and operational parameters. Through its Backbone™ product, Sentry also offers to retail pharmacies platform technology

that allows pharmacy chains to efficiently offer their contract pharmacy services to large numbers of covered entities working with a range of different third-party administrators.

39.     Sentry's Sentrex™ product is typically provided to covered entities pursuant to multi-year exclusive contracts.

40.     More than 10,000 hospitals, clinics, integrated delivery networks (IDNs) and pharmacies across the country rely on Sentry's unique proprietary data set for their analytics, procurement, drug utilization and compliance solutions.  Since 2003, Sentry's solutions have processed over 7 billion dispensations on more than 1.6 billion claims and currently provide decision support for more than 92 million patients.  To date, Sentry has helped hospitals, health systems and IDNs realize more than $8.5 billion in savings to help them better meet their safety net mission and continue to serve their communities.

## SENTRY'S CONTRIBUTIONS TO CVS'S CONTRACT PHARMACY BUSINESS

41.     CVS's growing dominance in the 340B contract pharmacy market is attributable in many respects to investments that Sentry made in helping CVS to develop and grow its contract pharmacy business.  Since 2007, when CVS first approached Sentry for help in entering the 340B contract pharmacy market, CVS has consistently benefitted from Sentry's expertise, proprietary knowledge,  processes, trade secrets, and software programs, all of which contributed significantly to CVS's growth as a 340B contract pharmacy.

42.     Many of Sentry's Sentrex™ customers utilize CVS as a contract pharmacy. Sentry's Sentrex™ customers utilizing CVS as a contract pharmacy typically start as customers of Sentry, not as customers of CVS.  It is Sentry that almost always introduces the Sentrex™ covered entity customer to CVS, and not CVS that introduces the covered entity to Sentry.

43.     When CVS first approached Sentry, Sentry had already developed a PSA template based on years of previous operational experience.  The PSA template developed by Sentry is a

valuable trade secret, embodying Sentry's know-how and accumulated expertise regarding entry into a contract pharmacy arrangement, and which Sentry provided to its hospital clients pursuant to confidentiality agreements.  That PSA template was provided to CVS in 2007, also subject to confidentiality agreement.  Beginning in 2007 and continuing through 2013, CVS utilized the Sentry-developed PSA template.  Beginning in 2013 and continuing to date, CVS based its own PSA on the template that Sentry developed.  As Sentry continues to make revisions and improvements to its PSA template, revisions that reflect Sentry's continually improving understanding of best practices and optimal workflows in the administration of 340B programs, those updates and changes to Sentry's PSA template were shared with CVS for the benefit of CVS.  Furthermore, and at CVS's request, Sentry has invested significant effort and resources reviewing, commenting on and improving the CVS-specific PSA template starting in 2013 through today, without any remuneration and as part of a good faith partnership.

44.     Beginning in 2011 and continuing to date, Sentry developed and improved the operational procedures that CVS uses to offer 340B contract pharmacy services to covered entities.  Based on the operational procedures that Sentry developed and refined, CVS has significantly benefitted, without any remuneration to Sentry, from Sentry's applied and practical knowledge and operational expertise, proficiency and efficiency.

45.     Beginning in 2003 and continuing through 2017, Sentry developed proprietary software programs for administering 340B programs.  These software programs contained certain valuable features that enhanced the value of Sentry's 340B Solutions Services to covered entities, and provided Sentry with a competitive advantage over other 340B Solutions Providers.  For example, Sentry developed a Blacklisting Tool, which allowed covered entities to proactively exclude certain drugs from their 340B program, thereby enhancing the ability of

covered entities to administer 340B programs that were both lawful and profitable.  Sentry also developed proprietary dispensing fee structures, custom reports, and delayed ordering functionality in its software.  Sentry allowed CVS to access and use these valuable and proprietary features of Sentry's software programs in the provision by CVS of contract pharmacy services to covered entities.

46.     Sentry's business model is to facilitate the collection, organization, and transfer of information between covered entities and pharmacies in a way that is efficient, effective and auditable by third parties. The process is difficult, and fraught with potentially high-stakes errors. Over the course of Sentry and Defendant CVS's business relationship, CVS was provided Sentry's internal procedures and best practices to facilitate this process.  This included various operational forms Sentry created to contract with entities, work and data flows, and the overall internal structure Sentry uses with its 340B technology platform to effectively transfer and manage information moving between covered entities and pharmacies.  Sentry built this structure over years of experience and after millions of dollars of investment.  CVS was thus given a front-row seat to Sentry's core business model and internal business methods that make Sentry a valuable business partner for covered entities in the 340B marketplace.

47.     Beginning in approximately 2014 and continuing through the present, Sentry has also shared the identity of its Sentrex™ customers with CVS.  The identity of Sentry's customers is highly confidential and proprietary information with great economic value to Sentry.   Sentry invests considerable effort, knowledge, time, and expense to identify covered entities interested in participating in the 340B program, and in understanding and identifying their capabilities and needs.  Sentry takes appropriate measures to protect the confidentiality of its customer lists, which reflect Sentry's investment in identifying specific covered entities with specific needs, and

building relationships with those covered entities.  Among other things, the identity of Sentry's Sentrex™ customers is protected by the confidentiality provisions in the various agreements, discussed below, that CVS and other pharmacies that work with Sentry execute with Sentry before they are told the identity of the covered entity that is considering doing business with them.

48.      In recognition of the substantial amount of valuable, proprietary, confidential and trade secret information that Sentry shared with CVS over the course of their relationship, Sentry and CVS have since 2007 entered into a number of Non-Disclosure and Confidentiality Agreements.   CVS and Sentry's agreements prohibit CVS from using any of the valuable, proprietary, confidential and trade secret information that Sentry shared with CVS to compete with Sentry.

49.      In 2016 Defendant CVS Pharmacy and Sentry entered a Mutual Non-Disclosure Agreement (the "CVS Mutual NDA", attached hereto as Exhibit B).  The CVS Mutual NDA barred disclosure of certain business information exchanged between the parties prior to or after the effective date of the agreement.  Section 4 of the CVS Mutual NDA imposes a non-disclosure obligation, Section 2 of the CVS Mutual NDA defines protected information, and Section 9 of the CVS Mutual NDA permits injunctive relief for any breach.  The CVS Mutual NDA remains in effect.

50.      In 2014, Defendant CVS Pharmacy and Sentry entered into a still valid contract (the "340B Platform Agreement", attached hereto as Exhibit C) wherein CVS agreed to use Sentry as its exclusive provider of 340B platform software services through Sentry's Backbone™ product.  Neither CVS nor Sentry has, as of the time of the filing of this Complaint, terminated the 340B Platform Agreement.

17

51.     Sentry's 340B Backbone™ platform provides retail pharmacy chains such as CVS with a single integration point for their 340B program needs, regardless of the number of covered entities and 340B Solutions Providers.   Sentry's Backbone™ has the benefit of streamlining pharmacy chain operations, financial reconciliation and inventory processes across the entirety of the chain's 340B program.  Sentry independently developed the operational parameters, documentation flows, and work processes embodied in the Backbone™ platform through significant investments and the benefit of years of experience as a 340B Solutions Provider.

52.     Section 2.1 of the 340B Platform Agreement required CVS and Sentry to collaborate in developing the operational procedures (the "Operational Documentation") utilized by CVS in providing through Sentry's Backbone™ contract pharmacy services to covered entities and the 340B Solutions Providers working with those covered entities.  CVS and Sentry collaborated in developing those Operational Documentation based on Sentry's prior investments in developing the operational parameters, documentation flows, and work processes embodied in the Backbone™ platform.  Sentry also shared with CVS, among other things, its draft documentation flow charts and internal best practices, likewise built and honed through investment and years of experience as a 340B Solutions Provider.

53.     Section 6 of the 340B Platform Agreement requires CVS to keep confidential the Operational Documentation and other confidential information provided by Sentry, and to refrain from using that information to compete with Sentry.  This obligation survives any termination of the 340B Platform Agreement.

## SENTRY'S RELATIONSHIP WITH WELLPARTNER

54.     Prior to December 2017, Defendant Wellpartner provided 340B administration services to certain covered entities contracting with CVS through Sentry's 340B Backbone™.

18

55.     Sentry and Wellpartner shared confidential information in the course of facilitating these transactions, including information shared by Sentry at the request of CVS.  In particular, to facilitate the transmission of information between covered entities (contracting with Wellpartner) and CVS (contracting with Sentry), Wellpartner needed access to the proprietary configurations and data specifications of Sentry's software in order to submit properly formatted data to Sentry for processing on behalf of CVS.

56.     Sentry shared the proprietary configurations and data specifications of Sentry's 340B software with Wellpartner (e.g., Wellpartner Inc.) pursuant to a certain 340B Backbone Agreement, executed in 2015, and attached hereto as Exhibit D.  The 340B Backbone Agreement required Wellpartner to comply with the Operational Documentation developed by Sentry pursuant to the 340B Platform Agreement.  Section 5 of the 340B Backbone Agreement requires Wellpartner to keep confidential the Operational Documentation and other confidential information provided by Sentry, and to refrain from using that information to compete with Sentry.  Neither Sentry nor Wellpartner has terminated the 340B Backbone Agreement or caused a condition precedent to its termination to occur.

57.     Before entering into the 340B Backbone Agreement, Sentry and Wellpartner (e.g., Wellpartner Inc.) executed in 2014 a Mutual Non-Disclosure Agreement (the "Wellpartner Mutual NDA", attached hereto as Exhibit E), which prohibited Wellpartner from using the valuable, proprietary, confidential and trade secret information that Sentry shared with Wellpartner to compete with Sentry.  Sentry provided Wellpartner with extensive details about Sentry's proprietary products and systems, including on weekly calls discussing Sentry's platforms, pursuant to the Wellpartner Mutual NDA.  Section 1of the Wellpartner Mutual NDA imposes a non-disclosure obligation, Section 10 defines Confidential Information, and Section 5

19

acknowledges that a breach of the agreement would irreparably harm the non-breaching party. The Wellpartner Mutual NDA has no expiration date.

## DEFENDANTS' ANTICOMPETITIVE, TORTIOUS, AND UNFAIR CONDUCT

58. On or about December 18, 2017, CVS announced in writing to many of Sentry's Sentrex™ customers that it had completed an acquisition of Wellpartner, that Wellpartner would be "the exclusive 340B program administrator for all CVS Health retail and specialty pharmacies", and that CVS would "transition all covered entities to Wellpartner by December 31, 2018" (the "CVS Announcement", attached hereto as Exhibit F).

59. CVS's mandate that covered entities that desire to deal with CVS as a contract pharmacy must purchase 340B administration services from Wellpartner is an aberrant departure from prevailing industry practice, including the past practice of CVS. No other major contract pharmacy chain mandates that covered entities purchase 340B services from the contract pharmacy as a condition of purchasing contract pharmacy services, and CVS in the past has not done so, instead dealing with many 340B Solutions Providers through Sentry's technology Backbone™. Covered entities, including Sentry's Sentrex™ customers, generally regard CVS's mandate as an unwelcome departure from efficient and prevailing industry practices.

60. Wellpartner sales representatives then privately contacted numerous covered entities, including Sentry's Sentrex™ customers. Wellpartner representatives confirmed to these covered entities that they would be forced to use Wellpartner as their exclusive provider of 340B program administrator for all CVS contract pharmacies or would receive PSA termination notices.

61. At least 56 Sentrex™ customers of Sentry have been contacted by CVS and Wellpartner and told they had to switch to using Wellpartner as their 340B Solutions Provider for all CVS contract pharmacies if they wanted to continue their relationship with CVS. Many

of the covered entities that CVS and Wellpartner contacted to deliver this message were parties to valid and enforceable contracts with Sentry appointing Sentry as the exclusive 340B Solutions Provider to those covered entities.  These agreements were typically of multi-year duration.

62.     CVS knew that Sentry delivered 340B software and technology solutions to covered entities pursuant to written agreements, and knew that the covered entities to which Wellpartner sales representatives were delivering these messages were under contract with Sentry.  Sentry reminded CVS of this fact in a written communication on December 20, 2017, in which Sentry requested CVS to cease and desist from interfering with Sentry's contracts with covered entities.  Wellpartner sales representatives continued to contact Sentry's covered entity customers after CVS received this communication from Sentry.

63.     A number of Sentrex™ customers have told their contacts at Sentry that they had no choice but to switch to using Wellpartner as their new 340B Solutions Provider for all CVS contract pharmacies, in breach of their existing contracts with Sentry.  These and other Sentrex™ customers of Sentry were forced to curtail their business with Sentry due to CVS's status as a "must have" contract pharmacy for many covered entities.  For example, one Sentrex™ customer communicated to Sentry that it felt "handcuffed" by CVS's mandate because 75 percent of that covered entity's contract pharmacy relationships were with CVS.  Another Sentrex™ customer terminated its contract with Sentry, writing to Sentry that "I really hate that we must make the change but at this point we have little choice."  Remarkably, CVS made up less than 15 percent of this covered entity's contract pharmacy network, showing that the coercive power of CVS's conduct has forced covered entities to breach their contracts with Sentry against their will even when CVS's nominal share of their contract pharmacy networks is below 30 percent.  Another Sentrex™ customer expressed to Sentry its reluctance to accede to CVS's mandate, although it

21

would do so if forced due to its desire to expand its business with CVS.  That covered entity

relied on CVS for only 20 percent of its contract pharmacy business, another example of how

CVS's mandate has coercive effect even when CVS makes up less than 30 percent of a covered

entity's network.  As yet another Sentrex™ customer wrote to Sentry after being contacted by a

Wellpartner representative and being told that it would need to terminate its contract with Sentry

and move to Wellpartner or lose access to CVS as a contract pharmacy: "CVS is our only

profitable Contract Pharmacy, we cannot lose them or our program may as well not exist."  This

covered entity has more than twenty non-CVS contract pharmacies, but regards access to CVS as

necessary for an effective 340B program, directly showing CVS's market power over covered

entities.  Other Sentrex™ customers contacted by Wellpartner informed Sentry of an intent to

renegotiate their contracts with Sentry, and/or to not renew those contracts when they came up

for renewal.  Another covered entity contacted by Wellpartner informed Sentry that they would

not contract with Sentry due in part to CVS's December 2017 mandate.

64.     On information and belief, Defendants are using the confidential customer list

Sentry provided them to solicit Sentry customers and coerce them into using Wellpartner's 340B

platform.  Other than a handful of customer-specific success profiles on its website, Sentry does

not make the identities of its customers publicly available, and there is no public information that

would allow CVS or Wellpartner to derive Sentry's customer list independently.  On information

and belief, Defendants have been as effective as they have been in soliciting Sentry's Sentrex™

customers through the use of Sentry's confidential customer list.

65.     Although CVS's December 2017 mandate had stated that CVS would "transition

all covered entities to Wellpartner by December 31, 2018," Wellpartner communicated to some

of Sentry's covered entity customers that CVS would be converting those customers much

sooner.  For example, one Sentry covered entity customer was told that it would be converted to Wellpartner in early 2018, and that "there wasn't any option except to switch if you wanted to maintain CVS as a contract pharmacy."  Another Sentry covered entity customer was told in January 2018 by Wellpartner that it must immediately discontinue its use of Sentry's services for all CVS contract pharmacies, and instead use Wellpartner as their 340B Solutions Provider for all CVS contract pharmacies.

66.     Switching 340B software and technology solutions providers is typically a time-consuming and complicated task that can take 6 months or more.  However, when asked by one of Sentry's covered entity customers how Wellpartner would manage to convert Sentry's customers to Wellpartner customers with one-month notice, a Wellpartner representative stated that "all you have to do is redirect the current Sentry Data Systems feeds to us and we will extract and reformat the data to support our solution."

67.     Wellpartner's professed ability and plan to quickly convert Sentry's covered entity customers by accessing Sentry's proprietary data feeds specifications shows that CVS and Wellpartner have misappropriated Sentry's valuable, proprietary, confidential and trade secret information shared with CVS and Wellpartner pursuant to non-disclosure agreements.  In particular, Wellpartner is using its knowledge of the proprietary configurations and data specifications of Sentry's 340B software, as embodied in the Operational Documentation of the 340B Backbone Agreement and the 340B Platform Agreement, to quickly convert Sentry's customers to Wellpartner. But-for the misappropriation of Sentry's valuable, proprietary, confidential and trade secret information embodied in the Operational Documentation, Wellpartner would be unable to transition Sentry's customers as quickly as Wellpartner has stated it will.

68.     During the term of the 340B Platform Agreement, CVS asked Sentry to develop and beta test customized features and functionality specifically for CVS.  Sentry did so, at significant expense to Sentry and at no charge to CVS, and shared these custom features with CVS pursuant to the non-disclosure provisions of the 340B Platform Agreement.   After CVS expressed dissatisfaction with Sentry's customization of its Backbone™ for CVS, Sentry expended significant time and money in attempting to debug and rework these custom features for CVS. CVS continued to task Sentry with modifications, customizations and testing of Backbone™ even at a time when CVS would have already known it would be acquiring Wellpartner.  As Wellpartner was connecting to CVS through Sentry's Backbone™ at this time, Wellpartner also (pursuant to the non-disclosure provisions of the 340B Backbone Agreement) learned of these customizations of the Backbone™, which facilitated Wellpartner's ability to now quickly switch Sentry's Sentrex™ customers over to its platform by accepting Sentry's proprietary data feed.

69.     Wellpartner and CVS are also using other valuable, proprietary, confidential and trade secret information shared with CVS and Wellpartner pursuant to non-disclosure agreements to compete with Sentry.  In particular, the other proprietary know-how, processes, and trade secrets that Sentry shared with CVS are being used to target and convert Sentry's covered entity customers into customers of Wellpartner more quickly than would have been possible without the use of Sentry's confidential and trade secret information.

**FIRST CLAIM FOR RELIEF: UNLAWFUL TYING (15 U.S.C. § 1)**

70.     Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 69.

71.     Contract pharmacy services and 340B Solutions Provider services are separate products.  Covered entities historically have purchased the services from different providers. Purchasing contract pharmacy services and 340B Solutions Provider services separately is

regarded by covered entities as efficient, in part because purchasing contract pharmacy services and 340B Solutions Provider services separately contributes to formation of large and diverse networks of competing contract pharmacies.

72.     CVS's mandate that covered entities that desire to deal with CVS as a contract pharmacy must purchase 340B Solutions Provider services from Wellpartner coerces covered entities to purchase 340B Solutions Provider services (the "tied" service) from CVS, not because covered entities prefer to do so but only because they must do so in order to obtain access to CVS as a contract pharmacy (the "tying" service).

73.     CVS possesses substantial economic power over the tying service, as manifested by its ability to impose a burdensome tie of contract pharmacy services and 340B Solutions Provider services on covered entities, forcing covered entities to accept 340B Solutions Provider services from Wellpartner, something they would not do in a competitive market.  CVS's ability to force covered entities to purchase 340B Solutions Provider services from CVS through Wellpartner against the preference of those covered entities is direct evidence of CVS's market power over the tying service.

74.     CVS's tie of contract pharmacy services and 340B Solutions Provider services will substantially foreclose competing providers of 340B Solutions Provider services, harming competition in the market for 340B Solutions Provider services.  Covered entities forced to purchase 340B Solutions Provider services from Wellpartner will pay higher prices for those services than they would have in an unrestrained market.  Foreclosing competing suppliers of 340B Solutions Provider services from access to covered entities will deprive those competing suppliers, including Sentry, of economies of scale, learning by doing, and commercial validation, and will in that way reduce the ability of those competing suppliers to impose competitive

25

discipline on the price and terms of service imposed by CVS on covered entities.  Because covered entities generally prefer to deal with a single 340B Solutions Provider, forcing covered entities to use Wellpartner to access CVS will also force some covered entities to use Wellpartner for all of their 340B Solutions Provider needs, for CVS and non-CVS business alike, an effect that Sentry has already observed in the marketplace, causing further injury to Sentry.

75.     One relevant service market, here the market for the "tying" service, is the market for the provision of 340B contract pharmacy services to covered entities.  Providers of 340B contract pharmacy services to covered entities compete based on their dispensing fees and other terms of dealing, their location and their prescription volume, among other factors.  As covered entities seek relationships with contract pharmacies to better serve their patient populations, contract pharmacies located near a covered entity are generally better positioned to provide contract pharmacy services to covered entities in a given geographic market than are contract pharmacies located father away.  CVS has market power in the provision of 340B contract pharmacy services to specific covered entities in local relevant geographic markets across the country.  CVS can and does profitably target these covered entities for price increases for 340B Solutions Provider services, in part by forcing them to take their 340B Solutions Provider services from Wellpartner, which charges higher administrator fees than does Sentry.  The market for the provision of 340B contract pharmacy services to covered entities is protected by barriers to entry of new competitors, including increasingly-necessary access to specialty pharmaceuticals, and the time and cost of obtaining physical locations that serve the needs of covered entities.

76.     Another relevant service market, here the market for the "tied" product, is the market for 340B Solutions Provider services.  340B Solutions Provider compete on the basis of

their fees and contract terms to covered entities, and the quality of their software and technology solutions, among other factors.  In particular, software and technology solutions for administration of 340B programs are custom designed for use in the administration of 340B programs, and other types of software, or manual administration of 340B programs, are not reasonable substitutes for software and technology solutions for administration of 340B programs.

77.     The anticompetitive effects of CVS's mandate that covered entities that desire to deal with CVS as a contract pharmacy must purchase 340B Solutions Provider services from Wellpartner will be felt in at least the "tied" service market (the market for 340B Solutions Provider services).  By eliminating competing 340B Solutions Providers, CVS will have the ability to force covered entities to pay higher 340B administration fees to Wellpartner than are currently charged to covered entities by competitors of Wellpartner, including Sentry.  Covered entities have described Wellpartner's fees as "excessive" and substantially in excess of Sentry's fees for comparable services.  Competition in the "tied" service market (the market for 340B Solutions Provider services) will also be harmed by substantially foreclosing competing suppliers of 340B software and technology solutions from covered entities forced to deal with CVS through Wellpartner.

78.     A not insubstantial volume of commerce is affected by CVS's tie of contract pharmacy services and 340B Solutions Provider services.  Many of Sentry's largest covered entity clients, including several of the largest and most significant covered entities participating in the 340B program, have substantial numbers of CVS contract pharmacies in their contract pharmacy networks, and will be foreclosed to Sentry as a result of CVS's conduct.

## SECOND CLAIM FOR RELIEF: VIOLATION OF
## FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

79.     Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 69.

80.     The Defendants engaged in a scheme to take Plaintiff's confidential and trade

secret information, then leveraged that information to steal Plaintiff's covered entity customers.

81.     Defendants' conduct was, among other things, an antitrust violation based on

unlawful tying in violation 15 U.S.C. § 1.

82.     For these reasons, among others, Defendants' conduct was knowingly unfair and

deceptive, injurious to the public, and an unfair method of competition.

83.     The conduct caused actual damage to Plaintiff in the form of damaged

relationships with existing and potential covered entity customers and loss of revenue.

84.     Plaintiff suffered actual damages as a result of Defendants' conduct.

## THIRD CLAIM FOR RELIEF: BREACH OF CONTRACT

85.     Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 69.

86.     Plaintiff and Defendant CVS Pharmacy entered into the 340B Platform

Agreement, where the parties agreed that Sentry shall be "the sole and exclusive 340B Platform

Software Services Provider for" CVS "with respect to all Pharmacy Service Agreements"

between CVS and covered entities, and that CVS would not use Sentry's Confidential

Information, as defined in the 340B Platform Agreement, to compete against Sentry.

87.     Plaintiff and Defendant CVS Pharmacy entered into the CVS Mutual NDA, where

the parties agreed that CVS would not disclose and/or use Sentry's confidential business

information, as defined in the CVS Mutual NDA, including in competition against Sentry.

88.     Plaintiff and Defendant Wellpartner (Wellpartner Inc.) entered into the 340B

Backbone Agreement, where Wellpartner agreed that Wellpartner would not use Sentry's

28

Confidential Information, as defined in the 340B Backbone Agreement, to compete against Sentry.

89.     Plaintiff and Defendant Wellpartner (Wellpartner Inc.) entered into the Wellpartner Mutual NDA, where the parties agreed that Wellpartner would not disclose and/or use Sentry's confidential business information, as defined in the Wellpartner Mutual NDA, including in competition against Sentry.

90.     Plaintiff performed each and all obligations under the 340B Platform Agreement, 340B Backbone Agreement, and the CVS and Wellpartner Mutual NDAs.

91.     All conditions to create a valid and enforceable contract were met with respect to the 340B Platform Agreement, 340B Backbone Agreement, and the CVS and Wellpartner Mutual NDAs.

92.     Defendant CVS stands in material breach of the 340B Platform Agreement due to its use of Defendant Wellpartner's 340B platform to provide 340B platform services to covered entities contracting with CVS, and its use of Sentry's confidential information, as defined in the 340 Platform Agreement, to compete against Sentry.  At all relevant times, Wellpartner has been a "third party" to CVS Pharmacy, as that term is used in 340B Platform Agreement.  For example, the contracts that Defendants are forcing Sentry's covered entity customers to sign call for the covered entity to contract with Wellpartner LLC, and not with CVS, for the provision of 340B Solutions Provider services.

93.     Defendant CVS stands in material breach of the CVS Mutual NDA due to its use of Defendant Wellpartner's 340B platform, made more effective through the use of Sentry's confidential information, as defined in the CVS Mutual NDA.

94.     Defendant Wellpartner stands in material breach of the 340 Backbone Agreement due to its use of Sentry's confidential information, as defined in the 340 Backbone Agreement, to compete against Sentry.

95.     Defendant Wellpartner stands in material breach of the Wellpartner Mutual NDA due to its use of Sentry's confidential information, as defined in the Wellpartner Mutual NDA.

96.     Plaintiff has been and continues to be damaged by the breach of both CVS and Wellpartner's contracts.

## FOURTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH CONTRACT

97.     Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 69.

98.     Plaintiff held valid contracts with covered entity customers.

99.     These contracts included, among other things, exclusivity clauses which state the covered entity customers may only use Plaintiff's 340B software and technology solutions during the contract term.

100.    The Defendants knew of these contracts with the covered entity customers.

101.    Defendants intentionally and unjustifiably interfered with Plaintiff's contracts, which has induced and will induce certain covered entities to not perform or seek to renegotiate the contracts.  Defendants contacted Sentry's customers and demanded that they either switch to Defendants' platform (and breach their contract with Sentry), or lose all business with Defendant CVS.  This has resulted in, for example, a customer under contract with Sentry (which cannot be named due to confidentiality obligations), terminating its valid and exclusive Sentrex™ contract with Sentry in order to use Wellpartner as a 340B Solutions Provider and thereby to continue accessing CVS as a contract pharmacy.   Other of Sentry's Sentrex™ customers have communicated to Sentry that they believe that they have no choice but to also breach their

contracts with Sentry and deal instead with Wellpartner, due to their need to retain access to CVS as a contract pharmacy.

102.    Defendants' conduct has caused and will continue to cause damage to Plaintiff.

### FIFTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

103.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 69.

104.    Plaintiff has business relationships with certain covered entities with an expectation of actual or probable future economic benefit.  Some of those covered entities have declined to contract with Plaintiff due to Defendants' conduct as alleged herein.

105.    Defendants knew about the existence of Plaintiff's relationships with these covered entities, and that Plaintiff would receive future economic benefit from the covered entities.  For instance, one of Sentry's covered entity customers was seeking to close certain agreements with CVS pharmacies that would have closed but for Defendants' refusal to use Sentry's 340B platform.  Sentry's customers, moreover, are being told that they must switch to Defendants' platform or lose business with CVS, while assuring the customers that the transition will be smooth.  At least one customer noted it felt "handcuffed" by Defendants' ultimatum given Defendant CVS' size and importance in the marketplace.

106.    Defendants intentionally engaged in wrongful acts and conduct designed to interfere with and disrupt the relationships between Plaintiff and various covered entities.

107.    Defendants' interference was made possible and more effective by their unlawful use of Plaintiff's trade secrets and other confidential business information, including regarding Plaintiff's data specifications.

108.    Defendants' engaged in unjustified interference with Plaintiff's economically advantageous relationships with covered entities.

109.     As a result of Defendants' conduct, Plaintiff's economic relationship with current and potential covered entity clients was damaged and Plaintiff was injured.

### SIXTH CLAIM FOR RELIEF: MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836)

110.     Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 69.

111.     Defendants had access to Sentry's trade secret information.  This includes Sentry's data specifications, operational documentation, internal processes and procedures built through costly development and years of industry experience.  As noted above, Defendants had access to Sentry's core business model:  this internal, proprietary process for best organizing and transferring data between covered entities and pharmacies.  This internal process included a wide swath of information and procedures that made up Sentry's core business, including data work flows, operational procedures, data collection best practices, form agreements, and general know-how as to how to deal with covered entities.  Part of Defendants' collection of Sentry's internal information includes Sentry's data feed generated by covered entities operating within Sentry's framework.  This data feed is fed into Sentry's 340B platform.   Defendants have, among other things, taken Sentry's process and knowledge of Sentry's data feed to build a system that allows Defendants to compete with Sentry.  Indeed, Wellpartner's ability to seamlessly use the data feed created by Sentry's customers using Sentry's proprietary protocols shows that Wellpartner is using Sentry's trade secret information to compete with Sentry. Defendants also obtained access to Sentry's internal customer list.

112.     Plaintiff maintains control and ownership over its internal processes and operations that make up its core business model and its internal customer list.

113.     Plaintiff has taken reasonable steps to maintain the full scope of its proprietary process and procedure a secret, including through agreements with third parties that barred

disclosure of related information and internal security measures to prevent public disclosure or use.   The same is true for Plaintiff's internal customer list.

114.     Defendants accessed, reviewed, maintained and/or employed Sentry's internal process to, among other things, create a 340B software and technology platform that could operate seamlessly with Sentry customers' data feed.   Defendants then used this platform to compete for Sentry's covered entity customers, telling the covered entities they could seamlessly switch to Defendants' 340B platform by using Sentry's data feed.

115.     Defendants knew they were using this trade secret information without Sentry's permission, including Sentry' customer list.

116.     Defendants knew they had an obligation to maintain the secrecy of the trade secrets and limit their use.

117.     Sentry derives significant economic value from its internal operational procedures and best practices, and they are not generally known to, and not readily ascertainable by, other persons who may be able to obtain economic value from their disclosure.   The same is true for Sentry's internal customer list.

118.     As a result of Defendants' use of the trade secrets, Plaintiff has suffered and continues to suffer damages.

### SEVENTH CLAIM FOR RELIEF: MISAPPROPRIATION OF TRADE SECRETS (FLA. STAT. § 688.002)

119.     Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 69.

120.     Defendants had access to Sentry's trade secret information.   This includes Sentry's internal method and process built over years of industry experience and costly development.   As noted, Defendants had access to Sentry's core business model:  Sentry's internal method and process for best organizing and transferring data between covered entities

and pharmacies, including information and procedures that made up Sentry's core business, such as data work flows, operational procedures, data collection best practices, form agreements, and general know-how as to how to deal with covered entities generated through years of experience in the industry and millions of dollars of investment. Part of Defendants' collection of Sentry's internal process included Sentry's data feed generated by covered entities operating within Sentry's framework. Defendants have, among other things, taken Sentry's process and knowledge of Sentry's data feed to build a system that allows Defendants to compete for Sentry's customers. Defendants also obtained access to Sentry's internal customer list.

121.    Plaintiff maintains control and ownership over its internal processes and operations that make up its core business model and its internal customer list.

122.    Plaintiff has taken reasonable steps to maintain the full scope of its proprietary process and procedure a secret, including through agreements with third parties that barred disclosure of related information, and internal security measures to prevent public disclosure or use. The same is true for Sentry's internal customer list.

123.    Defendants accessed, reviewed, maintained and/or employed Sentry's internal process to, among other things, create a 340B software and technology platform that could operate seamlessly with Sentry customers' data feed. Defendant then used this platform to attack Sentry's covered entity customers, telling the covered entities they could seamlessly switch to Defendants' 340B platform by using Sentry's data feed.

124.    Defendants knew that were using this trade secret information without Sentry's permission, including Sentry's internal customer list.

125.    Defendants knew they had an obligation to maintain the secrecy of the trade secrets and limit their use.

126.    Sentry derives major economic value from its internal operational procedures and best practices, and they are not generally known to, and not readily ascertainable by, other persons who may be able to obtain economic value from their disclosure.  The same is true for Sentry's customer list.

127.    As a result of Defendants' use of the trade secrets, Plaintiff has suffered and continues to suffer damages.

## EIGHTH CLAIM FOR RELIEF: FLORIDA COMMON LAW CONVERSION OF CONFIDENTIAL INFORMATION AND PROPRIETARY INFORMATION

128.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 69.

129.    Defendants, on multiple occasions, did knowingly, willfully, unlawfully, and with intent to steal, commit an act of conversion with Plaintiff's proprietary business information, including, without limitation, information about Plaintiff's 340B software and technology platform and regarding its data feed process.

130.    The acts of conversion were committed with the intent to permanently, or for an indefinite time, deprive Plaintiff of its rightful possession, access to and use of converted property, and to deprive Plaintiff of the value of its converted property.

131.    As a result of Defendants' conduct Plaintiff suffered a deprivation of its property.

132.    The Defendants' actions interfered with Plaintiff's enjoyment of its ownership rights over the converted property, over which the Defendants have improperly exercised dominion and control.

133.    The property gives Plaintiff a competitive advantage.

134.    Defendants' conduct has caused and will continue to cause damage to Plaintiff.

<u>**NINTH CLAIM FOR RELIEF: FLORIDA COMMON LAW UNFAIR COMPETITION**</u>

135.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 69.

136.    Defendant Wellpartner competes with Plaintiff in the 340B Solutions Provider services market.

137.    As noted, Defendants have, among other things, attempted to recreate Plaintiff's business by systematically taking proprietary information, data, and specialized industry knowledge extracted by Defendant CVS over the course of its business relationship with Plaintiff.

138.    Defendants' conduct constitutes business conduct which is unfair, dishonest, and contrary to industry practice.

139.    Plaintiff was damaged by this conduct.

<u>**PRAYER FOR RELIEF**</u>

140.    To remedy these illegal acts, Plaintiff requests the Court:

      a.    Enter an injunction permanently enjoining the Defendants from the other unlawful conduct of the Defendants as alleged herein;

      b.    Award actual, compensatory and trebled damages, as applicable, in favor of the Plaintiff and against all Defendants, jointly and severally, and punitive damages, including all interest thereon;

      c.    Award Plaintiff reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

      d.    Any such further relief as the Court deems appropriate.

Sentry hereby demands a trial by jury on all issues so triable.

Dated: February 5, 2018

**BOIES SCHILLER FLEXNER LLP**

By:*/s/Carl E. Goldfarb*
    Carl E. Goldfarb, Esq.
    Florida Bar No. 125891
    Travis Robert Ritter
    Florida Bar No. 103936
    401 East Las Olas Boulevard, Suite 1200
    Fort Lauderdale, Florida 33301
    Telephone: (954) 356-0011
    Facsimile:  (954) 356-0022
    Email: cgoldfarb@bsfllp.com
    Email: tritter@bsfllp.com

By:*/s/Christopher G. Renner*
    Christopher G. Renner
    (pro hac vice to be filed)
    1401 New York Ave. NW
    Washington, DC 20005
    Phone: (202) 237-2727
    Facsimile: (202) 237-237-6131
    Email: crenner@bsfllp.com

*Counsel for Plaintiff Sentry Data Systems, Inc.*
