```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                       FORT LAUDERDALE DIVISION
                        CASE NO. 0:18-cv-60257
 3

 4     SENTRY DATA SYSTEMS, INC.,

 5            Plaintiff,                      July 19, 2018
                                             9:15 a.m.
 6            vs.

 7     CVS HEALTH, CVS PHARMACY, INC.,
       WELLPARTNER, INC., and
 8     WELLPARTNER, LLC,

 9            Defendants.                     Pages 1 THROUGH 66

10     _____

11

12                    TRANSCRIPT OF MOTION HEARING
                   BEFORE THE HONORABLE BETH BLOOM
13                   UNITED STATES DISTRICT JUDGE

14     Appearances:

15     FOR THE PLAINTIFF:   BOIES, SCHILLER & FLEXNER
                            STEPHEN N. ZACK, ESQ.
16                          100 Southeast 2nd Street, Suite 2800
                            Miami, Florida 33131-2144
17
                            BOIES SCHILLER & FLEXNER, LLP
18                          CHRISTOPHER G. RENNER, ESQ.
                            1401 New York Avenue Northwest
19                          Washington, DC 20005

20                          BOIES SCHILLER & FLEXNER
                            CARL EDWARD GOLDFARB, ESQ.
21                          401 East Las Olas Boulevard, Suite 1200
                            Fort Lauderdale, Florida 33301
22

23     FOR THE DEFENDANT:   KOZYAK TROPIN & THROCKMORTON
                            GAIL ANN MCQUILKIN
24                          2525 Ponce de Leon Boulevard, Suite 900
                            Coral Gables, Florida 33134-6036
25
```

```
1    FOR THE DEFENDANT:   DECHERT, LLP
                          MICHAEL S. DOLUISIO, ESQ.
2                         2929 Arch Street
                          Philadelphia, Pennsylvania 19104
3

4    COURT REPORTER:      Yvette Hernandez
                          U.S. District Court
5                         400 North Miami Avenue, Room 10-2
                          Miami, Florida 33128
6                         yvette_hernandez@flsd.uscourts.gov

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (Call to order of the Court, 9:15 a.m.)
 2             COURTROOM DEPUTY:  Calling Civil Case Number 18-60257,
 3   Sentry Data Systems, Inc. v. CVS Health.
 4             Counsel, please state your appearances for the record.
 5             MR. ZACK:  Good morning, Your Honor.  Steve Zack for
 6   the Plaintiff.  I'm here with my partner Chris Renner from
 7   Washington and Carl Goldfarb from Fort Lauderdale, Your Honor.
 8             THE COURT:  Good morning to each of you.
 9             MS. MCQUILKIN:  Good morning.  Gail McQuilkin of
10   Kozyak, Tropin & Throckmortnon, on behalf of Defendant CVS and
11   Wellpartner.  And I have with me Michael Doluisio, who is from
12   the Dechert Firm and will be addressing the Court this morning.
13             MR. DOLUISIO:  Good morning, Your Honor.
14             THE COURT:  Good morning.
15             Good morning to each of you.  Go ahead and have a
16   seat.
17             There are some disclosures that I would like to make
18   with regard to my relationship with two of the attorneys that
19   are handling the case.  First and foremost with regard to
20   Mr. Zack.  Steve Zack and I have known each other for many
21   years.  I consider Mr. Zack a friend.  We worked together many
22   years ago, since I have been on the bench now 24 years.  But we
23   worked together at the Law Firm of Floyd, Pierson, Richman,
24   Greer, Weil, Zack & Brumbaugh, and we have been friends for
25   many years.
```

4

```
1              As well I, consider Harley Tropin a friend.  We have
2      been friends for many years and have also served together on
3      panels and as well with the leadership of the University of
4      Miami School of Law.
5              So I make that disclosure with regard to my
6      relationship to the attorneys.  As well, since CVS is one of
7      the entities involved in this case, I do wish to disclose that
8      I shop at CVS, and my prescriptions, as well as my husband's
9      prescriptions, as well as our three children, are obtained
10     through the CVS Pharmacy.
11             So with that said, I want to first and foremost thank
12     you for accommodating my schedule.  I know that there have been
13     some rescheduling due to my trial schedule, but we certainly
14     have the morning.  I'm not certain if any of you will be
15     attending the funeral of Bob Traurig, but I certainly would
16     accommodate additional time, if that's necessary.  But I think
17     we can answer many of the Court's questions and give you an
18     opportunity to make argument within the time that we've
19     allotted.
20             So with that said, we are here before the Court on the
21     motion to dismiss that has been filed, Docket Entry 43.  And
22     with regard to the argument, here, the Defendant is making
23     eight separate arguments as to nine separate claims.  So
24     perhaps it's best to ask how you would like to proceed with the
25     argument, since I do have some questions along the way.
```

1          MR. DOLUISIO:  Thank you, Your Honor.

2          My proposal would be that I would just march through

3    the different arguments.  Happy to address the Court's

4    questions at any point that you want to raise them.  Obviously,

5    some of the arguments are much more brief than the others.

6    I've tried to organize my arguments so that we're not going to

7    be spending equal amount of time on every single count.  But

8    that was my proposal, to sort of march through the counts not

9    necessarily in the order that they are alleged in the

10   complaint, but in an order that I thought made sense in light

11   of our arguments.

12         THE COURT:  All right.  Then perhaps we'll start with

13   the antitrust injury.

14         MR. DOLUISIO:  Sure.

15         Should I approach, Your Honor, and --

16         THE COURT:  Whatever is easiest.  If you have papers

17   that you want to spread out on counsel table, you do not need

18   to use the podium.  As long as you just speak into the

19   microphone, that would me be helpful.

20         MR. DOLUISIO:  Okay.  Well, tell you what, let me grab

21   my bottle of water.

22         THE COURT:  Okay.

23         MR. DOLUISIO:  So Your Honor, with regard to antitrust

24   injury, I think that this is one of the relatively quicker

25   arguments that we would like to present this morning.  I think

```
 1    most of our argument is set forth sufficiently in our brief.

 2            With regard to antitrust injury, it's important to

 3    note that the antitrust laws protect competition and not

 4    competitors.  Plaintiff here does not allege that there's going

 5    to be a decrease in output or poor quality.  They allege that

 6    they are no longer going to be able to provide services with

 7    regard to CVS pharmacies only, not with regard to other

 8    pharmacies.  It's important that the Court understands that the

 9    allegation is that CVS is telling covered entities, these

10    health care providers, that they should use Wellpartner in the

11    administration of this 340B program in connection only with CVS

12    pharmacies.  So Sentry and every other administrator is still

13    free to compete to get business with regard to other

14    pharmacies.

15            The case that we rely upon is a case called Valley

16    Products.  It is a tying case.  The plaintiff in that case was

17    a manufacturer of soap, who made soap for a hotel franchise --

18            THE COURT:  And I just -- that's an out-of-district

19    case.

20            MR. DOLUISIO:  It is.

21            THE COURT:  So what I'd like to do is focus on the

22    Eleventh Circuit test and cases that the Court would be

23    compelled to follow.  And it appears that you've cited to the

24    Palmyra Park case, as well as the Southern District's case of

25    IBM Global.  And if I look at the allegations in the
```

1    complaint -- if I look at Paragraphs 63, 77, and 78, why would

2    I accept the argument that it's insufficient as to the

3    allegations of antitrust injury?

4         MR. DOLUISIO:  Well, Your Honor, I will concede

5    Palmyra is a tough case for our side.  I do think that the

6    Court -- I do think the Court in that case spent a lot of time

7    analyzing the particular market there.  And the particular

8    market there was hospitals and insurance.  And in that context,

9    I think the Court concluded that there was antitrust injury.

10        In our case, I think that it is just a case about a

11   competitor who is upset that they no longer can allegedly do

12   business with certain potential customers.  I think that here

13   the efficient enforcer argument is much stronger because I

14   think the hospitals are the right entity.

15        THE COURT:  So are you somewhat conceding the

16   antitrust injury that's been alleged?  Because I understand the

17   argument.  I understand that an antitrust plaintiff must show

18   harm to competition in general.  But if I look at the

19   allegations -- not just 63, which is what you referenced, but

20   there are other allegations in Paragraphs 77 and 78 that tell

21   the Court that looking at the Palmyra case, as well as the IBM

22   Global, that those allegations are sufficient in alleging

23   antitrust injury.

24        So are you somewhat conceding that based on that case?

25   Because I don't want to look at a Sixth Circuit case, when an

```
 1    Eleventh Circuit case is telling the Court that it's

 2    sufficient.

 3           MR. DOLUISIO:  I understand that, Your Honor.  And I'm

 4    happy to move on past the antitrust injury case and get right

 5    to what I think is the most important argument that we've

 6    raised with regard to Count 1, which is market power, if that's

 7    okay with your Honor.

 8           THE COURT:  Certainly.

 9           MR. DOLUISIO:  Okay.  And with regard to this argument

10    I've put together a short PowerPoint, which I was hoping I

11    could hand up to Your Honor.

12           THE COURT:  All right.

13           MR. DOLUISIO:  So Your Honor, like I mentioned, this

14    PowerPoint deals only with Count 1 and it only deals with the

15    issue of allegations of market power.  And if you look at Page

16    2, this is just a general sort of overview of tying law.  The

17    important point here is that tying is not illegal.  There's

18    lots of times that tying is perfectly legal.  It's okay for a

19    car manufacturer to tell a customer:  "If you want to buy our

20    car, you got to buy our tires."  No problem at all.  The

21    question is whether the Plaintiff has alleged that there's

22    market power in the tying -- in the tying product.

23           And here, Sentry alleges that the tying product is

24    contract pharmacy services, not retail pharmacy, not every

25    pharmacy that you see as you're driving down the street, only
```

1   those contract pharmacies that have signed contracts with

2   covered entities under this program.  And flipping to Page 3,

3   it's black letter law that to establish market power the

4   Plaintiff has to allege a product market and a geographic

5   market and that there's market power in the relevant product

6   and geographic market.

7          Turning to Page 4.  This is an important point.  If a

8   plaintiff alleges that there's multiple geographic market, the

9   plaintiff has to allege facts establishing what those different

10  geographic markets are.  In Kaufman, which is a Second Circuit

11  case, the plaintiff alleged that there was 53 separate

12  geographic markets in which Time Warner had market power.  But

13  the plaintiff didn't allege facts to establish what those

14  markets were or allege facts showing that there was market

15  power in each of those 53 markets.  So the complaint got

16  dismissed and the Second Circuit affirmed the dismissal.

17         So what does Sentry say here about the relevant

18  geographic markets?  Essentially, Your Honor, they say nothing

19  other than the markets are local.  Markets are local -- and

20  I'm -- now I'm on Page 5.  The markets are local because

21  hospitals want to deal with patients who are located close to

22  where they are located.  That's the sum and substance of their

23  geographic market allegations.

24         Turning to Page 6 of the slide deck, we cited a case

25  here.  Local is not a properly defined geographic market.  That

```
1    is an out-of-circuit case, I will admit, but I do think that

2    the reasoning makes a lot of sense and applies fully here.  And

3    even courts within this circuit have required a lot more than

4    allegations like the word "local."  In Clark Memorials --

5    that's a case from, I believe it's the Northern District of

6    Alabama -- yes.  Northern District of Alabama -- the plaintiff

7    alleged that the geographic market was the city of Birmingham.

8    So they had a very definite definition of what that geographic

9    market was.  The Court dismissed the tying claim.  The Court

10   said that the Plaintiff had not pleaded sufficient facts to

11   suggest that the geographic market in burial lots, which was

12   the product at issue, is limited to the city of Birmingham.

13   They hadn't alleged facts showing that people from outside of

14   Birmingham would only come into Birmingham to get -- or would

15   not come into Birmingham to get buried.  So the Court said

16   those allegations were not good enough and dismissed the claim.

17        Now, here, what's wrong with the allegation of just

18   local?  Well, as an initial matter, we have no -- and now I'm

19   on Page 7, Your Honor.  I'm sorry.  I'm not always

20   consistent --

21        THE COURT:  I'm following.

22        MR. DOLUISIO:  Okay.  Thank you.

23        So what's wrong with the allegation of local?  As an

24   initial matter, we have no idea how many geographic markets are

25   at stake.  None.  And that single fact differentiates this case
```

1    from every case cited by Sentry and every case cited by us.

2    There is no case that we could find where a plaintiff could

3    come in and just say:  "Markets are local.  We won't tell you

4    how many there are."  The word "local" also doesn't tell us

5    anything the scope of the geographic markets.  Are they cities?

6    Are they counties?  Are they states?  Is it a certain number of

7    miles from hospitals?  We have no idea.

8         THE COURT:  And perhaps we may have no idea of the

9    specific answers to those questions in the complaint as filed.

10   But if I look at Paragraph 35 of the complaint, it speaks of

11   nationally.  And the cases that you appear to rely upon --

12   again, looking at the Eleventh Circuit and the Southern

13   District cases, the Metzler v. Bear Automotive was on a summary

14   judgment.  This was a determination after full discovery was

15   received.  But it appears that if I look at Paragraph 35 -- and

16   perhaps maybe we can look at it together.  But it alleges the

17   geographic market is the US and includes allegations specific

18   to the United States regarding its market power.  So doesn't

19   that undercut the argument that you're making?

20        MR. DOLUISIO:  Not at all, Your Honor.  And in fact,

21   in our opening motion, we pointed out that these allegations

22   were not sufficient because they didn't allege, in some

23   respect, in some areas, a market share of at least 30 percent.

24        And Sentry, in their opposition brief, said:  "Those

25   are national figures.  Those don't matter.  What matters is the

1    local geographic markets."

2            THE COURT:  I'm just reading from Paragraph 35.

3    "Nationwide, CVS makes up 30 percent or more of the contract

4    pharmacy networks of over 180 covered entities.  Forty

5    percent" -- I mean, and it goes on.

6            MR. DOLUISIO:  Yes.

7            THE COURT:  That's in the complaint.  That's not in a

8    brief in opposition to your motion.  Those are the allegations.

9            MR. DOLUISIO:  That's right.  That's right, Your

10   Honor.  And I will be addressing that particular allegation in

11   a little bit more detail, but the short answer to that is there

12   are 6,000 covered entities which the Plaintiffs allege are part

13   of this market.  They are picking 180, so four or five percent,

14   without telling us where these are located, if they are parts

15   of some geographic market, what that geographic market is.  And

16   they're saying that with regard to these 180, this three our

17   four percent of the market, in their view, CVS has more than --

18   I guess they say in this paragraph 30 percent.  And this ties

19   back to Exhibit A to their complaint, which I'd like to show

20   you in a --

21           THE COURT:  I have Exhibit A.

22           MR. DOLUISIO:  Okay.  Great.

23           THE COURT:  All the exhibits were filed under seal.  I

24   have all the exhibits.  But the reference to Exhibit A is a

25   listing of these covered entities and CVS's share of their

```
 1    contract pharmacy network.  So wouldn't that further undercut

 2    your argument that "We don't know," because, in fact, we have

 3    an exhibit that references those covered entities?

 4          MR. DOLUISIO:  Well, again, Exhibit A is not a listing

 5    of relevant geographic markets.  It's a list of hospitals.  And

 6    if you look at Exhibit A -- which maybe it would make sense to

 7    do right now, if you don't mind.  It's attached to this

 8    presentation.  And if we could take a look at the first page of

 9    Exhibit A, which actually says "Page 2 of 10" at the top, if

10    you're there.

11          THE COURT:  Yeah.

12          MR. DOLUISIO:  Okay.  Great.  Thank you.

13          So on the left-hand side, that's a listing of the

14    different covered entities.  And for each covered entity

15    there's a column saying how many CVS pharmacies are there, how

16    many CVS specialty pharmacies are there, the total number of

17    CVS pharmacies, and then the total number of pharmacies that

18    are part of this hospital's program.  And the problem with

19    Exhibit A, and why it's insufficient, is it entirely ignores

20    substitutes and alternatives for CVS.  And let me give you an

21    example of that, Your Honor.

22          THE COURT:  But does that go to a pleading

23    sufficiency, as opposed to the ultimate determination as to

24    whether the Plaintiff should prevail on this claim?  I'm not --

25    I understand you're making the argument.  But I'm not finding,
```

1    on a motion to dismiss, looking at these allegations, that it

2    should be dismissed because there is insufficient pleadings as

3    to market -- or insufficient allegations as to market power.

4            MR. DOLUISIO:  Well, I think it does.  Again, the

5    threshold is 30 percent market share.  96 percent of the

6    covered entities are not included on this chart, presumably

7    because they're below 30 percent.  So that's 96 percent of this

8    market they don't have any allegations about whatsoever.  And

9    even if you look at this chart, it does not plausibly allege

10   market share.  This is not a market share analysis.

11           If you wouldn't mind, Your Honor, if you could take a

12   look -- for instance, halfway down the chart, there's a covered

13   entity called State of Hawaii Department of Health.  Do you see

14   that one?

15           THE COURT:  Yes.  One hundred percent Honolulu?

16           MR. DOLUISIO:  Yes.  Exactly.

17           So the State of Hawaii has decided, for whatever

18   reason, to sign a contract with only one CVS pharmacy, and

19   that's the only pharmacy that it has signed a contract with.

20   And so CVS, on this chart, makes up a hundred percent of its

21   program, but that doesn't mean that CVS has market power.  This

22   is located in the city of Honolulu.  There are dozens, maybe

23   hundreds of pharmacies.  For all we know, there is a Walgreens

24   and a Walmart and a Rite-Aid and all sorts of other pharmacies

25   located on the same block as this CVS.

```
1          THE COURT:  But I guess the point that -- and perhaps

2    I'm not understanding the reference to the case law.  Because

3    the Court can then look at Henry Ford Hospital, in Detroit,

4    Michigan, where there are 179 CVSs.  So I'm not certain if just

5    picking apart the covered entities on Exhibit A is sufficient

6    for the Court to find as a matter of law that there is a lack

7    of an allegation as to market power.  And perhaps -- where

8    would the Court look to -- what case would support your

9    argument that, looking at Exhibit A and the allegations in the

10   complaint, particularly Exhibit -- or Paragraph 35 -- that it's

11   insufficient as a matter of law?

12         MR. DOLUISIO:  Well, with regard to the argument that

13   if it's not over 30 percent it's insufficient as a matter of

14   law, Jefferson Parish would get you there.  I believe that

15   Kaufman, the Second Circuit case, is similar.

16         THE COURT:  And was that on a motion to dismiss?

17         MR. DOLUISIO:  Kaufman was.

18         THE COURT:  All right.

19         MR. DOLUISIO:  Yes.  And then even one of the cases

20   that Sentry cites supports this argument.  They cited -- again,

21   it's Seventh Circuit.  They cited a Seventh Circuit case called

22   Ball Memorial Hospital.  And in that case, the hospital had

23   more than 30 percent market share, but there was all sorts of

24   alternatives and substitutes that could be part of the market

25   that could enter the market very quickly.  And so the Court
```

1    said that was insufficient.

2              Your Honor, I think the problem here is -- is maybe

3    illustrated by a hypothetical.  I don't know if this is helpful

4    or not, but it's been helpful to me.  If CVS decided they

5    wanted to give all of their legal work to my law firm, to

6    Dechert, on this chart, it would show we have a hundred percent

7    of CVS's work.  But I don't think anyone would say that means

8    Dechert has a monopoly in the legal market.  It just means that

9    a particular customer happened to choose us.  That's all that

10   Exhibit A does.  It does not take into account alternatives,

11   substitutes, the location of other pharmacies, and that's the

12   kind of facts and the kind of detail that courts require,

13   including in the Clark Memorial case, which is from within this

14   circuit.  I mean, to just say a hospital hires a particular

15   pharmacy doesn't tell you a thing about the market power of

16   that pharmacy.

17             So just getting back to -- even before we get to

18   market power, getting back to the geography, we just don't know

19   how many markets are at issue here.  We don't know if "local"

20   means something in a city that's different than in a country

21   because the populations in a city might be located very close

22   to a hospital, whereas in a country they might be located

23   further away.  This complaint doesn't say a thing about any of

24   that.  It just doesn't.

25             So they do -- and Your Honor already touched on this,

1    and it's sort of addressed in slide 9.  They do make a bunch of

2    allegations that are national allegations, which, again, is not

3    the correct market.

4           In Paragraph 29 of the complaint, they allege that CVS

5    has 23.8 of the United States' retail pharmacy market.  Again,

6    that's a national metric, not a metric that's tied to what

7    should be the relevant geographic markets.  It's also relating

8    to the wrong product.  The question here isn't CVS's market

9    share in retail pharmacies.  The question is its market share

10   in 340B contract pharmacies.  And they don't make any

11   allegations that go to that, other than with regard to a couple

12   of very discrete areas of the country, which again, they don't

13   even tell us if those are the relevant geographic markets.

14          So I think we've covered slide A.  And just to --

15   there are a couple other allegations in the complaint that go

16   to market power that I'd like to just touch on quickly, Your

17   Honor.  And the first is Paragraph 27.  They allege that the

18   top six retail pharmacy chains have more than two-thirds of the

19   340B market.  Again, a national metric.  Tells you nothing

20   about whether CVS in a particular area, with regard to a

21   particular hospital, has market power.  They don't allege that

22   CVS is the largest of those six.  And in fact, it is not.  And

23   they don't allege that CVS has 30 percent of the contract

24   pharmacy market, which would be a relevant metric.  Although,

25   again, it would be national and not tied to the particular

1    geographic markets.

2         They then make some allegations about specialty

3    pharmacies, which are pharmacies that dispense rare, more

4    expensive, specialty-type pharmaceuticals.  Again, a national

5    metric and that's not the tying market they have defined.

6    Their tying market is all 340B contract pharmacies, not

7    specialty.  And so those allegations don't support market power

8    and certainly not in the relevant geographic markets.

9         And then, as I mentioned, they do have some

10   allegations that refer to Maryland and DC as a group and then a

11   couple of cities in Pennsylvania; Scranton, Carlisle, Woodbury,

12   Harrisburg.  But again, they don't tell us.  Are those the

13   relevant geographic markets or are those just some information

14   they're putting in the complaint?  We have no idea.  So Your

15   Honor, we think that all those allegations are insufficient to

16   allege market power.

17        The last thing that Sentry alleges is that there's a

18   handful of covered entities, of hospitals who have said:  "Hey,

19   we don't want to switch to Wellpartner.  We like Sentry.  We

20   don't want to have to do this.  We feel forced."  I mean,

21   statements to that effect.  That's not exact quotes, but those

22   sorts of statements.  We don't know who those covered entities

23   are.  We don't know where they're located.  We don't know which

24   geographic market they're purportedly in.  There's only a

25   handful of them out of the 6,000.  There's maybe only five or

1    six alleged in the complaint.  And courts have recognized that

2    these sort of anecdotal, conclusory sorts of allegations are

3    insufficient.  The question here is market share, market share

4    in a relevant geographic market.  And here, the complaint is

5    just deficient on that.  So for those reasons, we think that

6    the tying claim should be dismissed.

7         Now, with Your Honor's permission, I'd like to move

8    next to the tortious interference claim because I think it's

9    very similar.

10        THE COURT:  All right.

11        MR. DOLUISIO:  So the tortious interference with

12   contract claim is Count 4, and the tortious interference with

13   business relations is Count 5.  And we've cited a case,

14   Metzler, which Your Honor already referenced, which holds that

15   when the antitrust claim fails then the tortious interference

16   claim, based on the same theory, likewise fails.  And that

17   makes sense.  If something is legal under the antitrust laws,

18   it shouldn't be illegal under tort law.

19        Now, in response, Sentry cites a case called Brokerage

20   Concepts.  And I'm sorry if I'm moving too fast, Your Honor.

21        THE COURT:  No.  I'm getting to that claim.

22        I'm here.

23        MR. DOLUISIO:  Okay.  Thank you.

24        In response, Sentry cites a case called Brokerage

25   Concepts, which is a 20-year-old case from the Third Circuit.

1    And the problem with their reliance on Brokerage Concepts is

2    later Third Circuit cases and other cases citing Brokerage

3    Concepts have held that for a tortious interference claim the

4    plaintiff must allege that the underlying conduct is

5    independently wrongful.

6          So if your tortious interference theory is a theory

7    like tying, as it is here, then the tortious interference claim

8    can only proceed if the tying claim can proceed.

9          THE COURT:  I accept that argument that it rises and

10   falls on the tying claim.

11         MR. DOLUISIO:  Thank you, Your Honor.  Thank you.

12         And we cited a bunch of cases in our reply brief,

13   footnote 4, to that effect.

14         The other tortious interference case I did want to

15   mention is a case called Duty Free v. Estee Lauder.  And that

16   is an Eleventh Circuit case from 2015.  And in that case, the

17   Court held that when you're dealing with tortious interference

18   with an at-will contract, or a business relation that has not

19   yet risen to the level of a contract, the plaintiff has to

20   allege malice, has to allege that the defendant intended to

21   harm the plaintiff.  And here we don't have any allegations

22   like that at all.  Those allegations are totally missing.

23         THE COURT:  So you're making the argument under the

24   Estee Lauder case that there are no allegations that the

25   Defendant acted without justification?  Because that's what the

1    Estee Lauder case requires.

2         MR. DOLUISIO:  Well --

3         THE COURT:  Because then you go on to say that this

4    element is normally a fact-intensive inquiry that requires an

5    examination of the defendant's conduct, its motives and

6    interests it sought to advance.  So are you basically conceding

7    that if, in fact, there are allegations that the Defendant

8    acted without justification, i.e. the argument with regard to

9    tying, that that would be an inquiry that's better left to

10   resolve on summary judgment?

11        MR. DOLUISIO:  No, Your Honor.

12        And I must admit I don't remember the exact language

13   of Estee Lauder.  But my reading of it was that there had to be

14   allegations of actual malice.  And those allegations are

15   missing from this complaint.

16        THE COURT:  So you believe that an allegation of

17   malice is required?

18        MR. DOLUISIO:  I do.  I do.  But again, Your Honor, I

19   don't mean to misstate if I'm misremembering the case.

20        THE COURT:  All right.  Thank you.

21        MR. DOLUISIO:  So if we could move on to Count 5,

22   which is the other tortious interference claim.  And this is a

23   tortious interference with business relations.  So relations

24   that have not given rise to a contract.  And under Florida law,

25   it's very clear that you can't just say:  "The defendant has

1   interfered with my business relations.  I would have sold to my

2   customers, some of my customers."  There has to be specific

3   allegations that the business relationship was evidenced by an

4   actual and identifiable agreement that in all probability would

5   have been signed but for the defendant's interference.

6           And here the count is littered with all sorts of

7   allegations of the sort that are insufficient, "Defendants

8   interfered with my business relations," without any

9   specification at all about whether a contract was about to be

10  signed or not.

11          Now, Paragraph 105 -- I do want to be fair --

12  Paragraph 105 does refer to a single customer that they allege

13  a little bit more specificity about.  But again, there's no

14  allegation here as to who the customer was, what the contract

15  was, when the contract was going to be signed.  I mean, there's

16  just no details to get them over the line under Florida law.

17  And certainly they are not close with regard to any other

18  customer at all.

19          So in addition to failing for the reasons that Count 4

20  fails, the general tortious interference with contract claim

21  fails, Count 5 fails, we think, for this additional reason.

22          So unless Your Honor has questions, I'd like to now

23  move to the breach of contract claim.

24          THE COURT:  Certainly.

25          MR. DOLUISIO:  Thank you.

1               So the breach of contract claim, which is Count 3,

2     there's sort of two theories, one of which deals with misuse of

3     confidential information and the other one deals with the

4     breach of an exclusivity provision.  I'd like to hold the

5     confidential information claim until I address the trade

6     secrets counts and just focus for present purposes on the claim

7     about the breach of the exclusivity provision.

8               And this claim involves Exhibit C to the complaint.

9     And Exhibit C is called a 340B Platform Agreement.  And in a

10    nutshell, this was an agreement whereby Sentry provided to CVS

11    a certain kind of service called a Backbone.  It's a little

12    technical, but I can tell you that the kind of administration

13    that most administrators do is separate.  It's a different sort

14    of product.  A Backbone is a very specialized product that

15    Sentry was retained to provide to CVS.

16              And Paragraph 1 of Exhibit C to the complaint provides

17    in pertinent part that CVS shall neither enter into any

18    contract or similar agreement for the services with any third

19    party other than Sentry, nor appoint any other third party as

20    the 340B Platform software services provider for the pharmacy.

21              And the parties have really two fights about what that

22    provision means.  We believe that there's been no breach of

23    that provision because Wellpartner is not a third party.

24    Wellpartner has now been acquired by CVS.  It's part of CVS.

25    It's not a third party to the contract.  They disagree.  They

1    cite some cases dealing with the separateness of different

2    legal entities and they say:  "No.  No.  No.  Wellpartner is a

3    third party."

4            But Your Honor, you don't even really need to reach

5    that question --

6            THE COURT:  We don't?  Isn't that's what's being asked

7    is to define the third party within Paragraph 1, the exclusive

8    appointment?

9            MR. DOLUISIO:  It is.

10           THE COURT:  I mean, why wouldn't the Court consider

11   Wellpartner a third party under this exclusive appointment

12   provision?

13           MR. DOLUISIO:  Well, Your Honor, we don't believe that

14   it is because we think that this contract is talking to third

15   parties and not wholly-owned subsidiaries.

16           THE COURT:  But if the Court were to follow the logic

17   of that argument, wouldn't that give a free license to any

18   company to acquire another company, i.e. a third party, to

19   avoid this exclusivity provision?

20           MR. DOLUISIO:  It might.  And then it might encourage

21   companies like Sentry to actually put covenants not to compete

22   in their contracts, so that it doesn't turn on if it's a third

23   party or if it's you yourself doing it.

24           But my only point in saying the Court doesn't need to

25   reach it is that there is no allegation in this complaint that

1    Wellpartner is providing a Backbone service.  None.  So even if

2    Wellpartner is a third party, there is no allegation of breach

3    because they don't allege anywhere that Wellpartner is

4    providing a Backbone.  So that's what I meant when I said the

5    Court doesn't need to reach it.  But the more important point

6    here is that they haven't alleged that anyone else is providing

7    the service that they alleged that they had exclusivity for.

8            Okay.  With that, I'd like to now turn to Counts 6 and

9    7, which are the trade secret counts.  Count 6 is under federal

10   law.  Count 7 is under state law.  And like the briefing did,

11   I'd like to address this in two parts, first dealing with

12   customer names and secondly dealing with the other information.

13           A little background on the program, I think, is

14   helpful.  And what's helpful is that it is undisputed, because

15   it's publicly available, that every single covered entity who

16   participates in this program -- their name is on a government

17   website maintained by the Office of Pharmacy Affairs.  The name

18   of every single hospital is publicly available.  The name of

19   every contact person at every hospital is publicly available.

20   The name of every contract pharmacy that has signed a contract

21   with each hospital is publicly available.  Two clicks on a

22   mouse and you can get everybody.

23           Here, Sentry does not allege that CVS communicated

24   only with Sentry customers.  Instead, they allege we

25   communicated with all sorts of covered entities, including

1    their customers.  And that's Paragraphs 58 and 60 of the

2    complaint.  And we just don't think that public information can

3    constitute a trade secret in this way, particularly because if

4    CVS wanted to send a letter to every covered entity, they could

5    go online and figure out the names and contact person.  And if

6    they wanted to send a letter to every covered entity with which

7    they had contract -- well, first of all, they would know they

8    have a contract, but that's even publicly available.

9           So this trade secret information just isn't secret and

10   there's no allegation in the complaint that CVS somehow treated

11   Sentry customers different than other covered entities.

12          We cited three cases dealing with publicly available

13   customer lists not constituting trade secrets.  In response,

14   they cited one.  Digital Assurance v. Pendolino.  In that case,

15   the Court recognized that customer lists can be confidential,

16   but in that case the plaintiff asked the Court to seal

17   information about its covered entities.  The Court denied that

18   request because it said the customer names are publicly

19   available.  That's the case that they cite, Your Honor.  And we

20   think -- we think this one -- this part of this trade secret

21   claim ought to be dismissed.

22          THE COURT:  So that is not in dispute, that the

23   customer list is the same as what is publicly available by way

24   of the website that you have cited to?

25          MR. DOLUISIO:  Well, no, there is a dispute.  The

```
 1    public -- the website --
 2             THE COURT:  I mean, it's either available completely
 3    publicly or it's not.
 4             MR. DOLUISIO:  Well, it is -- there's no dispute the
 5    names that I said are publicly available are publicly
 6    available.  There's no dispute that the contact information
 7    that I said is publicly available is publicly available and
 8    that the contract pharmacies are publicly available.
 9             What's not publicly available is which administrator
10    the covered entity works with.  So you could not go on the
11    website and figure out hospital A, which has a contract with
12    CVS, uses Wellpartner or uses Sentry.  So the name of the
13    administrator is not publicly available.  But given that the
14    allegations here are that CVS contacted all the covered
15    entities, including theirs, and that CVS has contracts,
16    publicly available contracts, with the covered entities that
17    they contacted anyway, the allegation just doesn't go anywhere.
18    The allegation just doesn't go anywhere.
19             THE COURT:  So it doesn't constitute the confidential
20    information as set forth in the contract?
21             MR. DOLUISIO:  Correct.  Correct.  Exactly.  Exactly.
22             Getting past the customer information, then there's
23    this amalgam of other information that they say is trade
24    secret, and it's -- there are allegations about it in different
25    places of the complaint.  Paragraph 43, 44, 45, 46 are some of
```

1    those places, and we cite these in our motion paper.  And I

2    think, Your Honor, if you take a look at those allegations and

3    compare them to the allegations that were at issue in some of

4    the other cases that we cited, where trade secret claims were

5    dismissed, I think you'll find that these allegations are less

6    detailed than they were in some of those cases.

7         THE COURT:  If I could just step back, because you did

8    mention that there are confidential customer lists.  So there

9    is some information that's confidential.  And I thought I

10   understood your argument with regard to the customer lists is

11   that the customer lists are the same as what is publicly

12   available information, and you have cited to a website.  But --

13   so CVS did not use the confidential customer list when

14   contracting or contacting and contracting with these entities?

15        MR. DOLUISIO:  They allege that CVS contacted all

16   sorts of covered entities that included their customers and

17   didn't include their customers.  And the names of all those

18   covered entities, whether they are their customers or not their

19   customers, are all publicly available.  And CVS had contracts

20   with entities that -- it itself had contracts with the entities

21   that it contacted, whether they were Sentry customers or not.

22        So the information that CVS would have needed to use

23   to do the contacting that they allege that CVS did, didn't need

24   the customer list at all.  It's all publicly available right

25   out there on the website.

```
 1          THE COURT:  So the confidential customer list that you

 2     referred to, there really is no confidential customer list or

 3     is there?

 4          MR. DOLUISIO:  Well, the world does not know the

 5     covered entities for which Sentry serves as an administrator.

 6     That's what the world doesn't know.  But the world knows every

 7     covered entity that CVS has a contract with.  And the

 8     allegation is that CVS contacted all those folks.  There is no

 9     allegation that CVS only -- took this customer list and only

10     contacted their customers.  The allegation is CVS contacted all

11     sorts of covered entities, which happened to include some of

12     theirs.  And to do that you don't need to use any confidential

13     customer list at all.  You just send a list to the people that

14     you already have a contract with or you go on the website and

15     hit print.

16          THE COURT:  So the representation is that CVS did not

17     use the covered entities for which Sentry serves as an

18     administrator in making its contacts.

19          MR. DOLUISIO:  It didn't use the list.  It contacted

20     Sentry covered entities.  But it also contacted covered

21     entities that were administered by other administrators.  But

22     it didn't use the -- there's no allegation that it just used

23     the customer list to make these --

24          THE COURT:  Not just.  But did it have access and make

25     use of that?
```

1          MR. DOLUISIO:  I don't believe it did, and I don't

2     know that they allege that we used it.  I think they say maybe

3     upon information and belief.  But again, their allegations are

4     that we contacted much more than just their customers.

5          THE COURT:  Understood.

6          MR. DOLUISIO:  Okay.  Thank you.

7          So beyond having to allege facts showing that the

8     remaining information is, in fact, trade secret information,

9     they have to allege facts plausibly showing that Wellpartner

10    and CVS misappropriated these trade secret -- the trade secret

11    information.

12         Now, it is undisputed that Wellpartner was already in

13    this business before it got acquired by CVS.  So you might

14    think that Sentry would be coming forward and saying:

15    "Wellpartner was in business.  They got acquired by CVS.  CVS

16    gave them confidential Sentry information.  And now Wellpartner

17    is able to do things that it had not been able to do in the

18    past."  Those allegations are nowhere in the complaint.

19         For instance, they make an allegation about a

20    blacklisting tool, a tool that would allow covered entities to

21    exclude certain drugs from their 340B program.  They don't

22    allege that Wellpartner didn't have a blacklisting tool or that

23    Wellpartner has a blacklisting tool now only because they stole

24    it from Sentry.  There's no allegations like that.

25         Instead, their entire theory of misappropriation is

1    that Wellpartner is able to transition covered entities quicker

2    than Sentry thinks Wellpartner should be able to do it.  They

3    say typically it takes about six months to transition a

4    customer, and here Wellpartner is able to do it a lot faster.

5    So their view is that must mean that Wellpartner is using

6    stolen information.

7          Same problem.  They don't allege that before the CVS

8    acquisition Wellpartner wasn't transitioning customers quicker

9    than six months.  They don't allege that after the acquisition

10    that Wellpartner is transitioning customers -- Sentry customers

11    faster than six months, but is not transitioning other

12    customers faster than six months.  You would expect that

13    allegation if their theory was that Wellpartner was using

14    Sentry's stolen information.  That we're able to now transition

15    Sentry customers faster than six months, but not transition

16    others.  There's no allegations like that.  It's just this

17    speculative notion of they're doing it faster than we think

18    that they should be able to do it, so they must be using our

19    information.

20          THE COURT:  Well, is it CVS's position that

21    Wellpartner is not offing the same services as those

22    contemplated by the 340B Platform Agreement?

23          MR. DOLUISIO:  The 340B Platform Agreement, the

24    Backbone services, Wellpartner is not providing those services.

25    It's providing other administration services, but

```
 1    Wellpartner -- there's no allegation that Wellpartner is

 2    providing Backbone services.

 3              THE COURT:  So is Wellpartner's services the same

 4    services as those of Sentry?

 5              MR. DOLUISIO:  In some respects, yes.  Some -- this

 6    gets a little technical.  And again, Mr. Renner can correct me

 7    if I get the facts wrong here.  But my understanding is that

 8    administrators sometimes provide a link between a hospital and

 9    a pharmacy.  And that's what I think of as more traditional

10    administration services.

11              A Backbone product is a product that's sold to

12    pharmacies and it allows a pharmacy to deal -- to essentially

13    get feeds from lots of different hospitals.  So each hospital

14    might have different administrators.  This Backbone product

15    used at the pharmacy level is a translator.  It allows you to

16    translate all this information that's coming from different

17    hospitals.

18              So Sentry and Wellpartner both provide the

19    administration service, the link between the covered entity and

20    the pharmacy.  Sentry was providing a Backbone service, which

21    is a service provided just to the pharmacies.  Wellpartner --

22    there's no allegation that Wellpartner's providing a Backbone

23    service.

24              THE COURT:  Okay.

25              MR. DOLUISIO:  Okay.  Moving along.  And hopefully
```

1    we'll get through these last few causes of action a little

2    quicker, Your Honor.  I do apologize.  There was nine separate

3    counts.  So I apologize.

4         So I wanted to now discuss our argument that Counts 2,

5    5, 8, and 9 are preempted by the Florida Uniform Trade Secret

6    Act.  We've cited a couple of cases -- well, we've cited many

7    cases, but we've cited a couple cases, including a very recent

8    Southern District of Florida case called Vape Fiends, Inc.,

9    2017 WL 5953429, that holds that a common law count is

10   preempted even if the information that's at issue in that

11   common law count doesn't arise to the level of a trade secret.

12   And we've cited a lot of cases saying that this kind of cause

13   of action is preempted and that kind of cause of action is

14   preempted.  So why do we think that these causes of action are

15   preempted?

16        Count 8 is, to me, an easy one.  That's the claim for

17   conversion.  It is called "Common Law Conversion of

18   Confidential Information and Proprietary Information."  It is

19   based entirely upon the theft of information.  Paragraph 129

20   within that count makes that clear.  The whole count is about

21   theft of trade secret and other confidential information and we

22   think should therefore be preempted.

23        Similarly, Count 9, the claim for unfair competition.

24   In Paragraph 137, the only wrongdoing alleged with regard to

25   Count 9 is that the Defendants have attempted to recreate

1    Plaintiff's business by systemically taking proprietary

2    information, data, and specialized industry knowledge extracted

3    by Defendant CVS over the course of its business relationship.

4    So again, that cause of action deals exclusively with the

5    alleged misuse of confidential information and should be

6    preempted.

7            Count 5, which is a claim for tortious interference

8    with business relations.  We think that claim fails for the

9    numerous reasons I mentioned earlier.  But in addition, to the

10   extent that it's based upon theft of confidential information,

11   as is alleged in Paragraph 107, we think that aspect of the

12   claim should be preempted.

13           And finally, Count 2, the Florida Deceptive and Unfair

14   Trade Practices Act.  Paragraph 80 makes clear that that's also

15   based upon theft of trade secret and confidential information.

16           Your Honor, they essentially two theories.  They have

17   a tying theory and a trade secret theory.  And they've just

18   brought a lot of different overlapping and unnecessary causes

19   of actions, which are preempted -- which are preempted.

20           Turning to Count 9, which we were just discussing,

21   unfair competition.  As I mentioned, as written, this count

22   deals exclusively with the theft or misuse of confidential

23   information and for that reason should be preempted.  We also

24   cited some cases saying the claim fails because they don't

25   allege deception.  In response, they cite some cases saying

1   unfair competition can be based on tortious interference.

2   Well, for the reasons I've already discussed, we think the

3   tortious interference claim fails.  And in addition, there's

4   nothing in this count which talks about tortious interference.

5   Paragraphs 135 through 139 set forth the support, and they're

6   all about theft of information.

7          So again, we think they haven't pleaded the elements

8   of an unfair competition claim.  What they have pleaded is

9   preempted.

10          And then the very last count, Your Honor, and then I

11   promise I will sit down, is Count 2, the claimed Florida

12   Deceptive and Unfair Trade Practices Act.  The Florida

13   Deceptive and Unfair Trade Practices Act requires an allegation

14   of actual damage.  And with regard to this statute, that's a

15   term of art.  It's actually defined.  It's a defined term and

16   the definition essentially says that you can recover the

17   difference between the product as it was delivered to you

18   versus the value of the product as it was promised to you under

19   a contract.  That's the measure of damages.  That's what you

20   have to show for actual damages.  The formulation makes clear

21   that this cause of action has no application here.

22          We cited a recent Southern District of Florida case,

23   ADT v. Vivant, V-I-V-A-N-T, saying that allegations for lost

24   profits are not allowed.  Lost revenue is not allowed.  Harm to

25   customer relationships, those sorts of things are not allowed

1    because they just don't match the kind of harm which this

2    statute requires.  And if you look at some of cases that they

3    cited, they're really off point.  I mean, one of their cases

4    deals with corrective advertising under the Lanham Act, costs

5    paid for that.  And so their cases are really off point.  And I

6    think the proof really here is in the pudding.

7            Second claim for relief.  Paragraph 83 is where they

8    allege the actual damage that they are seeking to recover.

9    Paragraph 83 says they are seeking to recover the form of

10   damaged relationships with existing and potential covered

11   entity customers and loss of revenue.  That's the harm they

12   allege under this count, and that is nothing like the actual

13   damage formulation set forth in the statute.

14           So your Honor, I really do appreciate your patience.

15   I know I threw a lot at you because there was a lot of

16   different causes of actions, a lot of different arguments, but

17   I appreciate your time and I'd be happy to answer any questions

18   that you might have.  And otherwise, I'll turn it over to

19   Mr. Renner.

20           THE COURT:  Mr. Doluisio, I may have some questions on

21   the back end.  But thank you, sir.

22           MR. DOLUISIO:  Thank you.

23           MR. ZACK:  May it please the Court.  I believe that

24   counsel has not met their burden on a motion to dismiss on any

25   of the counts that we have alleged.  My concern, Your Honor, is

1    as you pointed out, there is a funeral that I was hoping to

2    attend.  I may not be able to be here till the end of the --

3    this matter, depending on how the Court proceeds, but

4    Mr. Renner is available and will answer any questions.

5          There was numerous questions that were raised by the

6    Court that were not answered.  These questions, of course,

7    would more properly be dealt with on a motion for summary

8    judgment and not on a motion to dismiss on any of the counts.

9          But as far as specific questions the Court may have,

10   Mr. Renner is here to proceed.

11         THE COURT:  All right.  Thank you, Mr. Zack.

12         And Mr. Renner, perhaps we can start with the common

13   law claims and then we'll move backward, since that argument

14   was just made.

15         You responded by saying that Sentry's tortious

16   interference claims are not preempted because the claims are

17   factually distinct.  Where would the Court find within the body

18   of the complaint the factual distinction that would allow the

19   common law conversion and unfair competition to survive?

20         MR. RENNER:  Thank you, Your Honor.

21         Before I proceed, if I could, we have a representative

22   from Sentry with us today.  I'd like to introduce her to the

23   Court, if I could.

24         THE COURT:  Yes.  Of course.

25         MR. RENNER:  This is Ms. Lydia Rodriguez-Hupp from

 1   Sentry.

 2           THE COURT:  Good morning.  Do you want to sit at

 3   counsel table?

 4           MS. RODRIGUEZ-HUPP:  No.  I'm fine.  Thank you so

 5   much.

 6           THE COURT:  All right.

 7           MR. RENNER:  Your Honor, the tortious interference

 8   claims are not preempted because they are factually distinct

 9   insofar as they rely on, A, the antitrust violation as the

10   improper means, or B, as we think is proper under Section 768

11   of the restatement, on the use of economic power in one market,

12   the contract pharmacy market, to force customers to breach

13   their contract in the competitive market, namely, the market

14   for 340B administrator services.

15           So we have two separate theories about why the tort

16   claims are not preempted by the Florida Unfair Trade Secrets

17   Act.  And this is because they rest either on the antitrust

18   claim or on a species of conduct that's identified in comment E

19   to Section 768 as improper means.

20           THE COURT:  But it appears that when the Court looks

21   at the actual allegations in the complaint that the conduct

22   that forms the basis of these claims are subsumed within the

23   statutory claims, as well as the unlawful tying claim.

24           MR. RENNER:  I'm sorry, Your Honor.  We're looking at

25   the fifth and sixth --

1          THE COURT:  I'm looking at Counts 8 and 9.  I'm not

2    seeing where the material distinction is in terms of your

3    allegations.

4          You've told the Court that these claims are not

5    preempted because they are factually distinct, which I'm

6    assuming you're saying that because the law requires that there

7    be some factual distinction between the common law conversion

8    and unfair competition.  So my question is:  When I look at

9    your complaint, where would I find those factual distinctions?

10         MR. RENNER:  I understand now.  And I apologize, Your

11   Honor.  I answered a different question than the one you asked.

12         Count 9, the unfair competition claim, incorporates by

13   reference all of the paragraphs that give rise to the antitrust

14   and tortious interference allegations.  And in Paragraph 137,

15   we -- Sentry expressly gives an illustrative, non-exhaustive

16   list of the factual predicates for its unfair competition

17   claim.  So yes, Paragraph 137 does allege conduct that may well

18   be preempted, but the unfair competition claim does not rest

19   entirely on that.

20         With respect to the conversion claim, Your Honor,

21   Count 8, we've cited cases that suggest that the better course

22   of action is not to dismiss that count right now, but proceed

23   to discovery and let's see if there is confidential information

24   that does not rise to the level of a trade secret.  But we

25   acknowledge that the Defendants have cited cases to the

```
1    contrary.

2              THE COURT:  All right.  So you would somewhat concede

3    that if there are no facts that would distinguish the common

4    law conversion and unfair competition from the misappropriation

5    of trade secrets and the tortious interference, as well as the

6    unlawful tying, that perhaps those common law causes of action

7    may not survive?

8              MR. RENNER:  I agree with that principle.  I do think

9    that, as I've explained, the facts particularly giving rise to

10   the ninth claim are distinct, sufficiently distinct such as to

11   avoid preemption.

12             THE COURT:  And when you speak of the material -- or

13   that they are distinct, if I looked at the complaint, which I'm

14   looking at now, where would I find those allegations that apply

15   solely to the unfair competition and not to the

16   misappropriation of trade secrets and unlawful tying?

17             MR. RENNER:  I'm looking at -- with respect to the

18   ninth claim, I'm looking at Paragraph 135.

19             THE COURT:  The:  "Plaintiff repeats and re-alleges

20   the allegations"?

21             MR. RENNER:  Yes.

22             THE COURT:  All right.  Which --

23             MR. RENNER:  Those allegations include all the factual

24   predicates for the antitrust claim and for the tortious

25   interference claim.
```

1       THE COURT:  Understood.

2       And the Defendant is making the argument that seems to

3   be supported by the case law that there needs to be some

4   factual distinction between the common law claims and the

5   statutory claims so that they are not preempted.

6       MR. RENNER:  I understand the argument that the

7   Defendant is making to be that to the extent this claim is not

8   distinct from the misappropriation of trade secret claim, it is

9   preempted.  I agree with that proposition.  What I'm doing, or

10  attempting to do, is point Your Honor to the portions of the

11  claim that identify the factual predicates for claim 9 that are

12  not trade secret related.

13      THE COURT:  All right.  Thank you.

14      And if I may ask, Mr. Renner, because I want to give

15  you an opportunity -- Mr. Doluisio made reference to all of the

16  information being available publicly and it's not confidential.

17  Did you want to address that just solely relating to what's

18  alleged.

19      MR. RENNER:  Absolutely.

20      Your Honor, so we agree that the HRSA website lists

21  the covered entities, and it lists the contract pharmacies they

22  do business with, and it provides the contact information.

23  Now, Sentry's customer list is a small subset of that public

24  website.  As the case law recognizes, customer lists can be

25  trade secrets when they are distillation of larger public

1    information.  So if you have a universe of customers that is

2    then distilled by the time and investment of the Plaintiff in

3    identifying its customers, its key customers, that

4    distillation, that's protectable as a trade secret, provided

5    the other elements are met.

6         So our customer list is a small subset of what's on

7    the HRSA website.  We allege that the customer list was

8    developed over a period of many years, with substantial

9    investment, and that it's of great value to Sentry.

10        Now, I'd like to explain why the customer list matters

11   to the allegations in the complaint.  As Mr. Doluisio said,

12   there are two types of misappropriation alleged.  We allege

13   that we shared confidential trade secret information with

14   respect to Sentry's proprietary processes, the workflows, the

15   contract templates, the operational procedures that go into

16   running a successful 340B administrator business.  We developed

17   those processes over the course of many years, and pursuant to

18   NDAs shared those processes with the Defendants as part of

19   various business relationships.

20        If you have access to Sentry's proprietary workflows,

21   operational procedures, and the like, we allege that you would

22   be able to more easily convert Sentry's existing customers to

23   Wellpartner.  That's an allegation that's in the complaint.

24   That's Paragraphs 65 to 67.

25        Now, imagine a situation where the Defendants have

1    Sentry's proprietary workflows, the operational processes, the

2    things we allege are trade secrets.  That gives them the key to

3    unlock our customers.  But what they don't know is:  Which

4    customers can I open up with this key?  Because there are

5    thousands of covered entities in the HRSA database.  But this

6    key that I have, this key that is Sentry's proprietary

7    information, this only opens the lock at a small subset of

8    those customers.

9            Imagine you find a key -- I was thinking this

10   morning -- in a hotel room.  Someone's dropped their key in the

11   hallway.  You find the key.  You don't know which door it

12   opens.  Using the customer list helps you answer that question.

13   Because now the Defendants know which customers, which covered

14   entities can I quickly convert from being Sentry customers to

15   being Wellpartner customers, using the misappropriated trade

16   secret information about Sentry's proprietary processes.

17           THE COURT:  So does there exist a confidential

18   customer list or is the listing of all customers contained on

19   this HRSA database?

20           MR. RENNER:  There is a database at Sentry that

21   identifies Sentry's customers.

22           THE COURT:  All of them?

23           MR. RENNER:  Yes.  And that is a subset of the HRSA

24   database.  It's my understanding that there is not a document

25   that's titled "Customer List" at Sentry.  But yes, the identity

1    of Sentry's customers, which is a small subset of the HRSA

2    database, is at Sentry.  It's kept very confidential.  And it

3    was shared, pursuant to NDA, with the Defendants.

4              THE COURT:  All right.

5              MR. RENNER:  Would you care to hear argument --

6              THE COURT:  Well, the reason I asked is I understood

7    Mr. Doluisio to say that they contacted many entities, both

8    Sentry's customers and other covered entities.  And if in fact,

9    those individuals were contacted through this customer list

10   that's publicly available, then how do we get to confidential

11   information?  Is it the manner in which they were -- I guess

12   informed as to how to use the information?

13             MR. RENNER:  Let me talk a bit about what happened

14   here and what we allege in the complaint and try to --

15             THE COURT:  Well -- and what I'd like you to do is

16   just focus on the allegations of the complaint that support the

17   claim that this is confidential information and not publicly

18   available information, which is the Defendant's claim.

19             MR. RENNER:  Your Honor, the challenged conduct began

20   when CVS sent a letter in December 2017 announcing its policy

21   that covered entities going forward would need to use

22   Wellpartner to access CVS.  Mr. Doluisio says that that was

23   sent to many customers, not just Sentry customers.  But the

24   complaint doesn't say that.  Paragraph 58 says that this letter

25   was sent to Sentry's customers.  We don't allege anything about

```
 1     how widely the letter was disseminated.
 2             Then after CVS sent that letter, Sentry responded
 3     within two days.  I wrote a letter to the general counsel of
 4     CVS and I said:  "Please, stop.  We have contracts with those
 5     customers that you're contacting."
 6             CVS didn't stop.  Instead, they sent Wellpartner sales
 7     representatives in to visit our clients individually, and said:
 8     "You must switch over from Sentry," in some cases, very
 9     quickly.
10             When the customers said:  "How am I going to switch
11     over that fast?"  Wellpartner said:  "Don't worry about it.
12     Just give me the data the same way you give it to Sentry and
13     we'll figure it out."
14             We allege that, for the purposes of the motion to
15     dismiss, that's a smoking gun.  We allege with specificity and
16     plausibility that Wellpartner and CVS's access to Sentry's
17     proprietary workflows and operational procedures would have
18     made switching customers easier.  And when the customer said:
19     "Why are you able to switch me over so fast," they said:  "Just
20     give me the data the way you give it to Sentry.  We'll figure
21     it out."
22             And so we think that that alleges with plausibility
23     and specificity that there was that misappropriation of a
24     customer list.  There was a misappropriation of confidential
25     proprietary information.  Those two were used together to
```

1    effect the switchover of Sentry's existing customers faster

2    than what would have otherwise been possible.

3          And Your Honor, going back to their complaint to find

4    the allegation that --

5          THE COURT:  I see 66 and 67.

6          MR. RENNER:  Exactly.

7          Paragraph 47 also alleges with specificity that the

8    customer list is confidential.  Yeah.

9          The customer list -- just so we're all clear, the

10   customer list is not what's on the HRSA database.  The HRSA

11   database is a universe of all covered entities that participate

12   in the 340B program, no matter which administrator they work

13   with.  Only a small subset of those covered entities are Sentry

14   clients.

15         THE COURT:  All right.  And I had you start at the

16   back end.  So if you wanted to proceed with the unlawful tying.

17         MR. RENNER:  Absolutely, Your Honor.

18         So Mr. Doluisio started out with what we think is a

19   misstatement of the law.  Mr. Doluisio said:  "When you're

20   looking for market power, you're looking for market share.

21   Market share is what matters."  But actually, that's not the

22   case.  That's not true, particularly in a tying case.

23         So the Supreme Court has described and defined what

24   market power is in a tying case.  And market power in a tying

25   case is a special power to coerce a purchaser to do something

1    that they wouldn't otherwise do in a competitive market.  It's

2    the ability to force.  It's called -- by the Supreme Court, in

3    Jefferson Parish, it's called "leverage," the ability to force

4    a purchaser to purchase a product or service from a supplier

5    they otherwise would not have preferred to deal with.  The

6    Supreme Court says that's market power.

7            Now, how do you prove market power?  You can prove

8    market power in one of two ways.  You can prove market power

9    through direct evidence of the forcing, direct evidence that

10   customers are forced to deal with a supplier that they

11   otherwise would not deal with because of their need for the

12   tying product.  That's one way to do it.  Defendant's own cases

13   say that.

14           We've talked about Metzler today.  Metzler

15   specifically says you can show market power in a tying claim

16   through direct evidence that the defendant raised prices and

17   excluded competition in the tied product market.  We allege

18   that.  We allege that Wellpartner is forcing our customers to

19   deal with Wellpartner, despite the fact that Wellpartner's

20   prices are described by those same customers as excessive and

21   higher than Sentry's.

22           So accepting Metzler on its terms, we've shown at this

23   point plausibly alleged market power under both Jefferson

24   Parish and Metzler.

25           THE COURT:  So do you believe that market share is

1    even applicable in the Court's analysis?  Because the Defendant

2    argued that your client has not -- or that you have not alleged

3    sufficient market share.  What would be the -- if the Court

4    were to consider market share, what would be the requisite

5    market share in this circuit?

6         MR. RENNER:  I do think that the Court should consider

7    market share, which is why we included in the complaint.  I

8    think there is some confusion that I don't think is in the

9    complaint itself about what the market share is.  So why don't

10   I just talk about that.

11        THE COURT:  I know there was some reference with

12   regard to Exhibit A, but I want to give you an opportunity to

13   respond.

14        MR. RENNER:  Sure.  Of course.

15        So again, Jefferson Parish says you can show market

16   power through direct evidence or through by looking at market

17   share, and we're looking for a market share of 30 percent or

18   higher.  We agree with that proposition.

19        In the complaint, in addition to the -- what we think

20   is powerful direct evidence of market power, we also provide

21   the information that we have based on publicly available

22   information, right, without any discovery about what CVS's

23   market share might be.  So we identify specific metropolitan

24   statistical areas where CVS has a higher than 30 percent share

25   of 340B contract pharmacies.  That's one indicium of market

1    power.  We also drilled down a little deeper into the HRSA

2    database and pulled out Exhibit A, which we've discussed.

3           Now, Mr. Doluisio's got a problem with Exhibit A.  He

4    says:  "This is only four percent of the covered entities."

5    But the Supreme Court's been very clear that in a tying case

6    market power doesn't need to be exercised over every buyer in

7    the market.  It's enough if some buyers can be coerced to

8    purchase the tied product.  There's no requirement that all

9    buyers -- so that's Fortner Enterprises.  Proper focus of

10   concern is whether the seller has the power to raise prices or

11   impose other burdensome terms, such as a tie in with respect to

12   any appreciable number of buyers within the market.

13          A hundred and eighty hospitals?  Some of America's

14   largest, most significant disproportionate share hospitals?

15   That's an appreciable number of buyers.

16          Fortner also says it doesn't matter if some buyers in

17   the relevant market are free of the seller's power.  What

18   matters is that some of them can be forced.  Those some

19   customers that is can be forced, that's in Exhibit A.

20          Tic-X-Press, the Eleventh Circuit case, says the same

21   thing.  Doesn't matter if not every buyer in the relevant

22   market is coerced.  In fact, in Tic-X-Press, which is, as I

23   said, an Eleventh Circuit case, there was only one forced buyer

24   and the Eleventh Circuit affirmed a verdict for the Plaintiff.

25   Just one, with $10,000 worth of foreclosed business.

1          Tying law has a special solicitude for individual

2   customers being forced to purchase tied products against their

3   will.  There's no requirement that everyone in the relevant

4   market be forced.  There's no requirement that the Defendant be

5   dominant in any market.  What matters is:  Are there specific

6   customers that can be forced?  And 180 customers, at a minimum,

7   could be forced based on what's alleged plausibility at this

8   stage.

9          We've also alleged that the market shares that we've

10  identified are conservative.  So how did we do this?  We were

11  getting emails from our customers saying:  "I don't want to do

12  business with Wellpartner.  I hate to do this, but I have no

13  other choice."

14         Okay.  First of all, that's market power.  Right?

15  That's the power to force a purchaser to do something they

16  don't want to do.

17         So when I got this email I looked at the HRSA

18  database, and I said:  "Well, this must be a customer that

19  has -- a hundred percent of their network is CVS or 50 percent

20  of their network is CVS."  But it turns out, this customer had

21  many other contract pharmacies below the 30 percent share.  The

22  customer that said:  "I hate to do business with Wellpartner,

23  but I'm forced to do so because I have no other choice," that

24  customer's not even on Exhibit A, just to be clear.

25         So Exhibit A is conservative, because I have evidence,

1    direct evidence, of market power, that, if I could reduce it to

2    admissible evidence, would entitle Sentry to a jury trial.  And

3    that customer is not even appearing on Exhibit A, which is why

4    I say Exhibit A is conservative.

5           So we agree Exhibit A is not perfect.  This is what we

6    have based on publicly available information.  In discovery,

7    we're going to get more granular and more precise and more

8    powerful market share information.  But for the purposes of

9    alleging with plausibility and specificity that there are a

10   appreciable number of buyers that can be forced to deal with

11   Wellpartner because of CVS's market power, I think Exhibit A

12   does the trick.

13          I'd like to talk a little bit about the geographic

14   markets, if I could, Your Honor.  I want to be sensitive to the

15   time we have, but may I be heard on the geographic markets?

16          CVS's motion to dismiss has been a little bit of a

17   moving target.  In their opening brief and in their reply

18   brief, they actually didn't brief the issue about whether we

19   plausibly alleged a local geographic market.  This PowerPoint,

20   which we hadn't seen before this hearing, is the first time

21   they have ever raised this argument.  It cites cases that

22   aren't in the briefs.  So first, we just think it's improper

23   for this document to come in as a surreply at this point.

24          But I'm happy to discuss the principles of geographic

25   market definition explaining why --

1          THE COURT:  Thank you.

2          MR. RENNER:  So geographic market definition involves

3     an analysis of the competitive alternatives available to buyers

4     at any given point in time.  The question is asked:  Where

5     would the buyers look to purchase the relevant service?  And we

6     allege in great detail in the complaint why it is that these

7     markets are local in nature.  If you're a hospital, and you

8     want to provide outpatient pharmaceuticals to your patients,

9     and you're a hospital in Miami, a contract pharmacy in Tampa is

10    not a good substitute because your customers are probably in

11    the Miami area.  Your patients are in the Miami area.  They're

12    going to want to go to a pharmacy that's convenient for them.

13    They're not going to go to Tampa to pick up their medication.

14    So these markets are inherently local in nature, and we allege

15    with specificity and plausibility why this is.

16          So then Mr. Doluisio brings up the Birmingham Cemetery

17    case.  In the Birmingham Cemetery case, if you look at the

18    case, you'll see specifically that the Court faults the

19    plaintiff in that case for not alleging any facts about

20    consumer demand for burial services, in support of the

21    geographic market definition.  But we did that.  We did that.

22    We explained in the complaint why it is that these markets are

23    local in nature because of this dynamic I just explained.  So

24    we have the allegations that are missing in the Birmingham

25    case, which is why we think we've alleged, sufficient at this

53

1   stage, plausible local geographic market.

2        Now, CVS says they're not on notice of what the

3   geographic markets are.  Again, an argument that's not been

4   aired in this case before today.  But the contrary is true.

5   Exhibit A identifies 180 contract pharmacies over whom we

6   allege with plausibility CVS has market power.  It identifies

7   them by city and state, which is more than we would need to do

8   to satisfy our burden to allege local geographic markets at the

9   pleading stage.  I'm happy to make a supplemental submission to

10  Your Honor, if you would like to know more about the case law

11  about alleging local geographic markets at the pleading stage.

12        THE COURT:  I'm comfortable with the case law and I

13  appreciate the argument.

14        MR. RENNER:  Thank you, Your Honor.

15        THE COURT:  Mr. Renner, I want to give you an

16  opportunity to address some of the other claims.  And if I may

17  just ask, because I understand that the judges should not look

18  outside the four corners of the complaint on a motion to

19  dismiss, but the Defendant made a statement in its motion that

20  the contractual relationship was, in fact, terminated with CVS

21  in February of 2018 via the 340B Platform Agreement.

22        MR. RENNER:  That's correct, Your Honor.

23        The parties were, in January and February of this

24  year, trying to get on the same page about having a discussion

25  about this CVS letter that was sent in December.  And as part

54

1   of that, Sentry sent a notice of termination, as it was

2   entitled to do under the agreement, and said:  "We're going to

3   exercise our right to terminate."  CVS got back to us a few

4   days before the expiring of the notice period, which was late

5   January, early February, by this point, and said:  "Can we have

6   a little more time to talk?"  And we said:  "Yes."  So we

7   extended it.  The extension was past the date at which Sentry

8   chose to file the complaint.

9          So yes, we filed the complaint.  At this point, the

10  contract had not been terminated.  There was still room for

11  discussion.  I think at midnight that night there had been no

12  discussion and we terminated pursuant to the notice that we'd

13  given and the extensions that we'd given.

14         THE COURT:  And in your complaint, in Paragraph 50,

15  you state that:  "In 2014, Defendant CVS Pharmacy and Sentry

16  entered into a still valid contract," paren, "the 340B Platform

17  Agreement."

18         So how, if any, would this new development that the --

19  of the termination of the contract affect your claim?

20         MR. RENNER:  Not at all, because the non-disclosure

21  provisions, which is what is the principal gravamen of our

22  breach of contract claim, survived termination.  So the

23  operative portions of the contract that we are alleging had

24  breached are in effect today.

25         THE COURT:  All right.  So it's somewhat of a red

1    herring, so to speak, in terms of the fact that the contract

2    was subsequently terminated?

3              MR. RENNER:  I believe it to be, Your Honor.

4              THE COURT:  All right.  Did you want to address the

5    issues related to the tortious interference?  I'm not certain

6    if there were further arguments you wanted to make in response.

7              MR. RENNER:  Let me make one brief targeted argument.

8    We discussed what happens to the tortious interference claims

9    if the antitrust claim goes away.  And Mr. Doluisio cited

10   Metzler for the proposition that if the antitrust claims go

11   away tortious interference claims do as well.

12             We discussed Brokerage Concepts, the Third Circuit

13   case that we think is directly on point for the facts of this

14   case and stands for the proposition that even if the antitrust

15   claim fails the use of economic leverage in market A to force

16   customers in market B to stop doing business with the Plaintiff

17   is wrongful means under the restatement.  We think Brokerage

18   Concepts is directly on point.  We think it remains good law in

19   the Third Circuit.  The cases cited by the Defendants don't

20   address this part of the Brokerage Concept's opinion.  They

21   cited no case interpreting Brokerage Concepts that goes to this

22   specific point, which is namely whether the use of economic

23   coercion in market A is improper means in market B.  We think

24   that's good law.

25             We also think that Florida follows Section 768 of the

```
 1    restatement.  That's Jay v. Mobley, a case that the parties

 2    cited.  And so I think, when confronted with this fact pattern,

 3    the Court should follow the analysis in Brokerage Concepts.  In

 4    Brokerage Concepts, the Third Circuit said:  I see that

 5    Pennsylvania follows Section 768.  I can read Section 768.  I

 6    see in comment E that it says that the use of economic power in

 7    market A to force customers in market B is defined as improper

 8    means.  I'm going to go ahead and adopt that position.

 9         And so we think a Florida court would rule the same.

10    And so for that reason, although I think the antitrust claim

11    does survive, should survive, even if the antitrust claim

12    fails, Brokerage Concepts and Section 768 allow the tortious

13    interference claims to continue.

14         And that's all I have on the tortious interference

15    claims, unless Your Honor has specific questions.

16         THE COURT:  I don't.  I believe that the parties have

17    done a good job in terms of the briefing.  I don't have

18    questions specific to your allegations.

19         I want to ensure that you have an opportunity to

20    address the third party provision within Section 1 of the 340B

21    Platform.  I know that there was argument made that Wellpartner

22    is not a third party.  Did you want to address that point?

23         MR. RENNER:  Certainly, Your Honor.

24         First, I'll begin by saying even if you accept CVS's

25    argument in this regard, the count doesn't go away because we
```

1    still have claims for the breach of the still valid NDA

2    provisions in that agreement and the others.  So in some way

3    I'm not certain this is an argument that's worth the Court's

4    time, in the sense that it's not going to narrow the issues in

5    the case.  There's no contract that's no longer going to be in

6    the case.  There's no claim that's no longer going to be in the

7    case.  We clearly identify the terms of the contracts that we

8    allege to be breached as including the NDA provisions in

9    various agreements, and CVS just simply didn't move against

10   those.  So I'm happy to discuss it.

11          Two more points.  First of all, this seems an

12   inherently fact-specific issue, unsuitable to a resolution on a

13   motion to dismiss.  I don't know how Your Honor would just

14   interpret the contract, understand based on representations

15   made in court about what Wellpartner does or doesn't do, and

16   find that as a matter of law that the contract can't be read in

17   the way we allege.  So it's inherently fact specific.

18          But third, I'll share my factual theory with you to

19   the extent you're interested.  Under the platform agreement,

20   Sentry was the last mile, if you will, for hospitals that

21   wanted to interact with CVS.  You went through the Backbone

22   agreement.  No matter which administrator you worked with, it

23   was the feeds went into Sentry and then they went to CVS.  So

24   Sentry was serving as the last mile, if you will, in this chain

25   of business relations.  And the platform agreement was not

1    widely ruled out.  We had a number of customers, but it was

2    still -- it was a product that was in process.

3         But now, what's the world today?  The world today is

4    that Wellpartner is the last mile to CVS.  Right?  Now, all

5    contract covered entities that want to work with CVS, they all

6    go through Wellpartner.  So we had a position where, under the

7    platform agreement, Sentry is the exclusive last mile to CVS.

8    And now with Wellpartner, because of the mandate of exclusivity

9    and the requirement of the tie, any hospital that wants to

10   interact with CVS has got to go through Wellpartner.  So we do

11   they think replaced us.  We think that's a similar service to

12   the one we were offering in Backbone.  And so that's my factual

13   theory about why this claim should survive.

14        But again, I don't think you need to reach the issue

15   and I think it's probably not susceptible to resolution at this

16   stage.

17        THE COURT:  I also want to ensure that since you

18   stated yourself in your response that:  "Sentry requests leave

19   to file an amended complaint if any of the parts of the

20   complaint are to be dismissed.  This is especially appropriate

21   because Sentry has obtained additional evidence since the

22   filing of its complaint."

23        Can you advise the Court as to what additional facts

24   you would assert in the complaint that may support the claims

25   that have been made?

59

```
1          MR. RENNER:  Primarily what we had in mind is
2    additional evidence supporting the antitrust and tortious
3    interference claims.  So we would just give one example -- and
4    this has already been filed with the Court in connection with
5    some of the filing that we did for the preliminary injunction
6    motion that we later withdrew.
7          So after we filed the complaint, we received an email
8    from a customer.  And the customer said:  "Please understand
9    that I don't want to terminate my contract with Sentry.  But
10   I'm doing so.  The only reason I'm doing so because is because
11   I need access to CVS."  And then the email goes on to say:  "I
12   agree with you that what CVS is doing is wrong, but I have no
13   choice."
14         Okay.  That email, if it's reduced to admissible
15   evidence, entitles Sentry to a jury trial on both the antitrust
16   and the tortious interference claims.  Right?  You have a
17   covered entity that says:  "I'm forced to do business with CVS.
18   I don't want to do it.  I'm not firing you for any reason other
19   than my need for CVS and I think it's wrong."  So the wrongness
20   expressed in the email, that creates a jury issue of improper
21   means.  So I have that email.  I could put it in the complaint.
22   It's not in the complaint simply because we received it after
23   we filed.
24         You have to remember we filed this very much in real
25   time.  We filed the complaint about a month after this started.
```

1   And so we've received numerous emails that are very consistent

2   with what we have in the complaint since filing.  We've also

3   continued to experience lost business.  Customers are

4   terminating.  Customers are not renewing.  You know, we can add

5   more information about that.  Again, I don't think it's

6   necessary, given --

7           THE COURT:  Well, that's really what I was asking,

8   Mr. Renner, and that is:  Is the amendment to the complaint and

9   the addition of those facts essential to the survivability of

10  any of your causes of action?

11          MR. RENNER:  No.

12          THE COURT:  All right.  Is there anything further?

13          MR. RENNER:  Not from me.

14          Thank you very much for your time, Your Honor.

15          THE COURT:  All right, sir.

16          Mr. Doluisio?

17          MR. DOLUISIO:  Yes.  Thank you, Your Honor.

18          Couple points which I promise I will try and do

19  quickly and hopefully in the order that they were addressed

20  with Mr. Renner.

21          First, on the customer list, if you look at Paragraphs

22  58, 59 and 60, it's very clear.  They allege very clearly that

23  the communication went out to more than just Sentry customers.

24  Paragraph 58 says the communication went out to many of their

25  customers, not all.  59, last sentence says:  "Covered

1    entities, including Sentry's customers.  Generally regard CVS's

2    mandate."  And then 60:  "Wellpartner's sales representatives

3    privately contacted numerous covered entities, including their

4    customers."  So again, the allegation is not that we got their

5    customer list and targeted their customers and used their

6    customer list only.

7         I heard some discussion about the geographic market.

8    But again, we don't know how many markets there are.  We don't

9    know the parameters of them.  We don't know anything.  There

10   was some speculation that maybe it's Miami, maybe it's the city

11   of Miami.  But again, that's not good enough.  I mean, at the

12   pleading stage, they're supposed to allege facts showing the

13   geographic markets.  And if they want to have local markets,

14   they have to identify them.  That's sort of building block

15   number one for market power.

16        There was some statement that we hadn't raised this

17   argument.  The key cases we're relying upon are Kaufman and the

18   Clark case about the burials.  Clark Memorials was cited in our

19   opening brief at Page 8.  Kaufman was cited at Page 8.  In

20   response to our motion, they pointed out:  "Hey, we have local

21   markets."  And in our reply brief, we said:  "You still haven't

22   alleged market power."

23        So you know, I don't know where they're coming up with

24   this idea that we didn't challenge market power or didn't cite

25   the very cases that we're relying upon here.

1    Mr. Renner said in both Jefferson Parish and Metzler

2    both said that direct evidence was good enough.  Both of those

3    cases, the antitrust claim got thrown out because market share

4    was less than 30.  Both.

5    Mr. Renner rightfully said that the Fortner case says

6    that you don't have to show that every customer in a market has

7    been coerced.  That's true.  That's true.  But you have to

8    allege facts showing that customers in each market have.

9    So again, they seem to be playing a game here.  They

10   say:  "There's local markets.  We're not going to tell you what

11   they are.  There's local markets.  But I have people somewhere

12   in the country.  And as long as those five people say they were

13   coerced, that satisfies every local market," and that's just

14   not -- that's just not right.  Kaufman expressly says you have

15   to show facts for each market.  They're suing our client for

16   antitrust -- you know, for tying.  They can't just sort of say:

17   "A couple of people are upset somewhere.  We get to proceed."

18   And I think that it's sort of amazing that Mr. Renner

19   is saying:  "I have an email.  That gets me to a jury."  One

20   email gets me to a jury?  I just don't think that's the law at

21   all.  I think he's skipping a lot of different steps along the

22   way.

23   So one last comment on the breach of contract claim.

24   Mr. Renner -- I said that the claim with regard to the

25   exclusivity provision should fail because Sentry does not

1    allege that Wellpartner provides a Backbone.  Mr. Renner didn't

2    say:  "Yes.  They do.  We allege they provide a Backbone.

3    Here's paragraph whatever of the complaint."

4            Instead, he has some theory about who's the last mile.

5    That's what the contract talks about.  It's not:  You get to be

6    the last mile.  And if anyone else comes along, they get to be

7    a different sort of last mile.  That's a breach of contract?

8    No.  The contract talks about a specifically defined service,

9    Backbone services.  And they don't allege that Wellpartner

10   provides those services.

11           So with that, Your Honor, unless you have any

12   questions, I really, really appreciate the time you've taken.

13           THE COURT:  Just looking at my notes.

14           We didn't address sufficient enforcer, but I believe

15   that the Court is satisfied.  I'm not certain, Mr. Renner, if

16   you wanted an opportunity to respond to the claim with regard

17   to Wellpartner's providing a Backbone service.  Did you want

18   to?

19           MR. RENNER:  Your Honor, same point that I raised

20   before.  You would need some discovery to understand what the

21   scope of the services that are being offered and the intent of

22   the parties who are contracting and the correct construction of

23   that contract term.  This is just not a claim that's

24   susceptible to resolution on a motion to dismiss.

25           With respect to efficient enforcer, the Phoebe Putney

1    case says an excluded rival in a tying claim is a efficient

2    enforcer.  Right?  And the fact that Mr. Doluisio thinks that

3    the hospitals would be better plaintiffs, that doesn't show

4    that Sentry is not also an efficient enforcer.  Both consumers

5    and competitors typically have standing.  And here, in this

6    market, where there's evidence that the hospitals are being

7    coerced by CVS against their will, there's every reason to

8    think the hospitals won't file suit against CVS, which is what

9    the Eleventh Circuit, in Phoebe Putney, identified as a factor

10   that made the excluded rival an especially efficient enforcer

11   of the antitrust laws.  So, too, here.

12          THE COURT:  Are you still making that claim or would

13   you concede, since Wellpartner appears to be a direct

14   competitor of Sentry, that it would be an efficient enforcer?

15          MR. DOLUISIO:  I don't have anything above in our

16   brief to say anything on it, Your Honor.

17          Thank you.

18          THE COURT:  I want to thank the parties for taking the

19   time to educate the Court.  Your briefs were excellent.  And I

20   appreciate the thoroughness of your presentations this morning.

21   Thank you for the time that you have given to the Court.

22          Have a good afternoon.

23          I will certainly prepare a written order very shortly.

24          MR. DOLUISIO:  Thank you, Your Honor.

25          MR. RENNER:  Thank you, Your Honor.

1            MS. MCQUILKIN:  Thank you, Your Honor.

2            THE COURT:  Good to see each of you.

3            MS. MCQUILKIN:  Thank you.

4        (Proceedings concluded at 10:52 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    UNITED STATES OF AMERICA        )

2    ss:

3    SOUTHERN DISTRICT OF FLORIDA  )

4                        C E R T I F I C A T E

5            I, Yvette Hernandez, Certified Shorthand Reporter in

6    and for the United States District Court for the Southern

7    District of Florida, do hereby certify that I was present at

8    and reported in machine shorthand the proceedings had the 19th

9    day of July, 2018, in the above-mentioned court; and that the

10   foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.

12           I further certify that this transcript contains pages

13   1 - 66.

14           IN WITNESS WHEREOF, I have hereunto set my hand at

15   Miami, Florida this 20th day of July, 2018.

16

17                       /s/Yvette Hernandez
                         Yvette Hernandez, CSR, RPR, CLR
18                       Certified Shorthand Reporter
                         400 North Miami Avenue, 10-2
19                       Miami, Florida 33128
                         (305) 523-5698
20                       yvette_hernandez@flsd.uscourts.gov

21

22

23

24

25
```