**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-60257-BLOOM/Valle**

SENTRY DATA SYSTEMS, INC.,

          Plaintiff,

v.

CVS HEALTH, CVS PHARMACY, INC.,
WELLPARTNER INC., and
WELLPARTNER, LLC,

          Defendants.

_____/

**<u>ORDER</u>**

**THIS CAUSE** is before the Court upon Defendant CVS Pharmacy, Inc. ("CVS")'s Motion and Incorporated Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's Claims, ECF No. [43] ("Motion"), filed on March 13, 2018.  The Court heard oral argument on the Motion on July 19, 2018.  ECF No. [111]; *see also* Oral Argument Transcript, ECF No. [112]. The Court has reviewed Motion, the record, and is otherwise fully advised.

**I.     FACTUAL BACKGROUND**

Plaintiff Sentry Data Systems, Inc. ("Sentry" or "Plaintiff" ) is a developer and provider of information technology systems that assist certain hospitals and hospital-like entities—which the parties refer to as "covered entities"—in monitoring compliance with a federal drug pricing program, the 340B Program.  ECF No. [1] ¶ 1; *see also* Public Health Services Act, 42 U.S.C. § 256b.  The 340B Program allows hospitals that serve a disproportionate share of low-income patients to buy certain outpatient drugs at a discount, but seek reimbursement through the patient or a third-party payer at a non-discounted price, thereby providing an additional revenue stream for the hospital.  *Id.* ¶ 14.  The program helps a participating hospital defray other operating

losses, including costs incurred by providing care to under- or uninsured patients. *Id.* ¶ 15.  Drug manufacturers participating in Medicaid are required to participate in the 340B Program.  *Id.* ¶ 14.

In order for a hospital to participate in the program, it must register with the Health Resources and Services Administration ("HRSA") and comply with multiple reporting and auditing requirements to insure that the covered entity is operating within the restrictions of the 340B Program. *Id.* ¶¶ 16–17, 19–23.  This is where Plaintiff Sentry comes in. *Id.* ¶ 24.  Sentry has developed tracking software to assist covered entities in managing their prescription inventory, tracking reimbursements and rebates, and maintaining records of eligible drugs and patients. *Id.* ¶¶ 36–40.  Sentry's products further help covered entities comply with self-auditing requirements of the 340B Program, as well as respond to reporting inquiries from HRS. *Id.*

For both cost and convenience, most hospitals do not dispense the 340B Program drugs themselves. *Id.* ¶¶ 25, 26–27, Rather, they contract with certain pharmacies to dispense prescribed 340B Program outpatient medication. *Id.*  A covered entity may contract with several "contract pharmacies" to dispense its 340B Program-eligible drugs. *Id.*  Thus Sentry, and 340B administrators like it, provide tracking software to their covered entity customers and serve as a conduit of information between the covered entity and the contract pharmacy. *Id.* ¶ 25.  Defendant CVS is one of these contract pharmacies.

According to the Complaint, since 2007, Sentry has not only provided its tracking software to its covered entity customers, but also worked directly with CVS to develop contracts between CVS and covered entities, improve CVS's operational procedures, and develop proprietary software programs for CVS. *Id.* ¶¶ 41–45.  During this process, CVS was given a "front-row seat to Sentry's core business model and internal business methods . . . ," subject to

several confidentiality, non-disclosure, and non-compete agreements. *Id.* ¶¶ 46–53. In this capacity for CVS, Sentry also worked with Wellpartner, Inc. ("Wellpartner"), a competitor 340B administrator, to provide CVS with operational and software support for administering CVS's side of the 340B Program where Wellpartner served as the 340B administrator. *Id.* ¶ 54. As part of this arrangement, Wellpartner and Sentry also entered into several non-disclosure and confidentiality agreements. *Id.* ¶¶ 56-57.

On December 18, 2017, CVS announced that it had acquired Wellpartner and that all covered entities seeking to maintain CVS as a contract pharmacy must use Wellpartner for their 340B tracking and program administration by December 31, 2018. *Id.* ¶ 58. Specifically, the announcement stated:

> CVS Health has completed an acquisition of Wellpartner, Inc., a leading provider of 340B program management solutions. Wellpartner has a reputation for industry leading technology solutions, excellent Health Resources & Service Administration (HRSA) compliance record, and consistently high levels of customer satisfaction, making it an excellent fit for CVS Health.
>
> Over the last two years, CVS Health has significantly expanded its 340B contract pharmacy program to include hundreds of covered entities (CEs) and thousands of pharmacies across the country. This increased scale and complexity has driven a need to focus on a single administrator to help insure optimal results for our CEs.
>
> …
>
> In addition, by having Wellpartner as the exclusive 340B program administrator for all CVS Health retail and specialty pharmacies, we will also eliminate the restriction of limiting one CVS Pharmacy location to one administrator per CE, enabling us to offer clients expanded access to all CVS Pharmacy locations.
>
> **To ensure all clients benefit from these enhancements, we will transition all covered entities to Wellpartner by December 31, 2018.**

**...**

> **Account teams will contact you to discuss next steps and
> answer any questions about the integration and transition, and
> continue providing future updates.**

ECF No. [1-11] at 2 (emphasis in original); *see also* ECF No. [1] ¶ 58.  In furtherance of this announcement, representatives from Wellpartner reached out individually to covered entities, including entities listed on Sentry's confidential customer lists that had been shared with CVS subject to the confidentiality and non-disclosure agreements.  ECF No. [1] ¶ 64.

According to the Complaint, CVS's announcement effectively displaced Sentry as the 340B program administrator for at least some of its clients which relied heavily on CVS.  *Id.* ¶ 61.  At least fifty-six Sentry customers were contacted by CVS or Wellpartner and expressed to Sentry that they felt forced or coerced to switch to Wellpartner and terminate their relationship with Sentry or not renew their Sentry contracts.  *Id.*  One customer stated that it felt "handcuffed" by the announcement, while another stated that it had "little choice" but to switch to Wellpartner.  *Id. ¶* 63.

Plaintiff alleges that through this process, CVS misappropriated Sentry's trade secrets, including its customer lists and proprietary software to target Sentry customers to switch to Wellpartner and pitch a seamless transition from Sentry's system to Wellpartner.  *Id.* ¶¶ 64-65.  Specifically, Plaintiff alleges that when CVS reached out to Sentry customers, it misappropriated the customer lists and breached the non-disclosure and confidentiality agreements.  *Id.*  Plaintiff further alleges that CVS misappropriated Sentry's proprietary software and trade secrets in developing a platform that would allow an efficient switch for Sentry's customers between Sentry's product and Wellpartner's platform in violation of the confidentiality and non-disclosure agreements.  *Id.*

## II.     PROCEDURAL POSTURE

Based on these allegations, Plaintiff alleges nine causes of action: unlawful tying in violation of 15 U.S.C. § 1 (Count I); violation of Florida's Deceptive and Unfair Trade Practices Act (Count II); breach of contract (Count III); tortious interferences with contract (Count IV); tortious interference with business relationships (Count V); misappropriation of trade secrets in violation of 18 U.S.C. § 1836 and Fla. Stat. § 688.002 (Counts VI–VII); Florida common law conversion of confidential information and proprietary information (Count VIII); and Florida common law unfair competition (Count IX).

CVS moved to dismiss all nine counts in the Complaint on March 13, 2018.  ECF No. [43].  Sentry filed an opposition to the Motion on March 27, 2018, ECF No. [56], and CVS filed a reply on April 3, 2018, CF No. [62].  After several reschedulings, the Court held oral argument on the Motion on July 19, 2018.  ECF No. [111].  The Court now addresses the Motion.

## III.     LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,' " meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a court must accept well-pleaded factual allegations as true, "conclusory allegations ... are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010). "[T]he pleadings are construed broadly," *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint are viewed in the light most favorable to the plaintiff,

*Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1270 (11th Cir. 2016). The question is not whether the claimant "will ultimately prevail ... but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

### IV.    ANALYSIS

#### A.  UNLAWFUL TYING UNDER SECTION 1 OF THE SHERMAN ACT (COUNT I)

##### 1.  Antitrust Standing

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  Section 4 of the Clayton Act creates a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15(a), and this private right of action includes violations of Section 1 of the Sherman Act.  Read literally, Section 1 would "encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation," *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529 (1983).  Thus, "courts require parties to show that they are the proper plaintiffs to vindicate the public's interest in enforcing the antitrust laws." *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1298 (11th Cir. 2010)  The standing required is "referred to as 'antitrust standing,' " *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.,* 797 F.3d 1248, 1273 (11th Cir. 2015), and is a prudential consideration "aimed at preserving the effective enforcement of the antitrust laws" that goes beyond the requirements of Article III "case or controversy" standing.  *Palmyra*, 604 F.3d at 1299 (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991)).  "Antitrust standing is best understood

6

in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *Todorov*, 921 F.2d at 1448 (citations omitted).

The Eleventh Circuit has instructed the district courts to employ a two-prong test for antitrust standing. First, the plaintiff must allege both a violation of the antitrust laws resulting in "antitrust injury," defined as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 489 (1977). "The antitrust injury requirement ensures that the plaintiff, although motivated by private interests, is seeking to vindicate the type of injury to the public that the antitrust laws were designed to prevent." *Palmyra*, 604 F.3d at 1299 (citing *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389–90 (11th Cir. 1990)).

Second, the plaintiff must allege facts sufficient to show that it is an "efficient enforcer" of the antitrust laws, *Palmyra*, 604 F.3d at 1299, such that the "particular plaintiff will efficiently vindicate the goals of the antitrust laws." *Todorov*, 921 F.2d at 1452. Courts consider a non-exhaustive list of factors in determining whether a plaintiff would be an efficient enforcer: the directness or indirectness of the injury, the remoteness of the injury, whether other potential plaintiffs are better suited to vindicate the harm, whether the damages are highly speculative, the extent to which the apportionment of damages is highly complex and would risk duplicative resources, and whether the plaintiff would be able to efficiently and effectively enforce the judgment. *Id.*; *see also Associated General*, 459 U.S. at 537–46.

CVS moves to dismiss Sentry's claim for unlawful tying under the Sherman Act. CVS first argues that Sentry is unable to show antitrust injury precluding its tying claim. However, at oral argument, Defendant recognized that the allegations in the Complaint may be sufficient under the standard articulated in *Palmyra. See* ECF No. [112] at 7-8. The Court agrees that the

allegations of the Complaint are sufficient to demonstrate antitrust standing at this stage to survive a motion to dismiss.  Sentry alleges that CVS's influence as a contract pharmacy allows it to leverage that power to force covered entities to purchase 340B administration services from CVS.  Sentry further alleges that CVS's requirement that covered entities must use Wellpartner as their 340B administrator in order to use CVS as a contract pharmacy will cause injury in the market by forcing hospitals to choose Wellpartner over other 340B administrators and pay higher fees for the services currently provided by Sentry and its competitor 340B administrators.  *See* ECF No. [1] ¶¶ 32, 40, 59, 63, 72, 74, 77–78.  These allegations are sufficient to allege antitrust injury.

Moreover, in applying the non-exhaustive factors to the allegations in the Complaint, Sentry has sufficiently alleged that it is an efficient enforcer of the antitrust laws.  Sentry is a direct competitor of Wellpartner.  As a result of the tying arrangement, Sentry's customers have been coerced to decline to renew their contracts with Sentry or to breach the Sentry contracts to switch to Wellpartner.  Sentry alleges that it has suffered injury in both losses of current clients under contract and current clients who may have, but for the CVS's requirement, continued to use Sentry.  Thus, Sentry both has a strong incentive to sue, damages which are not highly speculative, and, as a player in the 340B administrator market, the ability to efficiently and effectively enforce any judgment it may obtain.  Accordingly, Sentry is an efficient enforcer and has antitrust standing to pursue its claims.  *Palmyra*, 604 F.3d at 1303–06.

### 2.  Antitrust Violation and the Relevant Market

Since the Court has determined that Plaintiff has antitrust standing, it now must determine whether Plaintiff has sufficiently alleged a violation of the antitrust laws in the relevant market.  "A tying arrangement is an agreement by a party to sell one product but only on

the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak*, 504 U.S. at 461–62 (citation and internal quotation marks omitted). "A tying arrangement violates § 1 of the Sherman Act if the seller has market power and the tying arrangement affects a substantial volume of commerce in the tied product market." *Palmyra*, 604 F.3d at 1296 n.4.

The Eleventh Circuit has noted that "the essence of illegality in a tying arrangement is the wielding of monopolistic leverage [by which] a seller exploits his dominant position in one market to expand his empire into the next." *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1284 (11th Cir. 1982) (citation omitted) (quoting *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 611 (1953)). Thus, the plaintiff must demonstrate that the seller of the products "forced or coerced the buyer into purchasing the tied product" that "he did not want or would have preferred to buy elsewhere on other terms." *Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1415–16 (11th Cir. 1987); *see also Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (noting the "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms"). Specifically, a plaintiff must allege five elements to state a tying agreement: "(1) a tying and a tied product; (2) evidence of actual coercion by the seller that in fact forced the buyer to purchase the tied product; (3) that the seller [has] sufficient market power in the tying product market to force the buyer to accept the tied product; (4) anticompetitive effects in the tied market; and (5) involvement of a not insubstantial amount of interstate commerce in the tied product market." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758

F.2d 1486, 1502–03 (11th Cir. 1985).

Plaintiff does not allege a *per se* tying claim. *See* ECF No. [1] ¶¶ 71–77. Thus, as a threshold issue, before the Court may analyze whether Sentry has adequately alleged a tying claim, the Court must first determine whether Sentry adequately pleaded the relevant market in which that alleged violation occurred. *Jacobs v. Tempur–Pedic Int'l, Inc.*, 626 F.3d 1327, 1337 (11th Cir. 2010); *see also Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. at 29; *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991). Section 1 plaintiffs must define both (1) a geographic market and (2) a product market. *Jacobs*, 626 F.3d at 1336 (11th Cir. 2010). Although the parameters of the relevant market are generally considered a question of fact, a plaintiff "still must present enough information in [its] complaint to plausibly suggest the contours of the relevant geographic and product markets." *Id.* (citing *Thompson*, 934 F.2d at 1573). With respect to the geographic market, a plaintiff must plead a geographic market that "correspond[s] to the commercial realities of the industry[, is] economically significant . . . and include[s] the area in which consumers can practically seek alternative sources of the product." *Q Club Resort & Residences Condo. Ass'n, Inc v. Q Club Hotel, LLC*, No. 09-CV-60911, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010) (citations omitted). "Rule 12(b)(6) dismissal is appropriate where the plaintiff's description of the geographic market is legally inadequate and/or wholly conclusory." *Id.* (collecting cases)

Here, Sentry has failed to articulate a relevant geographic market. Sentry alleges facts which appear to seek to define a relevant geographic market as the entire United States, including allegations related to the national roles of covered entities, contract pharmacies, and 340B administrators in the federal 340B Program. Moreover, the Complaint alleges that CVS has approximately 23.88% of the U.S. retail pharmacy market and cites numerous statistics citing

CVS's national footprint.  *See e.g.*, ¶¶ 27–29, 32.  However, Plaintiff also cites to CVS's role in smaller, local markets and pleads that it has a "dominant position in many regional retail pharmacy markets." *Id* ¶ 30.  The Complaint similarly alleges that "CVS disclosed that it operated in "98 of the top 100 United States drugstore markets" and held "the number one or number two market share in 93 of these markets." *Id.* ¶ 29.  Further, the Complaint alleges that CVS controls "over 50 percent of the retail pharmacy market" in Washington DC, as well as three different cities: Boston, Providence and Honolulu.  *Id.*

As to the contract pharmacy market, the Complaint alleges that "CVS makes up 30 percent or more of the contract pharmacies in Maryland and Washington DC, and over 40 percent of the contract pharmacies in the Metropolitan Statistical Areas [] comprising Wilkes-Barre, Scranton, Harrisburg and Carlisle, Pennsylvania." *Id.* ¶ 30.  Separately, the Complaint also alleges that CVS garners a large proportion of the contract pharmacy business from certain individual covered entities.  *Id.* ¶ 35, 63; *see also* Exhibit A, ECF No. [1-1].  According to the Complaint, "CVS has market power in the provision of 340B contract pharmacy services to specific covered entities in local relevant geographic markets across the country." *Id.* ¶ 75.  The Complaint alleges specific instances of individual customers of Sentry expressing that they felt forced or coerced to switch from Sentry's 340B administration product to that of Wellpartner. ECF No. [1] ¶ 60–61, 72–74, 77.

While each of these allegations may demonstrate CVS's power, leverage, and influence over some individual covered entities, some contract pharmacy markets, or some retail pharmacy markets in certain cities, groups of cities, or states, the allegations do not plausibly suggest the

contours of the relevant geographic market as required for a tying claim.[1]  While Sentry notes in

its opposition to the motion to dismiss that "CVS has a high share of the 340B pharmacy market

in specific geographic regions around the country, and a high share of the 340B pharmacy

networks of over 180 identified covered entities," ECF No. [56] at 14, this does little to clarify

exactly what geographic market Sentry is alleging is relevant to its Section 1 claim.  Sentry

attempts to clarify in its opposition that "the relevant markets in this case are local, not national,"

*id.*, but only points the Court to its allegations in the Complaint that evince that "CVS has a high

share of specific local markets around the country" and that for a select 180 covered entities,

CVS provides a high percentage of their contract pharmacy business.  *Id.* at 1; *see also* Exhibit

A, ECF No. [1-1].  At oral argument, Sentry reiterated this point, stating that the "markets are

local in nature."  ECF No. [112] at 52.  Thus, while the Court recognizes that "market power

over the tying product can be sufficient even though the seller does not dominate the market or

the seller only exercises the power with respect to some of the buyers in the market," *Tic-X-*

*Press*, 815 F.2d at 1420, that does not relieve Plaintiff from the threshold requirement that it

allege a relevant geographic market.  Taking the allegations as true in the Complaint, Plaintiff

has failed to clearly allege a relevant geographic market.  Because failure to plead a relevant

geographic market is fatal to Plaintiff's Section 1 claim, the Court dismisses it without prejudice.

## B.  BREACH OF CONTRACT (COUNT III)

Plaintiff's third cause of action alleges that CVS breached several of the agreements that

the parties entered into from 2007 until the filing of the Complaint, including the 340B Platform

---

[1] The Court notes that Sentry argued at oral argument that CVS raised the issue of the relevant geographic
market for the first time at oral argument.  However, because the parties had ample opportunity at the
hearing to argue the issue before the Court, the Court properly considers this threshold inquiry here. *See*
ECF No. [112].

Agreement (ECF No. [27-2], filed under seal), the CVS Mutual Non-Disclosure Agreement (ECF No. [27-1], filed under seal), the 340B Backbone Agreement (ECF No. [27-3], filed under seal), and the Wellpartner Mutual Non-Disclosure Agreement (ECF No. [27-4], filed under seal). ECF No. [1] ¶¶ 86–89.  Sentry alleges that it performed each of its obligations under these agreements, Defendant breached these agreements, and Plaintiff has been damaged.

Defendant does not move to dismiss Plaintiff's breach of contract claims premised on a breach of the CVS Mutual Non-Disclosure Agreement, the 340B Backbone Agreement, or the Wellpartner Mutual Non-Disclosure Agreement.  *Cf.* ECF No. [1] ¶¶ 87–89, 92–94 *with* ECF No. [43] at 16–17.  Accordingly, the Court need only address Defendant's Motion as to the 340B Platform Agreement.

Plaintiff alleges that Defendant breached the contract when it began using Wellpartner, and not Sentry, as its 340B administrator in violation of the exclusivity provisions that CVS agreed to in the 340B Platform Agreement.  *Id.* ¶ 86.  Under paragraph 1 of the 340B Platform Agreement, "Exclusive Appointment," the parties agreed that:

> Pharmacy [CVS] hereby appoints Sentry as the sole and exclusive 340B Platform Software Services Provider for Pharmacy, and Sentry hereby accepts such appointment for the Term (as defined below) of this Agreement.  Accordingly, during the Term of this Agreement, Pharmacy shall neither enter into any contract, or similar arrangement for the Services with any third party other than Sentry, nor appoint any other third party as the 340B Platform Software Services Provider for the Pharmacy.

ECF No. [27-2] at 2.  The 340B Platform Agreement defines the "Term" as two years beginning on July 9, 2014, with automatic renewals every year unless either party provides notice of termination ninety days prior to renewal.  *Id.* at 3. The 340B Platform Agreement also prohibits disclosure of confidential information, defined as "any information that is disclosed by one party

to the other party under this Agreement . . . ." to any third-party with certain exceptions not pertinent to the allegations in the Complaint.  *Id.* at 3-4.   Plaintiff thus alleges that Defendant breached the 340B Platform Agreement by using third-party Wellpartner as its 340B administrator and by sharing confidential information exchanged under the 340B Platform Agreement with third-party Wellpartner.  ECF No. [1] ¶ 92.

In its Motion, Defendant argues that Wellpartner is not a "third-party" and Plaintiffs breach of contract claim fails as a matter of law.  ECF N0. [43] at 16.  Defendant further argues that, even if Wellpartner was considered a third-party, Wellpartner is not offering the same services as those contemplated in the 340B Platform Agreement.  *Id.* 16–17.  However, based on a plain reading of the 340B Platform Agreement and the allegations in the Complaint, the Court does not find that Wellpartner—a separate legal entity and competitor of Sentry—could not be considered a "third-party" under the 340B Platform Agreement.  Moreover, Sentry has further alleged that Wellpartner is offering the platform services contemplated under the 340B Platform Agreement.  ECF No. [1] ¶ 92. Because Plaintiff has alleged a contract, breach, and damages, [2] Plaintiff has plausibly alleged a breach of the 340B Platform Agreement.

---

[2] Defendant also argues that Plaintiff's breach of contract claim fails because Plaintiff has failed to allege damages.  However, in support of this argument, Defendant cites to *Hartford Steam Boiler Inspection & Ins. Co. v. Brickellhouse Condo. Ass'n, Inc.*, No. 16-CV-22236, 2016 WL 5661636 (S.D. Fla. Sept. 30, 2016), where the district court dismissed a breach of contract claim when the plaintiff failed to "allege that it has been damaged in any way by that breach."  *Id.* at *2.  Because Sentry has alleged that it was damaged, the Court finds the allegations in the Complaint distinguishable.  *See* ECF No. [1] ¶ 64, 69, 96.

### C.  MISAPPROPRIATION OF TRADE SECRETS (COUNTS VI AND VII) AND PREEMPTION OF STATE LAW CLAIMS

CVS moves to dismiss Sentry's state and federal misappropriation of trade secrets claims

for failure to state a claim and moves to dismiss certain state law claims as preempted by the

Florida Uniform Trade Secrets Act ("FUTSA").[3]  The Court will first address whether Plaintiff

has stated a claim for misappropriation of trade secrets and then will address preemption.

### 1.  The Defend Trade Secrets Act, 18 U.S.C. § 1836, and Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001–009

Under the Defend Trade Secrets Act, 18 U.S.C. § 1836, "[a]n owner of a trade secret that

is misappropriated may bring a civil action under this subsection if the trade secret is related to a

product or service used in, or intended for use in, interstate or foreign commerce."  *Id.*  A "trade

secret" under the DTSA is defined broadly as follows:

> [A]ll forms of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if–
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3) (2016).  A trade secret is "misappropriated" by, *inter alia*, "disclosure or use

---

[3] Specifically, Defendant moves to dismiss Counts II, VIII, and IX in their entirety and Counts IV and V to the extent they are based on misappropriation of trade secrets.

of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C.A. § 1839(5)(B)(ii)-(iii).

A plaintiff bringing a claim under the DTSA must plausibly allege that it (i) "possessed information of independent economic value" that (a) "was lawfully owned by" the plaintiff and (b) for which the plaintiff "took reasonable measures to keep secret," and (ii) the defendant "used and/or disclosed that information," despite (iii) "a duty to maintain its secrecy." *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, No. 8:18-CV-230-T-24MAP, 2018 WL 3751288, at *3 (M.D. Fla. July 30, 2018) (citing *Primo Broodstock, Inc., v. Am. Mariculture, Inc.*, 2017 WL 1502714, at *11 (M.D. Fla. Apr. 27, 2017) and *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)).

Similarly, FUTSA provides a cause of action for the misappropriation of trade secrets. Fla. Stat. §§ 688.001–009. "To prevail on a FUTSA claim, a plaintiff must demonstrate that (1) it possessed a 'trade secret' and (2) the secret was misappropriated." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, -- F.3d.--, No. 17-11176, 2018 WL 3734344, at *9 (11th Cir. Aug. 7, 2018) (citing *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 853 (11th Cir. 2017). Under FUTSA, a "trade secret" is:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure

> or use; and (b) Is the subject of efforts that are reasonable under
> the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4). "Misappropriation" includes the "[d]isclosure or use of a trade secret of

another without express or implied consent by a person who . . . [a]t the time of disclosure or

use, knew or had reason to know that her or his knowledge of the trade secret was . . . [a]cquired

under circumstances giving rise to a duty to maintain its secrecy or limit its use; or [d]erived

from or through a person who owed a duty to the person seeking relief to maintain its secrecy or

limit its use . . . ."  Fla. Stat. § 688.002(2).   "Information that is generally known or readily

accessible to third parties cannot qualify for trade secret protection."  *Am. Red Cross v. Palm

Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998).

       Sentry alleges that CVS had access to Sentry's trade secrets, including its proprietary

customer lists and proprietary data specifications, operational documentation, internal processes

and procedures organizing and transferring data between covered entities and pharmacies.  ECF

No. [1] ¶ 111, 120.  Sentry further alleges that it derives significant economic value from these

trade secrets and took reasonable steps to protect them, including requiring CVS to sign

confidentiality and non-disclosure agreements. These trade secrets were thus subject to a duty of

confidentiality but were disclosed to another—Wellpartner—in order to compete with Sentry. *Id.*

¶¶ 47, 111, 114–17. 122–26.

       In its Motion, CVS first argues that Sentry's customer lists are not protectable as a trade

secret because they are publically available.  "Under Florida law, customer lists are generally

considered trade secrets provided: (1) the list was acquired or compiled through the industry of

the owner of the list and is not just a compilation of information commonly available to the

public; and (2) the owner shows that it has taken reasonable efforts to maintain the secrecy of the

information." *Digital Assurance Certification, LLC v. Pendolino*, No. 6:17-CV-72-ORL-31TBS, 2017 WL 320830, at *2 (M.D. Fla. Jan. 23, 2017) (collecting cases).   Sentry alleges that it compiled its customer lists through "considerable effort, knowledge, time, and expense to identify covered entities interested in participating in the 340B program, and in understanding and identifying their capabilities and needs."  ECF No. [1] ¶ 47.  Defendant argues in its Motion that the customer list is openly available, pointing the Court to the HRSA website which allows a user to search a database of all participants in the 340B program.  ECF No. [43] at 18.  However, this does little to defeat Sentry's claim that Defendant misappropriated its curated customer list since the information reflected in Sentry's customer list, including which covered entities use Sentry as its 340B administrator, is not readily available through the HRSA website.  ECF No. [112] at 27.

Second, Defendant argues that Plaintiff has failed to plead with the requisite specificity the additional trade secrets—other than the customer list—that it alleges were misappropriated. While a "plaintiff is required to identify with reasonable particularity the trade secrets at issue before proceeding with discovery . . .  to satisfy this requirement at the dismissal stage in federal court, the plaintiff need only allege sufficient facts to plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret."  *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 848 (11th Cir. 2016) (per curiam).  Sentry specifically alleges that it shared trade secrets including its Pharmacy Services Agreement template, proprietary software programs for administering the 340B program, "proprietary configurations and data specifications of Sentry's software in order to submit properly formatted data to Sentry for processing on behalf of CVS," "proprietary configurations and data specifications of Sentry's 340B software, as embodied in the Operational Documentation," and

certain customizations of the Backbone technology.  *Id.* ¶¶ 43–45, 55, 67, 68.  These allegations provide sufficient specificity regarding the trade secrets that form the basis of Sentry's misappropriation claims.

Finally, Defendant argues that Plaintiff failed to adequately allege misappropriation because there are "no credible allegations even suggesting why or how CVS would have used such information . . . ."  ECF No. [43] at 20.  However, in evaluating the sufficiency of the pleadings, the "credibility" of the allegations is irrelevant.  Taking the allegations as true, Sentry has alleged that Defendants misappropriated these trade secrets by using the confidential customer lists to call Sentry customers to persuade them to switch to Wellpartner and by using the trade secret information to develop the Wellpartner platform so that it was compatible with Sentry's platform to promote a seamless transition of Sentry's customers to Wellpartner.  At this stage, these allegations are sufficient.

### 2.  Preemption

Section 688.008 of FUTSA "displace[s] conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret."  Fla. Stat. § 688.008(1).  FUTSA, however, does not preempt "other civil remedies that are not based upon misappropriation of a trade secret" or "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret."  *Id.* § 688.008(2).  To determine whether allegations of trade-secret misappropriation preempt a plaintiff from sufficiently pleading a separate, but related tort, the Court must evaluate "whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred by § 688.008."  *Allegiance Healthcare Corp. v. Coleman*, 232 F. Supp. 2d 1329, 1135-36 (S.D. Fla. 2002) (citation omitted).  Thus, "a plaintiff's separate tort claim is preempted by FUTSA if there is no 'material distinction'

between the plaintiff's FUTSA claim and the other allegation.  *Gonzalez-Hernandez v. Orbay*, No. 08-21782-CIV, 2009 WL 10668626, at *2 (S.D. Fla. Jan. 15, 2009) (quoting Allegiance, 232 F. Supp. 2d at 1336).

Here, Plaintiff's claims for violation of Florida's Deceptive and Unfair Trade Practices Act (Count II), Florida common law conversion of confidential information and proprietary information (Count VIII), and Florida common law unfair competition (Count IX), each re-allege all the prior allegations of the Complaint and are based on the "conversion" or "tak[ing]" of the same trade secrets and proprietary information as the misappropriation of trade secrets claims. *See* ECF No. [1] ¶¶ 80, 129, 137.  Since the misappropriation of the trade secret comprises the underlying wrong for each of Counts II, VII, and IX,  each of these causes of action is preempted by FUTSA.

In addition, Defendant moves to dismiss Plaintiff's tortious interference with contract claim (Count IV) and tortious interference with business relationships claim (Count V) as preempted.  However, the "allegations of trade secret misappropriation alone" do not comprise the underlying wrong in these Counts.  While both Counts IV and V rely on misappropriation of trade secrets and confidential information as the "improper means," ECF No. [1] ¶¶ 90–102, 104–09, the factual underpinnings of these claims are sufficiently distinct from Plaintiff's misappropriation of trade secrets claims such that they are not preempted.  *See Gonzalez-Hernandez*, 2009 WL 10668626, at *2.

### D.  TORTIOUS INTERFERENCE (COUNTS IV AND V)

Under Florida law, "[t]he elements of tortious interference with a business relationship are '(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the

defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.' " *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1279 (11th Cir. 2015). The "intentional and unjustified" inquiry is "fact-intensive . . . [and] requires an examination of the defendant's conduct, its motive, and the interests it sought to advance." *Id.* (internal citations omitted). However, under Florida law, a plaintiff alleging tortious interference must allege that Defendant employed some improper means in order to survive dismissal.

Sentry alleges that it had valid exclusive contracts with its customers, that CVS knew about these contracts, and that CVS intentionally and unjustifiably interfered with these contracts using Sentry's trade secrets and confidential information to coerce Sentry's customers to breach their existing contracts or fail to renew expiring contracts. ECF No. [1] ¶¶ 98–102, 104–109. Sentry further alleges that certain business relationships which were in the negotiation process were stalled or prevented from being finalized based on CVS's interference. Id. ¶ 105. Taking these allegations as true, Plaintiff has adequately pleaded its tortious interference claims.

## V.      CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1.  The Motion, **ECF No. [43]**, is **GRANTED IN PART AND DENIED IN PART.**

2.  **COUNT I** is **DISMISSED WITHOUT PREJUDICE.**

3.  **COUNTS II, VIII, and IX** are **DISMISSED WITH PREJUDICE** based on preemption.

4.  The Motion is **DENIED** as to **COUNTS III-VII.**

5.  Plaintiff is **GRANTED LEAVE TO REPLEAD COUNT I.**  Plaintiff shall **FILE** its Amended Complaint on or before **September 10, 2018.**

Case No. 18-cv-60257-BLOOM/Valle

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of August, 2018.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

22