IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SENTRY DATA SYSTEMS, INC.<br><br>                         Plaintiff,<br><br>      v.<br><br>CVS PHARMACY, INC., and<br>WELLPARTNER, LLC,<br><br>                  Defendants. | **Case No. 18-cv-60257-BLOOM/VALLE**<br><br>**JURY TRIAL DEMANDED** |

## (REDACTED) AMENDED COMPLAINT[1]

Plaintiff Sentry Data Systems, Inc. ("Sentry") by and through its undersigned attorneys, brings this action for trebled compensatory damages and injunctive relief under the antitrust laws of the United States, and for compensatory and punitive damages and injunctive relief under state law, against the above-named Defendants, demanding a trial by jury. For its Complaint against Defendants, Plaintiff alleges the following:

## NATURE OF THE ACTION

1.  Plaintiff Sentry is an innovator and a leader in the healthcare information technology field. Sentry provides platform software and technology solutions to hospitals and pharmacies participating in the 340B Drug Pricing Program, a vital federal program designed to expand access to health care to underserved patient populations. Defendants CVS Pharmacy, Inc. ( "CVS"), and Wellpartner, LLC ( "Wellpartner"), developed their businesses using Sentry's

---

[1] Pursuant to Rule 5.4(b), Sentry filed a motion to file this Amended Complaint under seal, Dkt. 120. The Court had not addressed the motion by the time of filing. Accordingly, pursuant to the Rule, Sentry is filing a redacted version of the Amended Complaint pending the Court's decision on its motion to seal.

proprietary, confidential and trade secret business information, information protected by non-disclosure agreements and other contracts between the parties.  In violation of federal antitrust law, and following CVS's recent acquisition of Wellpartner, Defendants began forcing Plaintiff's customers to switch from using Sentry's platform and technology solutions to using Wellpartner's services as a condition of access to CVS's pharmacy services, a "must have" for many hospitals and health clinics participating in the 340B program.  Defendants also misappropriated Sentry's trade secrets in violation of state and federal law, breached their contracts with Sentry, and committed numerous other state law torts at Sentry's expense.

## THE PARTIES

2.      Plaintiff Sentry Data Systems, Inc. is incorporated under the laws of Florida, with its principal place of business at 800 Fairway Drive, Suite 400, Deerfield Beach, Florida, 33441.

3.      Defendant CVS Pharmacy, Inc. ("CVS") is incorporated under the laws of Rhode Island, with its principal place of business at One CVS Drive, Woonsocket, Rhode Island, 02895.

4.      Defendant Wellpartner, LLC, is organized under the laws of Delaware, with its principal place of business at 20800 S.W. 115th Avenue, Suite 100, Tualatin, Oregon, 97062.

5.      Although CVS acquired Wellpartner in 2017, Wellpartner continues to operate as a legally separate, distinct entity from CVS.

## STANDING, JURISDICTION, AND VENUE

6.      Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, as well as injunctive relief, arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

7.      This Court has subject matter jurisdiction of the Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1337 (commerce and antitrust regulation).

8.      Plaintiff has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

9.      This Court has subject matter jurisdiction of the Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367, and pursuant to 28 U.S.C. § 1332.  Each of the Plaintiff's state law claims arises out of the same factual nucleus as the Plaintiff's federal law claims.

10.     This Court has personal jurisdiction over each Defendant and venue is proper in the Southern District of Florida under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, and under Florida's long-arm statute, Fla. Stat. § 48.193.  Both Defendants do business in Florida, and the acts and practices alleged herein were committed in part in Florida, causing injury to Sentry and to third parties within Florida.  Certain contracts between Plaintiff and certain of the Defendants require those Defendants to consent to the jurisdiction of, and venue in, this Court for purposes of all legal proceedings arising out of those agreements, which are at issue in this action.

11.     Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.

## THE 340B DRUG PRICING PROGRAM

12.     The Veterans Health Care Act of 1992 established the 340B program in section 340B of the Public Health Service Act, 42 U.S.C. § 256b.  The 340B program requires drug manufacturers participating in Medicaid to provide discounts on certain outpatient drugs to certain eligible health care entities, known as covered entities.  Covered entities include hospitals and community health centers serving a significantly disproportionate share of low-income patients (called disproportionate share hospitals or "DSHs"), among other provider types.  More than 6,000 covered entities participated in the 340B program in 2017.

13.     Congress intended for the savings from 340B-purchased drugs "to enable

[covered] entities to stretch scarce Federal resources as far as possible, reaching more eligible

patients and providing more comprehensive services."  H.R. Rep. No. 102-384 (Part 2), at 12

(1992) (Conf. Rep.).  The benefits available through participation in the 340B program support

and further the safety net mission of covered entities, allowing covered entities to save and

generate revenues that will offset losses incurred in other areas of their business such as

Medicare, charitable patient care, and care provided to underinsured, uninsured, and indigent

patients.  The 340B program is budget-neutral for the federal government.

14.     To participate in the 340B program, covered entities must register with the Health

Resources and Services Administration ("HRSA"), the agency responsible for administering the

program via the Office of Pharmacy Affairs.  HRSA adds covered entities to its database after

receiving and approving their registration forms.  Covered entities must annually sign an

agreement re-certifying that they meet 340B program requirements and that their information in

the database is correct.

15.     Once approved, covered entities may purchase covered outpatient drugs under the

340B Program from drug manufacturers at or below the 340B ceiling price, which is typically

well below prevailing wholesale prices.  According to an analysis by Pembroke Consulting,

more than $16 billion of discounted drugs were sold under the 340B program in 2017.  Although

the workflows associated with the 340B program can be complex, as described in detail below,

in general the program allows covered entities to purchase covered drugs at the 340B ceiling

price, and to dispense them (either directly or through third-party contract pharmacies) at the

negotiated contract price with third-party payers, including Medicare and private insurers. The

difference between the ceiling price and the negotiated third-party contract price, minus any fees

4

paid to third-party program administrators and/or contract pharmacies, is the surplus realized by the covered entity through participation in the 340B program.

16.     In order for these savings to be captured, the prescription must be filled.

17.     Covered entities are not permitted (and have never been permitted) to steer patients to any particular pharmacy (in-house or contract pharmacy).

18.     Covered entities may dispense 340B drugs to their patients either directly or through third-party contract pharmacies.  Because hospital-owned retail pharmacies are often not convenient to the public, have limited hours, and serve only a small part of a covered entity's patient mix, many covered entities engage contract pharmacies to dispense 340B-purchased drugs on their behalf.  Engaging with contract pharmacies can allow covered entities to reach a greater percentage of their patient population, creating a continuum of care and potentially enhancing the revenues available through participation in the 340B program.

19.     If a patient chooses to fill a prescription at a pharmacy that the covered entity does not contract with, the covered entity cannot receive any benefits or savings from the 340B program, even if all eligibility requirements are otherwise met. Those savings are thus lost.

20.     Covered entities must comply with the 340B statute and relevant HRSA guidance, and are responsible for the compliance of their contract pharmacies as well.

21.     Covered entities may dispense 340B-purchased drugs only to eligible patients, meaning among other things that the covered entity has established a relationship with the individual, and that the individual receives health care services from a health care professional affiliated with the covered entity such that the covered entity is responsible for the care provided. Dispensing 340B-purchased drugs to ineligible patients, a practice known as diversion, is prohibited by law.

22.     To prevent diversion, covered entities identify which prescriptions filled at their contract pharmacies will be categorized as 340B-eligible.  Covered entities and their contract pharmacies may dispense 340B-purchased drugs only to individuals who meet all applicable components of HRSA's patient definition.  Those individuals can, however, fill any of their prescriptions at a covered entity's contract pharmacy, and not just those that originate from the covered entity.  As a result, if a covered entity does not consider all prescriptions for an individual to be 340B-eligible, the covered entity must determine 340B eligibility at the prescription level.

23.     Subjecting drug manufacturers to duplicate discounts on 340B-purchased drugs is also prohibited by law.  Duplicate discounts occur when a drug manufacturer pays a State Medicaid agency a rebate under the Medicaid drug rebate program on a drug sold at the already-discounted 340B price.  To avoid Medicaid duplicate discounts in contract pharmacy arrangements, covered entities must either not dispense 340B-purchased drugs to Medicaid beneficiaries through their contract pharmacies, or make arrangements with relevant State Medicaid agencies to prevent duplicate discounts.

24.     HRSA guidance recommends that covered entities conduct oversight activities for their contract pharmacy arrangements, including monitoring their contract pharmacy arrangements by periodically comparing the covered entity's prescribing records with the contract pharmacies' dispensing records to detect irregularities (e.g., potential diversion or duplicate discounts), and retaining independent auditors to perform annual audits.  HRSA also audits covered entities to ensure compliance with the requirements of the 340B program.

25.     Third parties, often known as 340B Solutions Providers, often assist covered entities in the complex task of identifying 340B-eligible prescriptions through specialized

6

tracking software to prevent diversion and duplicate discounts, and in maintaining an auditable record of 340B workflows and payments.

26.     A sample 340B workflow involving a covered entity utilizing the services of contract pharmacies may proceed as follows, although the specific workflow between a covered entity, contract pharmacy, and 340B Solutions Provider will vary based on the terms of their relationship.  When a covered entity's patients fill their prescription at a contract pharmacy, the contract pharmacy will (if the patient is insured) send a payment request to a third-party payer, such as a Pharmacy Benefits Manager ("PBM").  The third-party payer will reimburse the contract pharmacy for the prescribed drugs at the standard contractual price, which is typically higher than the 340B price.  On an agreed upon schedule, the contract pharmacy will send to the 340B Solutions Provider records of all drugs dispensed.  Using tracking software, the 340B Solutions Provider will match the data from the covered entity and the contract pharmacy to determine which dispensed drugs are eligible for 340B pricing.  The 340B Solutions Provider will send a report, often called an accumulation report, of the eligible dispensed drugs to the covered entity, which is used by the covered entity to re-order or replenish the 340B eligible drugs dispensed by the contract pharmacy. The ordering or replenishment is usually done by the 340B Solutions Provider on behalf of the covered entity. The covered entity (or the contract pharmacy or 340B Solutions Provider acting on behalf of the covered entity) will purchase the replenishment drugs at 340B prices using the covered entity's 340B purchasing account.  An invoice will be sent to the covered entity for payment, while the replenishment drugs will be shipped by the 340B wholesale drug distributor directly to the contract pharmacy.  This is known as a bill to/ship to arrangement.  At an agreed upon schedule, the contract pharmacy will report to the 340B Solutions Provider the amounts it has collected for the 340B drugs sold.  The

contract pharmacy will, after withholding a negotiated fee, pay to the covered entity the remaining amount.  The covered entity will use the amount received to pay the 340B invoices, and use the amount remaining, which are the 340B savings to the covered entity, to provide other services to its patients.

27.     Because the risk of non-compliance grows with every additional 340B Solutions Provider due to the scattered location of data and the lack of a single data portal or dashboard to track compliance, covered entities generally prefer to use a single 340B Solutions Provider.

## CONTRACT PHARMACIES

28.     Covered entities pay a fee to contract pharmacies for their services, commonly known as an enhanced dispensing fee.  The contract between a covered entity and a contract pharmacy is often known as a Pharmacy Services Agreement ("PSA").

29.     A contract pharmacy relationship involves substantial implementation and administrative costs to the covered entity and several risks.  For example, under the replenishment method utilized by most covered entities and contract pharmacies, covered entities may be required to replenish drugs at full price if the contract pharmacy does not fill enough 340B eligible prescriptions. This requirement results in a loss of savings to the covered entity.

30.     As a result, covered entities seek to contract with pharmacies that will be filling large volumes of prescriptions for their patients. Because a covered entity cannot steer its patients to any particular pharmacy, it must determine where its patients seek pharmacy services to identify the contract pharmacies where that particular covered entity can realize savings from the 340B program.

31.     Because covered entities realize savings only if their patients fill prescriptions at pharmacies under contract with the covered entities, covered entities typically seek to contract with a number of pharmacies in order to avoid losing savings that could have been realized from

8

the 340B eligible prescriptions.  However, initial implementation and administration costs and the associated compliance risk increase as the number of a covered entity's contract pharmacies increase.

32.     As a result, covered entities typically do not choose to contract with every pharmacy that their patients visit. Instead, covered entities choose the pharmacies that have the most locations and the highest volume so that the covered entities can realize the greatest savings under the 340B program while still maintaining a manageable number of contract pharmacy relationships.

33.     National and regional chain pharmacies dominate the 340B contract pharmacy market because they tend to have the highest 340B prescription volumes, provide the most locations, and have the widest access to 340B program drugs, including specialty drugs. National and regional chain pharmacies are more desirable to covered entities as contract pharmacies than are independent pharmacies because chain pharmacies are easier for covered entities to identify and work with.  Pharmacy chains typically have streamlined approval and implementation processes that make chains more desirable as contract pharmacies than are independent pharmacies.

34.     According to a Pembroke Consulting analysis, there were nearly 20,000 separate pharmacy locations participating in the 340B program as contract pharmacies in 2017.  However, not all contract pharmacies are equally attractive candidates for inclusion in a covered entity's network.  The costs of setting up and administering contract pharmacy relationships drives covered entities to look for relationships with the pharmacies with the highest volume, broadest access to 340B-eligible drugs, and most convenient locations for their patients.  According to a 2017 Pembroke Consulting Analysis, six retail pharmacy chains—Walgreens, CVS, Walmart,

Rite Aid, Kroger, and Albertsons—account for two-thirds of 340B contract pharmacy locations. Although Walgreens is the single largest contract pharmacy, it is among the slowest growing of the major contract pharmacy chains, increasing its number of contract pharmacy locations by just 19 percent since 2013.  CVS, the second largest contract pharmacy, has increased its contract pharmacy locations by 281 percent over the same period.

35.     Both Walgreens and CVS are regarded by many covered entities interested in assembling networks of contract pharmacies to be "must have" providers of 340B contract pharmacy services.  According to a 2017 Pembroke Consulting analysis, each of the top ten DSHs with the largest 340B contract pharmacy networks included CVS within their network. Other than Walgreens, no other pharmacy chain appeared in the contract pharmacy networks of each of the top ten DSHs with the largest 340B contract pharmacy networks.

36.     CVS is a dominant firm in the 340B contract pharmacy market, due to its leading position in three related markets, namely the retail pharmacy, specialty pharmacy, and pharmacy benefits manager ("PBM") markets.  CVS's suite of integrated and market-leading assets are unique and gives CVS sustainable competitive advantages over other providers of 340B contract pharmacy services, none of which match CVS's market presence in any of the three pillars of CVS's dominance.  In particular, CVS's large retail footprint, its leading role as PBM and its unmatched ability to provide access to specialty pharmaceuticals make CVS very attractive to third-party payers, who contract with CVS to provide services for managing drug formularies, medical benefits, and site of care management, and often appoint CVS as their exclusive or preferred supplier of specialty pharmaceuticals.  This broad network of exclusive and preferred payer contracts in turn require many 340B covered entities to contract with CVS in order to obtain access to the pharmacies that CVS uses to serve the covered lives of those payers, making

CVS a "must have" contract pharmacy for many covered entities.  CVS boasts in its public statements that "We own the last mile of care through our unmatched patient touchpoints," including retail and specialty pharmacy.  According to CVS, its "unparalleled scale in the U.S. make[s] us a low-cost provider."

37.     One cause of CVS's status as a "must have" contract pharmacy provider is its large and growing market share in the retail pharmacy market.  CVS has 9,800 retail pharmacy locations in 49 states and Puerto Rico.  In its 2016 Securities and Exchange Commission Form 10-K filing, CVS stated that it "held approximately 23.8% of the United States retail pharmacy market."  In 2017, CVS stated that it had a 24 percent share of the U.S. prescription drug market.  Between 2010 and 2015, CVS increased its share of the U.S. prescriptions dispensed, capturing 39 percent of market growth over that period.  Because covered entities seek to deal with contract pharmacies located in close proximity to their patient population, CVS's national market share in the retail pharmacy market understates its competitive significance as a 340B contract pharmacy.  According to CVS, 76 percent of the population of the United States lives within 5 miles of a CVS pharmacy, and 82 percent lives within 10 miles.  In its 2015 Securities and Exchange Commission Form 10-K filing, CVS disclosed that it operated in "98 of the top 100 United States drugstore markets" and held "the number one or number two market share in 93 of these markets."  For example, CVS controls over 50 percent of the retail pharmacy market in Washington DC, Boston, Providence, and Honolulu.  CVS is also the largest retail clinic operator in the United States, with more than 1,100 MinuteClinics across the country.

38.     CVS's dominant position in the retail pharmacy markets is protected by substantial barriers to entry.  CVS's CEO, Larry Merlo, himself acknowledged as much in a recent interview discussing the possibility of competitive entry: "There are many barriers to

entry when you're looking at pharmacy. Most people are thinking about pharmacy as another distribution point, but pharmacy is also about the clinical outcomes that are provided. In an environment where there's a migration more value based care, those clinical capabilities are going to continue to grow in importance. It's highly regulated, so the barriers to entry are high."

39.     Another pillar of CVS's dominance as a 340B contract pharmacy is its PBM business, conducted through CVS Caremark. Health plans provide insurance to consumers, and contract with PBMs to negotiate rebates with pharmaceutical manufacturers and to assemble networks of retail and specialty pharmacies to service the covered lives of those health plans. CVS Caremark is the largest PBM in the United States, with a nearly 30 percent share of the PBM market and nearly 90 million plan members. CVS can and does steer patients insured by health plans serviced by its PBM to its retail and specialty pharmacies. In 2014, CVS stated publicly that nearly 60 percent of specialty pharmaceutical prescriptions managed by CVS Caremark were dispensed through CVS or its affiliated companies. In 2015, CVS stated publicly that approximately 40 percent of prescriptions managed by CVS Caremark were dispensed through CVS or its affiliated companies.

40.     Another cause of CVS's status as a "must have" contract pharmacy provider is its growing dominance in the dispensing of so-called specialty pharmaceuticals, including high-cost treatments for rare or uncommon diseases that have special development, handling, administrative and monitoring requirements. In 2016, CVS estimated its 2015 market share of specialty pharmaceuticals by dispensed revenue to be 30 percent, 12 percentage points higher than its nearest competitor. In 2015, CVS stated that it is also the fastest growing specialty pharmacy, and in 2017 CVS stated that it had captured approximately 40 percent of specialty market growth since 2013. CVS touts its suite of retail pharmacy and PBM assets as a

competitive advantage that specialty pharmaceutical rivals cannot meet.  For example, approximately half of CVS's specialty pharmaceuticals are dispensed to patients through CVS's retail pharmacy locations, giving patients easy, local access to specialty pharmaceuticals, and enhancing prescription adherence, in ways that mail order rivals cannot match.  CVS's dominance in dispensing specialty pharmaceuticals covered by the 340B program through retail pharmacies is even greater, as the next largest retail pharmacy chain in the dispensing of specialty pharmaceuticals was Walgreens, with a 10 percent market share of all specialty pharmaceutical revenues, followed by Kroger and Walmart, each with 1 (one) percent market shares.  Thus, CVS's market share of specialty pharmaceuticals covered by the 340B program sold through retail pharmacies is, upon information and belief, approximately 60 percent, a figure which has remained relatively constant for several years.

41.     CVS's dominant position in dispensing specialty pharmaceuticals to 340B participants is protected by substantial barriers to entry confronting new competitors.  One such barrier to entry is access to specialty pharmaceuticals.  For many specialty drugs, manufacturers limit and manage the specialty pharmacies eligible to dispense these expensive medications. According to CVS, it offers covered entities unmatched access to specialty drugs, with 99 percent of specialty drugs available through CVS.  A July 2018 presentation by CVS identified over 150 specialty pharmaceuticals distributed by CVS that were subject to limited distribution. CVS has access to specialty pharmaceuticals that other specialty pharmacies do not.  For example, in a 2016 presentation, CVS presented its analysis of specialty pharmacy access to all FDA approved limited distribution drugs launched between January 2015 and October 2016. CVS had access to 30 such drugs, while four other competitors had access to 25, 25, 26 and 29 of those drugs.

42.     Another barrier to entry protecting CVS's position in dispensing specialty pharmaceuticals through the 340B program is the fact that third-party payers (including commercial insurers and providers of Medicare Advantage, and Medicare Part D Prescription Drug plans) can and do influence where prescriptions for specialty pharmaceuticals may be filled.  CVS's status as the largest PBM in the United States (through CVS's Caremark business) allows it to force patients and third-party payers to utilize CVS as their specialty pharmacy, as demonstrated by more than 1,000 exclusive or preferred arrangements that CVS has with third-party payers.  These preferred arrangements often take the form of disincentives, or penalties, for the use of non-CVS specialty pharmacies.  CVS's exclusive and preferred arrangements with third-party payers create a substantial barrier to entry for competing specialty pharmacies seeking to provide specialty pharmaceuticals in the specific local markets served by the third-party payers.  These exclusive and preferred arrangements with third-party payers also enhance CVS's status as a "must have" contract pharmacy for covered entities seeking to dispense outpatient pharmaceuticals to patients insured by third-party payers that are in exclusive or preferred arrangements with CVS.  Covered entities operating in markets where a significant percentage of the patient population are insured by third-party payers in an exclusive or preferred arrangement with CVS for specialty pharmaceuticals risk substantial revenue loss if they lose access to CVS as a 340B contract pharmacy.

43.     Nationwide, CVS is the exclusive supplier of specialty pharmaceuticals for approximately 35 million Americans covered by various health insurance plans, bolstering CVS's status as a "must have" contract pharmacy nationwide.

44.     Aetna, the third largest U.S. health insurer with more than 23 million covered lives, outsources part of its PBM operations to CVS Health's Caremark business.  Caremark

14

manages the purchasing, inventory management, and prescription fulfillment of Aetna's mail order and specialty pharmacies. Aetna's in-house specialty pharmacy is the preferred specialty pharmacy for Aetna members.  Aetna-insured patients that go out of network can incur higher cost, additional expenses, or non-coverage.  Because all of Aetna's specialty business runs through CVS, CVS is effectively the preferred specialty pharmacy for Aetna's members.  Certain Aetna plans, including Aetna Better Health of Virginia, identify CVS as "our exclusive specialty provider for specialty medications for our members."  CVS's status as the preferred supplier of specialty pharmaceuticals to Aetna enhances CVS's status as a "must have" contract pharmacy nationwide.

45.     CVS is the exclusive provider of specialty pharmaceuticals for Blue Shield California, the third largest health insurer in the state of California, with over 4 million covered lives.  Blue Shield California has an approximately 15 percent share of the market for small-group (1-100 employees) benefit plans in California, and approximately 13 percent of the market for large-group (over 100 employees) benefit plans in California.  CVS's status as the exclusive provider of specialty pharmaceuticals for Blue Shield California enhances CVS's status as a "must have" 340B contract pharmacy for covered entities seeking to dispense outpatient pharmaceuticals to patients located in California.

46.     CVS is one of only two specialty pharmacies contracted with CareFirst, the largest health insurer serving Maryland, the District of Columbia, and parts of Northern Virginia, with over 3.2 million covered lives.  CareFirst has an approximately 60 percent share of the market for health insurance for small-group and large-group benefit plans in Maryland.  CareFirst also has an approximately 40 percent share of the market for small-group benefit plans in the District of Columbia, and 20 percent of the market for large-group benefit plans in the

15

District of Columbia.  CVS's status as one of two preferred providers of specialty

pharmaceuticals for Carefirst enhances CVS's status as a "must have" 340B contract pharmacy

for covered entities seeking to dispense outpatient pharmaceuticals to patients located in

Maryland, the District of Columbia, and parts of Northern Virginia.

      47.    CVS is the preferred specialty pharmacy of BlueCross BlueShield South Carolina

("BCBS South Carolina"), the largest health insurer serving South Carolina.  BCBS South

Carolina has an approximately 80 percent share of the market for small-group benefit plans in

South Carolina, and 89 percent of the market for large-group benefit plans in South Carolina.

CVS's status as the preferred provider of specialty pharmaceuticals for BCBS South Carolina

enhances CVS's status as a "must have" 340B contract pharmacy for covered entities seeking to

dispense outpatient pharmaceuticals to patients located in South Carolina.

      48.    CVS is the exclusive specialty pharmacy of Harvard Pilgrim, the second largest

health insurer serving Massachusetts.  Harvard Pilgrim has an approximately 23 percent share of

the market for small-group benefit plans in Massachusetts, and 14 percent of the market for

large-group benefit plans in Massachusetts.  Harvard Pilgrim also has an approximately 41

percent share of the market for small-group benefit plans in New Hampshire, and 35 percent of

the market for large-group benefit plans in New Hampshire.  CVS's status as the exclusive

provider of specialty pharmaceuticals for Harvard Pilgrim enhances CVS's status as a "must

have" 340B contract pharmacy for covered entities seeking to dispense outpatient

pharmaceuticals to patients located in Massachusetts and New Hampshire.

      49.    CVS is one of two specialty pharmacies contracted with Anthem BlueCross

BlueShield in Indiana ("Anthem"), the largest commercial insurer in the state.  Anthem has an

approximately 48 percent share of the market for small-group benefit plans in Indiana, and 62

percent of the market for large-group benefit plans in Indiana.  CVS's status as one of two dispensers of specialty pharmaceuticals for Anthem enhances CVS's status as a "must have" 340B contract pharmacy for covered entities seeking to dispense outpatient pharmaceuticals to patients located in Indiana.

50.     CVS is the exclusive supplier of most specialty pharmaceuticals for HealthPartners, the largest commercial insurer in Minnesota.  HealthPartners has an approximately 45 percent share of the market for small-group benefit plans in Minnesota, and 46 percent of the market for large-group benefit plans in Minnesota.  CVS's status as the exclusive provider of specialty pharmaceuticals for HealthPartners enhances CVS's status as a "must have" 340B contract pharmacy for covered entities seeking to dispense outpatient pharmaceuticals to patients located in Minnesota.

51.     CVS is one of two preferred providers of specialty pharmaceuticals to Wellmark Blue Cross Blue Shield ("Wellmark"), the leading health insurance company in Iowa and South Dakota. Wellmark has an approximately 81 percent share of the market for small-group benefit plans in Iowa, and 78 percent of the market for large-group benefit plans in Iowa.  Wellmark has an approximately 66 percent share of the market for small-group benefit plans in South Dakota, and 55 percent of the market for large-group benefit plans in South Dakota.  CVS's status as one of two preferred providers of specialty pharmaceuticals for Wellmark enhances CVS's status as a "must have" 340B contract pharmacy for covered entities seeking to dispense outpatient pharmaceuticals to patients located in Iowa and South Dakota.

52.     CVS is the exclusive supplier of specialty pharmaceuticals to the Sharp Health Plan of San Diego, a HMO with 130,000 covered lives. CVS's status as the exclusive provider of specialty pharmaceuticals for the Sharp Health Plan enhances CVS's status as a "must have"

340B contract pharmacy for Sharp Memorial Hospital, a major disproportionate share hospital in San Diego and the sponsor of the Sharp Health Plan.

53.     CVS is the preferred or exclusive supplier of specialty pharmaceuticals to CareSource, an insurer active in Ohio, Kentucky, Indiana, Georgia and West Virginia with over 1 million covered lives.  CVS's status as the preferred or exclusive supplier of specialty pharmaceuticals to CareSource enhances CVS's status as a "must have" contract pharmacy for covered entities seeking to prescribe outpatient pharmaceuticals to patients located in Ohio, Kentucky, Indiana, Georgia and West Virginia.

54.     CVS is one of two preferred suppliers of specialty pharmaceuticals to Florida Blue, an insurer serving the State of Florida, and the exclusive supplier of certain injectable specialty pharmaceuticals to Florida Blue's HMO serving Miami-Dade, Broward, Palm Beach, Indian River, Okeechobee, Martin and St. Lucie counties.  Florida Blue has an approximately 32 percent share of the market for small-group benefit plans in Florida, and 49 percent of the market for large-group benefit plans in Florida.  CVS's status as one of two preferred providers of specialty pharmaceuticals for Florida Blue enhances CVS's status as a "must have" 340B contract pharmacy for covered entities seeking to dispense outpatient pharmaceuticals to patients located in Florida.

55.     CVS is the preferred supplier of specialty pharmaceuticals to Blue Cross of Idaho, an insurer serving the State of Idaho, and the exclusive supplier of certain specialty pharmaceuticals to Blue Cross of Idaho.    Blue Cross of Idaho has an approximately 46 percent share of the market for small-group benefit plans in Idaho, and 65 percent of the market for large-group benefit plans in Idaho.  CVS's status as the preferred, and in some cases exclusive, supplier of specialty pharmaceuticals for Blue Cross of Idaho enhances CVS's status as a "must

have" 340B contract pharmacy for covered entities seeking to dispense outpatient pharmaceuticals to patients located in Idaho.

56.     CVS is the preferred supplier of specialty pharmaceuticals to the Government Employees Health Association, Inc. ("GEHA"), the second-largest plan in the Federal Employees Health Benefits Program.  GEHA insures 1.8 million patients nationwide.  CVS's status as the preferred supplier of specialty pharmaceuticals to GEHA enhances CVS's status as a "must have" contract pharmacies for covered entities nationwide.

57.     CVS is the preferred or exclusive supplier of specialty pharmaceuticals to MVP Healthcare, an insurer serving New York and Vermont.  CVS's status as the preferred or exclusive supplier of specialty pharmaceuticals to MVP Healthcare enhances CVS's status as a "must have" contract pharmacy for covered entities seeking to dispense outpatient pharmaceuticals to patients located in New York and Vermont.

58.     Effective October 1, 2018, CVS will be the exclusive supplier of specialty pharmaceuticals for Physician's Health Plan of Michigan, a dominant HMO in the Lansing, Michigan area.  CVS's status as the exclusive provider of specialty pharmaceuticals for the Physician's Health Plan of Michigan will enhance CVS's status as a "must have" 340B contract pharmacy in Michigan.

59.     CVS is the exclusive supplier of over 200 specialty pharmaceuticals for BlueCross BlueShield of Western New York ("BCBS WNY").  CVS's status as the exclusive provider of specialty pharmaceuticals for BCBS WNY enhances CVS's status as a "must have" 340B contract pharmacy in at least the following eight counties in western New York, where BCBS WNY has a 23 percent share of insured lives: Allegany, Cattaraugus, Chautauqua, Erie, Genesee, Niagara, Orleans, and Wyoming.

60.     CVS is also a preferred pharmacy, including specialty pharmacy, in many major Medicare Part D Prescription Drug Plans in regional insurance markets across the country, covering more than 8 million covered lives in 2018. CVS's status as a preferred pharmacy for Medicare Part D Prescription Drug Plans across the country enhances CVS's status as "must have" contract pharmacy for covered entities nationwide.

61.     CVS is the exclusive supplier of specialty pharmaceuticals for many benefit plan sponsors, including Indiana University, the University of Nebraska, Fidelity Investments, and other employers nationwide.   Many of these plan sponsors are national accounts that seek to provide health insurance to employees nationwide. CVS's status as the exclusive supplier of many benefit plan sponsors across the country enhances CVS's status as a "must have" 340B contract pharmacy nationwide, and in the local markets where the patients covered by these benefit plans reside and seek health care.

62.     Industry participants widely agree that access to specialty pharmaceuticals is becoming increasingly important in selecting contract pharmacies in 340B plans. In 2017, Defendant Wellpartner informed covered entities that "the recent and anticipated growth of specialty pharmacy necessitates adding specialty pharmacy to your existing pharmacy services," and estimated that spending on expensive specialty pharmaceuticals would quadruple from $87.1 billion in 2012 to $401.7 billion in 2020. Thus, according to Wellpartner, "The 340B program will remain vitally important for safety-net providers and their patients because expensive specialty drugs are a quickly growing share of the pharmaceutical market." According to Wellpartner, although "Health systems want to develop specialty pharmacy services" and "Understand the potential for 340B impact", "Most" covered entities "lack product access [and] payer contracts" to develop these programs on the their own, thereby making them reliant on

contract pharmacies, and especially CVS, for access to specialty pharmaceuticals for their 340B programs.

63.     Even when CVS does not, through its influence as a PBM or its contracts with third party payers, dictate where patients can fill their specialty pharmaceutical prescriptions, it still enjoys substantial market shares.  When discussing its specialty pharmaceutical business publicly, CVS differentiates between "patient directed" and "payer directed" business. According to CVS, its "enterprise assets" –including retail pharmacy—"make CVS/specialty the pharmacy of choice when patients have options."  CVS identifies Hepatitis C drugs as one example where its "national market share" is substantially greater than that of its "nearest competitor" in the "patient directed" segment of the specialty pharmacy market.

64.     CVS's pending merger with Aetna, a leading health insurer, will further solidify CVS's status as a "must have" contract pharmacy, as insurers can and do steer patients of covered entities toward specific pharmacies, including 340B contract pharmacies.  Aetna has an approximately 19 percent share of the market for small-group (1-100 employees) benefit plans in Delaware, an approximately18 percent share of the market for small-group benefit plans in Arizona, an approximately 17 percent share of the market for small-group benefit plans in New Jersey, an approximately 15 percent share of the market for small-group benefit plans in Virginia, an approximately 14 percent share of the market for small-group benefit plans in Alaska, and an approximately 12 percent share of the market for small-group benefit plans in West Virginia.  Aetna also has an approximately 37 percent share of the market for large-group (over 100 employees) benefit plans in the District of Columbia, an approximately 17 percent share of the market for large-group plans in New Jersey, an approximately 15 percent share of the market for large-group plans in Delaware, an approximately 12 percent percent share of the

21

market for large-group benefit plans in Alaska, an approximately 12 percent share of the market for large-group plans in Utah, and an approximately 11 percent share of the market for large-group plans in Texas.  Aetna's market share in specific Metropolitan Statistical Areas ("MSAs") around the country is even higher, as Aetna is the first or second-largest health insurer in more than 40 MSAs.  Post-merger, Aetna's patient population will be steered (through price and non-price incentives) to use CVS retail and specialty pharmacies, enhancing CVS's status as a "must have" provider of 340B contract pharmacy services for covered entities located in at least Arizona, New Jersey, Virginia, Alaska, the District of Columbia, Delaware, Utah and Texas, and specific MSAs across the country.

65.      Many covered entities already regard access to CVS retail or specialty pharmacies as necessary in order to assemble a network of contract pharmacies in the specific local geographic markets served by those covered entities.  Attached as Exhibit A is a list derived from the HRSA database of 365 covered entities with unique database identifiers that are listed as of September 2018 as being dependent upon CVS for 30 percent or more of their contract pharmacy network.[2]  Many of the covered entities on this list are among the largest hospitals in the United States.  (Because Exhibit A provides the number of pharmacies in a covered entity's network, rather than the prescription volumes associated with each pharmacy, Exhibit A understates CVS's importance as a contract pharmacy.  In fact, and as alleged at greater length below, several covered entities not appearing on Exhibit A have reported to Sentry that they feel compelled by CVS's importance as a contract pharmacy to accede to its illegal and coercive

---

[2] An earlier version of Exhibit A, listing fewer covered entities and based on the HRSA database as of January 2018, was attached to Sentry's Complaint, D.E. 1.

conduct.)  As alleged at greater length herein, CVS has market power over each and every one of the covered entities identified in Exhibit A.

66.     Sentry is routinely informed by covered entities that the covered entities need access to CVS retail and specialty pharmacies as 340B contract pharmacies because those CVS pharmacies are the pharmacies frequently patronized by large percentages of their patient population.

## 340B PROGRAM ADMINISTRATORS

67.     Covered entities utilizing contract pharmacies remain responsible for the compliance of their contract pharmacies with the 340B statute and relevant HSRA guidance. This can be a complex and data-intensive task, and covered entities typically utilize computer software and technology provided by 340B Solutions Providers to achieve this goal.  340B software and technology solutions provided by 340B Solutions Providers allow covered entities to help track 340B eligibility, inventory, and replenishment, and to maintain the detailed audit trail HRSA requires.  340B Solutions Providers also assist covered entities in selecting contract pharmacies for inclusion in their networks, and at times by assisting in the negotiating of enhanced dispensing fees and other contract terms with contract pharmacies on behalf of their covered entity customers.  340B Solutions Providers charge covered entities a fee for their services through various models.

68.     For covered entities seeking to participate in the 340B program and to utilize contract pharmacies, there are no close substitutes for the services, specialized software and technology provided by 340B Solutions Providers.  Because the data required to track and monitor eligible dispensations often resides in different databases within a covered entity, manually gathering, reconciling and interpreting these databases to ensure compliance is costly

and increases the risk of non-compliance with the 340B statute and relevant HSRA guidance. Software programs and technology not designed and optimized for 340B workflows can bring covered entities into non-compliance, impose additional expense, or both.  As a result, covered entities seeking to participate in the 340B program and to utilize contract pharmacies typically purchase services and software and technology solutions from 340B Solutions Providers rather than attempt to self-provide the services necessary to comply with the 340B statute and HRSA guidance.

69.     Sentry is a leading provider of software and technology solutions for 340B administration and compliance.  Through its Sentinel™ product, Sentry provides software and technology for covered entities that dispense 340B program drugs directly to eligible patients within the hospital setting.  Through its Sentrex® service Sentry assists covered entities in selecting contract pharmacies for inclusion in their networks, and provides the software and technology that defines and facilitates the relationship between covered entities and contract pharmacies through the covered entity's policies and procedures and operational parameters.  Through its Backbone™ product, Sentry also offers to retail pharmacies platform technology that allows pharmacy chains to efficiently offer their contract pharmacy services to large numbers of covered entities working with a range of different third-party administrators.

70.     Sentry's Sentrex® product is typically provided to covered entities pursuant to multi-year exclusive contracts.

71.     More than 10,000 hospitals, clinics, integrated delivery networks (IDNs) and pharmacies across the country rely on Sentry's unique proprietary data set for their analytics, procurement, drug utilization and compliance solutions.  Since 2003, Sentry's solutions have processed over 7 billion dispensations on more than 1.6 billion claims and currently provide

24

decision support for more than 92 million patients.  To date, Sentry has helped hospitals, health systems and IDNs realize more than $8.5 billion in savings to help them better meet their safety net mission and continue to serve their communities.

**SENTRY'S CONTRIBUTIONS TO CVS'S CONTRACT PHARMACY BUSINESS**

72.     CVS's growing dominance in the 340B contract pharmacy market is attributable in many respects to investments that Sentry made in helping CVS to develop and grow its contract pharmacy business.  Since 2007, when CVS first approached Sentry for help in entering the 340B contract pharmacy market, CVS has consistently benefitted from Sentry's expertise, proprietary knowledge,  processes, trade secrets, and software programs, all of which contributed significantly to CVS's growth as a 340B contract pharmacy.

73.     Many of Sentry's Sentrex® customers utilize CVS as a contract pharmacy. Sentry's Sentrex® customers utilizing CVS as a contract pharmacy typically start as customers of Sentry, not as customers of CVS.  It is Sentry that almost always introduces the Sentrex® covered entity customer to CVS, and not CVS that introduces the covered entity to Sentry.

74.     When CVS first approached Sentry, Sentry had already developed a PSA template based on years of previous operational experience.  The PSA template developed by Sentry is a valuable trade secret, embodying Sentry's know-how and accumulated expertise regarding entry into a contract pharmacy arrangement, and which Sentry provided to its hospital clients pursuant to confidentiality agreements.  That PSA template was provided to CVS in 2007, also subject to confidentiality agreement.  Beginning in 2007 and continuing through 2013, CVS utilized the Sentry-developed PSA template.  Beginning in 2013 and continuing to date, CVS based its own PSA on the template that Sentry developed.  As Sentry continues to make revisions and improvements to its PSA template, revisions that reflect Sentry's continually improving understanding of best practices and optimal workflows in the administration of 340B programs,

those updates and changes to Sentry's PSA template were shared with CVS for the benefit of CVS. Furthermore, and at CVS's request, Sentry has invested significant effort and resources reviewing, commenting on and improving the CVS-specific PSA template starting in 2013 through today, without any remuneration and as part of a good faith partnership.

75.     Beginning in 2011 and continuing to date, Sentry developed and improved the operational procedures that CVS uses to offer 340B contract pharmacy services to covered entities. Based on the operational procedures that Sentry developed and refined, CVS has significantly benefitted, without any remuneration to Sentry, from Sentry's applied and practical knowledge and operational expertise, proficiency and efficiency.

76.     Beginning in 2003 and continuing through 2017, Sentry developed proprietary software programs for administering 340B programs. These software programs contained certain valuable features that enhanced the value of Sentry's 340B Solutions Services to covered entities, and provided Sentry with a competitive advantage over other 340B Solutions Providers. For example, Sentry developed a Blacklisting Tool, which allowed covered entities to proactively exclude certain drugs from their 340B program, thereby enhancing the ability of covered entities to administer 340B programs that were both lawful and profitable. Sentry also developed proprietary dispensing fee structures, custom reports, and delayed ordering functionality in its software. Sentry allowed CVS to access and use these valuable and proprietary features of Sentry's software programs in the provision by CVS of contract pharmacy services to covered entities.

77.     Sentry's business model is to facilitate the collection, organization, and transfer of information between covered entities and pharmacies in a way that is efficient, effective and auditable by third parties. The process is difficult, and fraught with potentially high-stakes errors.

Over the course of Sentry and Defendant CVS's business relationship, CVS was provided Sentry's internal procedures and best practices to facilitate this process.  This included various operational forms Sentry created to contract with entities, work and data flows, and the overall internal structure Sentry uses with its 340B technology platform to effectively transfer and manage information moving between covered entities and pharmacies.  Sentry built this structure over years of experience and after millions of dollars of investment.  CVS was thus given a front-row seat to Sentry's core business model and internal business methods that make Sentry a valuable business partner for covered entities in the 340B marketplace.

78.     Beginning in approximately 2014 and continuing through the present, Sentry has also shared the identity of its Sentrex® customers with CVS.  The identity of Sentry's customers is highly confidential and proprietary information with great economic value to Sentry.   Sentry invests considerable effort, knowledge, time, and expense to identify covered entities interested in participating in the 340B program, and in understanding and identifying their capabilities and needs.  Sentry takes appropriate measures to protect the confidentiality of its customer lists, which reflect Sentry's investment in identifying specific covered entities with specific needs, and building relationships with those covered entities.  Among other things, the identity of Sentry's Sentrex® customers is protected by the confidentiality provisions in the various agreements, discussed below, that CVS and other pharmacies that work with Sentry execute with Sentry before they are told the identity of the covered entity that is considering doing business with them.

79.     In recognition of the substantial amount of valuable, proprietary, confidential and trade secret information that Sentry shared with CVS over the course of their relationship, Sentry and CVS have since 2007 entered into a number of Non-Disclosure and Confidentiality

Agreements.   CVS and Sentry's agreements prohibit CVS from using any of the valuable, proprietary, confidential and trade secret information that Sentry shared with CVS to compete with Sentry.

80.     In 2016 Defendant CVS Pharmacy and Sentry entered a Mutual Non-Disclosure Agreement (the "CVS Mutual NDA", attached hereto as Exhibit B).  The CVS Mutual NDA barred disclosure of certain business information exchanged between the parties prior to or after the effective date of the agreement.  Section 4 of the CVS Mutual NDA imposes a non-disclosure obligation, Section 2 of the CVS Mutual NDA defines protected information, and Section 9 of the CVS Mutual NDA permits injunctive relief for any breach.  The CVS Mutual NDA remains in effect.

81.     In 2014, Defendant CVS Pharmacy and Sentry entered into a still valid contract (the "340B Platform Agreement", attached hereto as Exhibit C) wherein CVS agreed to use Sentry as its exclusive provider of 340B platform software services through Sentry's Backbone™ product.  Neither CVS nor Sentry has, as of the time of the filing of this Complaint, terminated the 340B Platform Agreement.

82.     Sentry's 340B Backbone™ platform provides retail pharmacy chains such as CVS with a single integration point for their 340B program needs, regardless of the number of covered entities and 340B Solutions Providers.   Sentry's Backbone™ has the benefit of streamlining pharmacy chain operations, financial reconciliation and inventory processes across the entirety of the chain's 340B program.  Sentry independently developed the operational parameters, documentation flows, and work processes embodied in the Backbone™ platform through significant investments and the benefit of years of experience as a 340B Solutions Provider.

83.     Section 2.1 of the 340B Platform Agreement required CVS and Sentry to collaborate in developing the operational procedures (the "Operational Documentation") utilized by CVS in providing through Sentry's Backbone™ contract pharmacy services to covered entities and the 340B Solutions Providers working with those covered entities.   CVS and Sentry collaborated in developing those Operational Documentation based on Sentry's prior investments in developing the operational parameters, documentation flows, and work processes embodied in the Backbone™ platform.   Sentry also shared with CVS, among other things, its draft documentation flow charts and internal best practices, likewise built and honed through investment and years of experience as a 340B Solutions Provider.

84.     Section 6 of the 340B Platform Agreement requires CVS to keep confidential the Operational Documentation and other confidential information provided by Sentry, and to refrain from using that information to compete with Sentry.  This obligation survives any termination of the 340B Platform Agreement.

## SENTRY'S RELATIONSHIP WITH WELLPARTNER

85.     Prior to December 2017, Defendant Wellpartner provided 340B administration services to certain covered entities contracting with CVS through Sentry's 340B Backbone™.

86.     Sentry and Wellpartner shared confidential information in the course of facilitating these transactions, including information shared by Sentry at the request of CVS.  In particular, to facilitate the transmission of information between covered entities (contracting with Wellpartner) and CVS (contracting with Sentry), Wellpartner needed access to the proprietary configurations and data specifications of Sentry's software in order to submit properly formatted data to Sentry for processing on behalf of CVS.

87.     Sentry shared the proprietary configurations and data specifications of Sentry's 340B software with Wellpartner (then operating as Wellpartner Inc.) pursuant to a certain 340B Backbone Agreement, executed in 2015, and attached hereto as Exhibit D.  The 340B Backbone Agreement required Wellpartner to comply with the Operational Documentation developed by Sentry pursuant to the 340B Platform Agreement.  Section 5 of the 340B Backbone Agreement requires Wellpartner to keep confidential the Operational Documentation and other confidential information provided by Sentry, and to refrain from using that information to compete with Sentry.  Neither Sentry nor Wellpartner has terminated the 340B Backbone Agreement or caused a condition precedent to its termination to occur.

88.     Before entering into the 340B Backbone Agreement, Sentry and Wellpartner (then operating as Wellpartner Inc.) executed in 2014 a Mutual Non-Disclosure Agreement (the "Wellpartner Mutual NDA", attached hereto as Exhibit E), which prohibited Wellpartner from using the valuable, proprietary, confidential and trade secret information that Sentry shared with Wellpartner to compete with Sentry.  Sentry provided Wellpartner with extensive details about Sentry's proprietary products and systems, including on weekly calls discussing Sentry's platforms, pursuant to the Wellpartner Mutual NDA.  Section 1of the Wellpartner Mutual NDA imposes a non-disclosure obligation, Section 10 defines Confidential Information, and Section 5 acknowledges that a breach of the agreement would irreparably harm the non-breaching party. The Wellpartner Mutual NDA has no expiration date.

## DEFENDANTS' ANTICOMPETITIVE, TORTIOUS, AND UNFAIR CONDUCT

89.     On or about December 18, 2017, CVS announced in writing to many of Sentry's Sentrex® customers that it had completed an acquisition of Wellpartner, that Wellpartner would be "the exclusive 340B program administrator for all CVS Health retail and specialty

pharmacies", and that CVS would "transition all covered entities to Wellpartner by December 31, 2018" (the "CVS Announcement", attached hereto as Exhibit F).

90.     CVS's mandate that covered entities that desire to deal with CVS as a contract pharmacy must purchase 340B administration services from Wellpartner is an aberrant departure from prevailing industry practice, including the past practice of CVS.  No other major contract pharmacy chain mandates that covered entities purchase all 340B services from the contract pharmacy as a condition of purchasing contract pharmacy services, and CVS in the past has not done so, instead dealing with many 340B Solutions Providers, including through Sentry's technology Backbone™.  Indeed, in 2007—before being acquired by CVS—Wellpartner publicly described an industry norm pursuant to which 340B Solutions Providers did not compete on the basis of offering exclusive access to particular pharmacies.  Covered entities, including Sentry's Sentrex® customers, generally regard CVS's mandate as an unwelcome departure from efficient and prevailing industry practices.  As one of Sentry's covered entity customers communicated to Wellpartner, discussing the CVS mandate:



91.     Wellpartner sales representatives then privately contacted numerous covered entities, including Sentry's Sentrex® customers.  Wellpartner representatives confirmed to these covered entities that they would be forced to use Wellpartner as their exclusive provider of 340B program administrator for all CVS contract pharmacies or would receive PSA termination

notices.  To effectuate the transition to Wellpartner, Wellpartner presented Sentry's covered entity customers with mandatory and non-negotiable pharmacy contract amendments.

92.     All or nearly all of Sentry's Sentrex® customers have been contacted by CVS and Wellpartner and told they had to switch to using Wellpartner as their 340B Solutions Provider for all CVS contract pharmacies if they wanted to continue their relationship with CVS.  Many of the covered entities that CVS and Wellpartner contacted to deliver this message were parties to valid and enforceable contracts with Sentry appointing Sentry as the exclusive 340B Solutions Provider to those covered entities.  These agreements were typically of multi-year duration.

93.     CVS knew that Sentry delivered 340B software and technology solutions to covered entities pursuant to written agreements, and knew that the covered entities to which Wellpartner sales representatives were delivering these messages were under contract with Sentry.  Sentry reminded CVS of this fact in a written communication on December 20, 2017, in which Sentry requested CVS to cease and desist from interfering with Sentry's contracts with covered entities.  Wellpartner sales representatives continued to contact Sentry's covered entity customers after CVS received this communication from Sentry.  ████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████

94.     A number of Sentrex® customers have told their contacts at Sentry that they had no choice but to switch to using Wellpartner as their new 340B Solutions Provider for all CVS contract pharmacies, in breach of their existing contracts with Sentry.  These and other Sentrex® customers of Sentry were forced to curtail their business with Sentry due to CVS's status as a "must have" contract pharmacy for many covered entities.  For example, one Sentrex® customer

communicated to Sentry that it felt "handcuffed" by CVS's mandate because 75 percent of that covered entity's contract pharmacy relationships were with CVS. Another Sentrex® customer terminated its contract with Sentry, writing to Sentry that "I really hate that we must make the change but at this point we have little choice." Remarkably, CVS made up less than 15 percent of this covered entity's contract pharmacy network, showing that the coercive power of CVS's conduct has forced covered entities to breach their contracts with Sentry against their will even when CVS's nominal share of their contract pharmacy networks is below 30 percent. Another Sentrex® customer expressed to Sentry its reluctance to accede to CVS's mandate, although it would do so if forced due to its desire to expand its business with CVS. That covered entity relied on CVS for only 20 percent of its contract pharmacy business, another example of how CVS's mandate has coercive effect even when CVS makes up less than 30 percent of a covered entity's network. As yet another Sentrex® customer wrote to Sentry after being contacted by a Wellpartner representative and being told that it would need to terminate its contract with Sentry and move to Wellpartner or lose access to CVS as a contract pharmacy: "CVS is our only profitable Contract Pharmacy, we cannot lose them or our program may as well not exist." This covered entity has ten non-CVS contract pharmacies, but regards access to CVS as necessary for an effective 340B program, directly showing CVS's market power over covered entities. Other Sentrex® customers contacted by Wellpartner informed Sentry of an intent to renegotiate their contracts with Sentry, and/or to not renew those contracts when they came up for renewal. Another covered entity contacted by Wellpartner informed Sentry that they would not contract with Sentry due in part to CVS's December 2017 mandate.

95.      ██████████████████████████████████████████, a Sentry covered

entity customer, sent Sentry a series of writings expressing its regret that it was being forced by

Defendants to switch against its will to Wellpartner. A March 1, 2018, email to Sentry states:

> We have been provided with a contract from Wellpartner to
> provide exclusive service from CVS.  As a very small FQHC, the
> 340b revenue from CVS is vital to our financial picture.  While we
> do not want to change our TPA, we feel that in the short run we
> really do not have another option.

On March 9, 2018, ████████████████████████████ sent a termination letter to

Sentry, stating that "It is with regret" that it was terminating the relationship, that "While we

appreciate the service your organization has provided, the necessity to switch to another

administrator to keep the CVS pharmacy contract has forced us to make this change," and that

"If this were to change in the future we would gladly consider utilizing the services of Sentry

Data Systems."  A March 14, 2018, email to Sentry again noted that "Unfortunately, we have

had to make the decision to utilize the services of another organization to continue [the CVS]

relationship in the future." On March 19, 2018, ██████████████████████████████ stated

to Sentry that:

> We did not choose to terminate the CVS contract with Sentry
> because we felt that your organization was not able to deliver, we
> only did it because of the potential risk of losing the CVS contract
> altogether.  While we agree that CVS should not be allowed to do
> this, we did not feel that had another option at this time.

96.      CVS and Wellpartner are aware that covered entities are unable to steer their

outpatient population or meaningfully influence where patients fill their prescriptions, and that

for this reason covered entities whose patients frequently fill their prescriptions at CVS

pharmacies face the loss of substantial revenues if they lose access to CVS as a contract

pharmacy.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

97.     On information and belief, Defendants are using the confidential customer list Sentry provided them to solicit Sentry customers and coerce them into using Wellpartner's 340B platform.  Other than a handful of customer-specific success profiles on its website, Sentry does not make the identities of its customers publicly available, and there is no public information that would allow CVS or Wellpartner to derive Sentry's customer list independently.  On information and belief, Defendants have been as effective as they have been in soliciting Sentry's Sentrex® customers through the use of Sentry's confidential customer list.

98.     Although CVS's December 2017 mandate had stated that CVS would "transition all covered entities to Wellpartner by December 31, 2018," Wellpartner communicated to some of Sentry's covered entity customers that CVS would be converting those customers much sooner.  For example, one Sentry covered entity customer was told that it would be converted to Wellpartner in early 2018, and that "there wasn't any option except to switch if you wanted to maintain CVS as a contract pharmacy."  Another Sentry covered entity customer was told in January 2018 by Wellpartner that it must immediately discontinue its use of Sentry's services for all CVS contract pharmacies, and instead use Wellpartner as their 340B Solutions Provider for all CVS contract pharmacies.

99.     Switching 340B software and technology solutions providers is typically a time-consuming and complicated task that can take 6 months or more.  However, when asked by one of Sentry's covered entity customers how Wellpartner would manage to convert Sentry's

customers to Wellpartner customers with one-month notice, a Wellpartner representative stated that "all you have to do is redirect the current Sentry Data Systems feeds to us and we will extract and reformat the data to support our solution."

100.    Wellpartner's professed ability and plan to quickly convert Sentry's covered entity customers by accessing Sentry's proprietary data feeds specifications shows that CVS and Wellpartner have misappropriated Sentry's valuable, proprietary, confidential and trade secret information shared with CVS and Wellpartner pursuant to non-disclosure agreements.  In particular, Wellpartner is using its knowledge of the proprietary configurations and data specifications of Sentry's 340B software, as embodied in the Operational Documentation of the 340B Backbone Agreement and the 340B Platform Agreement, to quickly convert Sentry's customers to Wellpartner. But-for the misappropriation of Sentry's valuable, proprietary, confidential and trade secret information embodied in the Operational Documentation, Wellpartner would be unable to transition Sentry's customers as quickly as Wellpartner has stated it will.

101.    During the term of the 340B Platform Agreement, CVS asked Sentry to develop and beta test customized features and functionality specifically for CVS.  Sentry did so, at significant expense to Sentry and at no charge to CVS, and shared these custom features with CVS pursuant to the non-disclosure provisions of the 340B Platform Agreement.   After CVS expressed dissatisfaction with Sentry's customization of its Backbone™ for CVS, Sentry expended significant time and money in attempting to debug and rework these custom features for CVS. CVS continued to task Sentry with modifications, customizations and testing of Backbone™ even at a time when CVS would have already known it would be acquiring Wellpartner.  As Wellpartner was connecting to CVS through Sentry's Backbone™ at this time,

Wellpartner also (pursuant to the non-disclosure provisions of the 340B Backbone Agreement) learned of these customizations of the Backbone™, which facilitated Wellpartner's ability to now quickly switch Sentry's Sentrex® customers over to its platform by accepting Sentry's proprietary data feed.  Unbeknownst to Sentry, CVS was at the same time engaged in developing an alternative to Backbone™ with RxStrategies, a competitor of Sentry's.

102.    Wellpartner and CVS are also using other valuable, proprietary, confidential and trade secret information shared with CVS and Wellpartner pursuant to non-disclosure agreements to compete with Sentry.  In particular, the other proprietary know-how, processes, and trade secrets that Sentry shared with CVS are being used to target and convert Sentry's covered entity customers into customers of Wellpartner more quickly than would have been possible without the use of Sentry's confidential and trade secret information.

103.    Defendants have refused to provide necessary data and data specifications to allow Sentry to continue to offer 340B-related services to covered entities forced to breach their contracts with Sentry and use Wellpartner, despite knowing that Sentry had specific covered entities that sought to contract with Sentry for this service, and having previously agreed with Sentry to provide this information.  Defendants' refusal to provide necessary data and data specifications to allow Sentry to continue to offer 340B-related services to covered entities forced to deal with Wellpartner is unjustified and an extension of Defendants' anticompetitive and tortious conduct aimed at Sentry and its covered entity customers.

### FIRST CLAIM FOR RELIEF: UNLAWFUL TYING (15 U.S.C. § 1)

104.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 103.

105.    Contract pharmacy services and 340B Solutions Provider services are separate products.  Covered entities historically have purchased the services from different providers. Purchasing contract pharmacy services and 340B Solutions Provider services separately is

regarded by covered entities as efficient, in part because purchasing contract pharmacy services and 340B Solutions Provider services separately contributes to formation of large and diverse networks of competing contract pharmacies.

106.   CVS's mandate that covered entities that desire to deal with CVS as a contract pharmacy must purchase 340B Solutions Provider services from Wellpartner coerces covered entities to purchase 340B Solutions Provider services (the "tied" service) from CVS, not because covered entities prefer to do so but only because they must do so in order to obtain access to CVS as a contract pharmacy (the "tying" service).

107.   CVS's mandate that covered entities that desire to deal with CVS as a contract pharmacy must purchase 340B Solutions Provider services from Wellpartner is a *per se* unlawful tying arrangement.  Alternatively, CVS's mandate that covered entities that desire to deal with CVS as a contract pharmacy must purchase 340B Solutions Provider services from Wellpartner is unlawful under the rule of reason.

108.   CVS possesses substantial economic power over the tying service, as manifested by its ability to impose a burdensome tie of contract pharmacy services and 340B Solutions Provider services on covered entities, forcing covered entities to accept 340B Solutions Provider services from Wellpartner, something they would not do in a competitive market.  CVS's ability to force covered entities to purchase 340B Solutions Provider services from CVS through Wellpartner against the preference of those covered entities is direct evidence of CVS's market power over the tying service.

109.   CVS's tie of contract pharmacy services and 340B Solutions Provider services will substantially foreclose competing providers of 340B Solutions Provider services, harming competition in the market for 340B Solutions Provider services.  Covered entities forced to

38

purchase 340B Solutions Provider services from Wellpartner will pay substantially higher prices for those services than they would have in an unrestrained market. Foreclosing competing suppliers of 340B Solutions Provider services from access to covered entities will deprive those competing suppliers, including Sentry, of economies of scale, learning by doing, and commercial validation, and will in that way reduce the ability of those competing suppliers to impose competitive discipline on the price and terms of service imposed by Defendants on covered entities. In particular, Sentry and other 340B Solutions Providers benefit from commercial engagement with certain large and sophisticated covered entities, which often provide feedback and suggestions to Sentry that are used by Sentry to improve its Sentrex® product. Losing access to these covered entities will make Sentry and other 340B Solutions Providers less effective competitors in the 340B Solutions Provider market. Because covered entities generally prefer to deal with a single 340B Solutions Provider, forcing covered entities to use Wellpartner to access CVS will also force some covered entities to use Wellpartner for all of their 340B Solutions Provider needs, for CVS and non-CVS business alike, an effect that Sentry has already observed in the marketplace, causing further injury to Sentry. ████████████████████

████████████████████████████████████████

███████████████████████████████████

█████████████████████████████

110.     One relevant service market, here the market for the "tying" service, is the market for the provision of 340B contract pharmacy services to covered entities. Providers of 340B contract pharmacy services to covered entities compete based on their dispensing fees and other terms of dealing, their location and their prescription volume, among other factors. The market for the provision of 340B contract pharmacy services to covered entities is protected by barriers

to entry of new competitors, including increasingly-necessary access to specialty pharmaceuticals, and the time and cost of obtaining physical locations that serve the needs of covered entities. There are no close substitutes for the services of 340B contract pharmacies, and a monopolist of 340B contract pharmacies could profitably increase the price of 340B contract pharmacy services to covered entities by a significant and non-transitory amount.

111.    CVS has market power in the provision of 340B contract pharmacy services to specific covered entities located across the country.  CVS can and does profitably target these covered entities for price increases for 340B Solutions Provider services, in part by forcing them to take their 340B Solutions Provider services from Wellpartner, which charges higher administrator fees than does Sentry.  CVS's market power over the covered entities identified in Exhibit A—all of which are in the national market and many of which are also in the local markets specified below—is a result of CVS's unique product offerings, unmatched access to specialty pharmaceuticals, payer contracts, and the inability of covered entities whose patients use CVS pharmacies to steer those patients towards other contract pharmacies in the event the covered entity loses access to CVS as a contract pharmacy.  For those covered entities dependent upon access to CVS for a substantial percentage of their 340B program revenues, there are no good substitutes for access to CVS as a contract pharmacy, meaning that Defendants have the ability to force an unwelcome tie and higher prices on those covered entities.

112.    There are a number of relevant geographic markets in which CVS competes and has market power as a 340B contract pharmacy.  One such relevant geographic market is the nationwide provision of 340B contract pharmacy services.  CVS competes to offer 340B contract pharmacy services nationwide, and its closest and most effective competitors in that market are other national chain pharmacies.  The economies of scale and scope that CVS enjoys from its

national footprint are attractive to covered entities and provide CVS a competitive advantage.

Although covered entities seek to contract with contract pharmacies located in close geographic

proximity to their physical location, they also seek to contract with contract pharmacies located

across the country.  For example, more than forty-five percent of disproportionate share hospitals

contract with contract pharmacies located more than 1,000 miles away, often for the provision of

specialty pharmaceuticals.   In addition to its over 9,800 retail locations, CVS offers 340B

contract pharmacy services to covered entities located across the country from 13 specialty mail

order pharmacies and 4 mail order dispensing pharmacies.  Specialty pharmacies typically fill

prescriptions from a central location and then deliver the products directly to the consumer's

home. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ For

example, according to Pembroke Consulting, as of July 2018 the typical CVS Specialty location

had agreements with 214 covered entities located around the country.  Attached as Exhibit G is a

map showing the more than 300 covered entities located around the country that have contracted

with a single CVS specialty pharmacy in Pennsylvania to provide 340B contract pharmacy

services.   CVS contracts with third-party payers and benefit plan sponsors to serve as their

exclusive or preferred supplier of specialty pharmaceuticals on a nationwide basis, which drives

demand for CVS as a 340B contract pharmacy on the part of covered entities nationwide.

CVS's anticompetitive conduct as alleged herein takes place on a national scale, and affects

covered entities across the country.  Conversely, the relevant geographic market is appropriately

limited to the United States, because suppliers of pharmaceuticals located outside the United

States and lacking regulatory approvals in the United States and distribution assets in the United States do not offer 340B contract pharmacy services.  A monopolist of 340B contract pharmacy services in the United States could profitably increase the price of 340B contract pharmacy services to covered entities by a significant and non-transitory amount.

113.    In addition to a relevant geographic market that is nationwide, there are also local relevant geographic markets where CVS has market power and where the effects of CVS's anticompetitive conduct are felt.  CVS competes at a local level for covered entities that require access to contract pharmacies located in close proximity to their patient population.  CVS's payer contracts, vast footprint of retail pharmacies located within 10 miles or less of covered entities' patient populations, coupled with its ability to deliver certain specialty pharmaceuticals through those retail pharmacies and the other unique features of CVS's integrated business model, give CVS substantial competitive advantages and a unique product offering that rivals are unable to duplicate.  Because covered entities draw patients from the local markets surrounding their physical locations, and seek to contract with contract pharmacies located in the same geography as their patient population, CVS's market power in the 340B contract pharmacy services market is also manifested in a number of local geographic markets across the county.

114.    A core-based statistical area ("CBSA") is a geographic area defined by the federal government's Office of Management and Budget that consists of one or more counties (or equivalents) anchored by an urban center of at least 10,000 people plus adjacent counties that are socioeconomically tied to the urban center by commuting.  Because covered entities draw patients from local markets that are limited by the desire of patients to access health care close to where they live and work, and contract for contract pharmacy services to serve that local patient population, there are local geographic markets relevant to this action that are no broader than

42

each of the 22 individual CBSAs identified below, and CVS has market power in each of these CBSAs.

| CBSA | CVS 340B Contract Pharmacies | CVS's Share of 340B Contract Pharmacies |
|---|---|---|
| Harrisburg-Carlisle, PA | 19 | 54% |
| Scranton--Wilkes-Barre, PA | 11 | 48% |
| Binghamton, NY | 15 | 45% |
| Tallahassee, FL | 15 | 45% |
| Winston-Salem, NC | 14 | 44% |
| Chattanooga, TN-GA | 18 | 43% |
| Worcester, MA | 35 | 43% |
| Springfield, MA | 30 | 38% |
| Durham, NC | 8 | 38% |
| Allentown-Bethlehem-Easton, PA-NJ | 8 | 36% |
| Albany-Schenectady-Troy, NY | 32 | 35% |
| Boston-Cambridge-Quincy, MA-NH | 112 | 34% |
| Pensacola-Ferry Pass-Brent, FL | 19 | 34% |
| Detroit-Warren-Livonia, MI | 175 | 33% |
| Honolulu, HI | 11 | 33% |
| Santa Barbara-Santa Maria-Goleta, CA | 11 | 33% |
| Ann Arbor, MI | 14 | 33% |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 56 | 33% |
| Charleston-North Charleston, SC | 18 | 32% |
| Tuscaloosa, AL | 9 | 31% |
| Peoria, IL | 12 | 31% |
| Asheville, NC | 16 | 30% |

115.    Although covered entities seek to deal with contract pharmacies located across the country, as well as contract pharmacies located near to the covered entities' physical locations, the services of more distant contract pharmacies are a complement to, rather than a substitute for, the service of more proximate contract pharmacies.  Nationwide, the median distance between covered entities and their contract pharmacies as of July 1, 2017, was 4.2 miles.  The covered

entities located in the identified CBSAs draw a substantial majority of their patient population from within a 30 mile catchment radius, and need contract pharmacies located in close proximity to where their patients live and work, and could not turn to contract pharmacies with locations located only outside these CBSAs in response to a price increase for contract pharmacy services located within those CBSAs. A monopolist of contract pharmacy services in any of the 22 CBSAs identified above could profitably increase the price of 340B contract pharmacy services to covered entities in those CBSAs by a significant and non-transitory amount. As alleged above, CVS's market share in the 22 identified CBSAs, which is expressed as a percentage of CVS store locations within in each CBSA, understates its power as a contract pharmacy, due to CVS's unique product offerings, unmatched access to specialty pharmaceuticals, payer contracts, and the inability of covered entities whose patients use CVS pharmacies to steer those patients towards other contract pharmacies in the event the covered entity loses access to CVS as a contract pharmacy. For those covered entities dependent upon access to CVS for a substantial percentage of their 340B program revenues, there are no good substitutes for access to CVS as a contract pharmacy, meaning that Defendants have the ability to force an unwelcome tie and higher prices on those covered entities.

116.    CVS's market power in the relevant geographic markets is amplified by its control over access to increasingly important specialty pharmaceuticals and its network of payer contracts making CVS the exclusive or preferred supplier of specialty pharmaceuticals for tens of millions of patients nationwide. Although specialty pharmaceuticals are dispensed through the 340B program nationwide, covered entities select specialty pharmacies for inclusion in their network of contract pharmacies based on inherently local considerations, namely the number of the covered entities' patients covered by third-party payers with whom a specialty pharmacy has

contracted with and entered into an exclusive or preferred relationship.  A specialty pharmacy not contracted with payers that are important in a given area are less attractive candidates for inclusion in a contract pharmacy's network of contract pharmacies than specialty pharmacies that are contracted with the payers that insure the patients served by the covered entity, especially when that contract establishes an exclusive or preferred relationship.

117.    Sentry has existing covered entity customers in more than half of the identified CBSAs, and potential customers in all of the identified CBSAs.

118.    Another relevant service market, here the market for the "tied" product, is the market for 340B Solutions Provider services.  340B Solutions Provider compete on the basis of their fees and contract terms to covered entities, and the quality of their software and technology solutions, among other factors.  In particular, software and technology solutions for administration of 340B programs are custom designed for use in the administration of 340B programs, and other types of software, or manual administration of 340B programs, are not reasonable substitutes for software and technology solutions for administration of 340B programs.  The market for the provision of 340B Solutions Provider services to covered entities is protected by barriers to entry of new competitors, including the time and cost of product design, as well as Defendants' anticompetitive conduct. There are no close substitutes for the services of 340B Solutions Providers, and a monopolist of 340B Solutions Provider services could profitably increase the price of 340B Solutions Provider services to covered entities by a significant and non-transitory amount.

119.    The relevant geographic market for the 340B Solutions Provider services market is nationwide.  Sentry, Wellpartner and other 340B Solutions Providers compete for the business of covered entities across the country, covered entities select from 340B Solutions Providers

45

offering services from disparate and often remote parts of the country, and the effects of

Defendants' anticompetitive conduct will be felt nationwide.

120.    The anticompetitive effects of CVS's mandate that covered entities that desire to

deal with CVS as a contract pharmacy must purchase 340B Solutions Provider services from

Wellpartner will be felt in at least the "tied" service market (the market for 340B Solutions

Provider services).  By eliminating competing 340B Solutions Providers, CVS will have the

ability to force covered entities to pay higher 340B administration fees to Wellpartner than are

currently charged to covered entities by competitors of Wellpartner, including Sentry, leveraging

and extending CVS's market power from the 340B contract pharmacy market to the 340B

Solutions Provider services market.  Sentry's covered entity customers have described

Wellpartner's fees as "excessive" and substantially in excess of Sentry's fees for comparable

services.  As one covered entity communicated to Wellpartner, referring to the prices

Wellpartner proposed to charge for 340B Solutions Provider services: ██████████████████

█████████████████████████████."  Another covered entity sought from Wellpartner

"███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

████████  Competition in the "tied" service market (the market for 340B Solutions Provider services) will also be harmed by substantially foreclosing competing suppliers of 340B software and technology solutions from covered entities forced to deal with CVS through Wellpartner. Defendants' conduct will also create substantial barriers to the ability of Sentry and other 340B Solutions Providers to compete for the business of prospective customers.

121.   The competitive effects of the CVS mandate are felt market wide and are not limited to Sentry or to Sentry's customers. ████████████████████

████████████████████████████

██████████████████████

████████████████████████

██████████████████████████

███████████████████████████

██████████████████████

███████████████████████

██████████████████████████

█████████████████████████

███████████████████████████

████████████████████████████

██████████████████████  A not insubstantial volume of commerce is affected by CVS's tie of contract pharmacy services and 340B Solutions Provider services.  Many of Sentry's largest covered entity clients, including several of the largest and most significant covered entities participating in the 340B program, have substantial numbers of CVS contract pharmacies in their contract pharmacy networks, and

will be foreclosed to Sentry as a result of CVS's conduct.  By Defendants' own count, at least

█████ covered entities have been forced to accede to the Defendants' tie and contract with

Wellpartner for the provision of 340B Solutions Provider services, ████████████████

█████████.

## THIRD CLAIM FOR RELIEF: BREACH OF CONTRACT[3]

122.   Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 103.

123.   Plaintiff and Defendant CVS Pharmacy entered into the 340B Platform

Agreement, where the parties agreed that Sentry shall be "the sole and exclusive 340B Platform

Software Services Provider for" CVS "with respect to all Pharmacy Service Agreements"

between CVS and covered entities, and that CVS would not use Sentry's Confidential

Information, as defined in the 340B Platform Agreement, to compete against Sentry.

124.   Plaintiff and Defendant CVS Pharmacy entered into the CVS Mutual NDA, where

the parties agreed that CVS would not disclose and/or use Sentry's confidential business

information, as defined in the CVS Mutual NDA, including in competition against Sentry.

125.   Plaintiff and Defendant Wellpartner (then operating under the name Wellpartner

Inc.) entered into the 340B Backbone Agreement, where Wellpartner agreed that Wellpartner

would not use Sentry's Confidential Information, as defined in the 340B Backbone Agreement,

to compete against Sentry.

126.   Plaintiff and Defendant Wellpartner (then operating under the name Wellpartner

Inc.) entered into the Wellpartner Mutual NDA, where the parties agreed that Wellpartner would

not disclose and/or use Sentry's confidential business information, as defined in the Wellpartner

Mutual NDA, including in competition against Sentry.

---

[3] Sentry's Second, Eighth, and Ninth claims for relief were dismissed pursuant to this Court's
August 28, 2018 Order, Dkt. 115.

127.    Plaintiff performed each and all obligations under the 340B Platform Agreement, 340B Backbone Agreement, and the CVS and Wellpartner Mutual NDAs.

128.    All conditions to create a valid and enforceable contract were met with respect to the 340B Platform Agreement, 340B Backbone Agreement, and the CVS and Wellpartner Mutual NDAs.

129.    Defendant CVS stands in material breach of the 340B Platform Agreement due to its use of Defendant Wellpartner's 340B platform to provide 340B platform services to covered entities contracting with CVS, and its use of Sentry's confidential information, as defined in the 340 Platform Agreement, to compete against Sentry.  At all relevant times, Wellpartner has been a "third party" to CVS Pharmacy, as that term is used in 340B Platform Agreement.  For example, the contracts that Defendants are forcing Sentry's covered entity customers to sign call for the covered entity to contract with Wellpartner LLC, and not with CVS, for the provision of 340B Solutions Provider services.

130.    Defendant CVS stands in material breach of the CVS Mutual NDA due to its use of Defendant Wellpartner's 340B platform, made more effective through the use of Sentry's confidential information, as defined in the CVS Mutual NDA.

131.    Defendant Wellpartner stands in material breach of the 340 Backbone Agreement due to its use of Sentry's confidential information, as defined in the 340 Backbone Agreement, to compete against Sentry.

132.    Defendant Wellpartner stands in material breach of the Wellpartner Mutual NDA due to its use of Sentry's confidential information, as defined in the Wellpartner Mutual NDA.

133.    Plaintiff has been and continues to be damaged by the breach of both CVS and Wellpartner's contracts.

49

<u>**FOURTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH CONTRACT**</u>

134.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 121.

135.    Plaintiff held valid contracts with covered entity customers.

136.    These contracts included, among other things, exclusivity clauses which state the covered entity customers may only use Plaintiff's 340B software and technology solutions during the contract term.

137.    The Defendants knew of these contracts with the covered entity customers.

138.    Defendants intentionally and unjustifiably interfered with Plaintiff's contracts, which has induced and will induce certain covered entities to not perform or seek to renegotiate the contracts.  Defendants contacted Sentry's customers and demanded that they either switch to Defendants' platform (and breach their contract with Sentry), or lose all business with Defendant CVS.  This has resulted in, for example, a customer under contract with Sentry (which cannot be named due to confidentiality obligations), terminating its valid and exclusive Sentrex® contract with Sentry in order to use Wellpartner as a 340B Solutions Provider and thereby to continue accessing CVS as a contract pharmacy.   Other of Sentry's Sentrex® customers have communicated to Sentry that they believe that they have no choice but to also breach their contracts with Sentry and deal instead with Wellpartner, due to their need to retain access to CVS as a contract pharmacy.

139.    Defendants' conduct has caused and will continue to cause damage to Plaintiff.

<u>**FIFTH CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**</u>

140.    Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 121.

141.   Plaintiff has business relationships with certain covered entities with an expectation of actual or probable future economic benefit.  Some of those covered entities have declined to contract with Plaintiff due to Defendants' conduct as alleged herein.

142.   Defendants knew about the existence of Plaintiff's relationships with these covered entities, and that Plaintiff would receive future economic benefit from the covered entities.  For instance, one of Sentry's covered entity customers was seeking to close certain agreements with CVS pharmacies that would have closed but for Defendants' refusal to use Sentry's 340B platform.  Sentry's customers, moreover, are being told that they must switch to Defendants' platform or lose business with CVS, while assuring the customers that the transition will be smooth.  At least one customer noted it felt "handcuffed" by Defendants' ultimatum given Defendant CVS' size and importance in the marketplace.

143.   Defendants intentionally engaged in wrongful acts and conduct designed to interfere with and disrupt the relationships between Plaintiff and various covered entities.

144.   Defendants' interference was made possible and more effective by their unlawful use of Plaintiff's trade secrets and other confidential business information, including regarding Plaintiff's data specifications.

145.   Defendants' engaged in unjustified interference with Plaintiff's economically advantageous relationships with covered entities.

146.   As a result of Defendants' conduct, Plaintiff's economic relationship with current and potential covered entity clients was damaged and Plaintiff was injured.

## SIXTH CLAIM FOR RELIEF: MISAPPROPRIATION OF TRADE SECRETS
### (18 U.S.C. § 1836)

147.   Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 121.

148.     Defendants had access to Sentry's trade secret information.  This includes Sentry's data specifications, operational documentation, internal processes and procedures built through costly development and years of industry experience.  As noted above, Defendants had access to Sentry's core business model:  this internal, proprietary process for best organizing and transferring data between covered entities and pharmacies.  This internal process included a wide swath of information and procedures that made up Sentry's core business, including data work flows, operational procedures, data collection best practices, form agreements, and general know-how as to how to deal with covered entities.  Part of Defendants' collection of Sentry's internal information includes Sentry's data feed generated by covered entities operating within Sentry's framework.  This data feed is fed into Sentry's 340B platform.   Defendants have, among other things, taken Sentry's process and knowledge of Sentry's data feed to build a system that allows Defendants to compete with Sentry.  Indeed, Wellpartner's ability to seamlessly use the data feed created by Sentry's customers using Sentry's proprietary protocols shows that Wellpartner is using Sentry's trade secret information to compete with Sentry. Defendants also obtained access to Sentry's internal customer list.

149.     Plaintiff maintains control and ownership over its internal processes and operations that make up its core business model and its internal customer list.

150.     Plaintiff has taken reasonable steps to maintain the full scope of its proprietary process and procedure a secret, including through agreements with third parties that barred disclosure of related information and internal security measures to prevent public disclosure or use.   The same is true for Plaintiff's internal customer list.

151.     Defendants accessed, reviewed, maintained and/or employed Sentry's internal process to, among other things, create a 340B software and technology platform that could

operate seamlessly with Sentry customers' data feed.   Defendants then used this platform to compete for Sentry's covered entity customers, telling the covered entities they could seamlessly switch to Defendants' 340B platform by using Sentry's data feed.

152.   Defendants knew they were using this trade secret information without Sentry's permission, including Sentry' customer list.

153.   Defendants knew they had an obligation to maintain the secrecy of the trade secrets and limit their use.

154.   Sentry derives significant economic value from its internal operational procedures and best practices, and they are not generally known to, and not readily ascertainable by, other persons who may be able to obtain economic value from their disclosure.   The same is true for Sentry's internal customer list.

155.   As a result of Defendants' use of the trade secrets, Plaintiff has suffered and continues to suffer damages.

## SEVENTH CLAIM FOR RELIEF: MISAPPROPRIATION OF TRADE SECRETS (FLA. STAT. § 688.002)

156.   Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 121.

157.   Defendants had access to Sentry's trade secret information.   This includes Sentry's internal method and process built over years of industry experience and costly development.   As noted, Defendants had access to Sentry's core business model:   Sentry's internal method and process for best organizing and transferring data between covered entities and pharmacies, including information and procedures that made up Sentry's core business, such as data work flows, operational procedures, data collection best practices, form agreements, and general know-how as to how to deal with covered entities generated through years of experience in the industry and millions of dollars of investment.   Part of Defendants' collection of Sentry's

internal process included Sentry's data feed generated by covered entities operating within Sentry's framework.  Defendants have, among other things, taken Sentry's process and knowledge of Sentry's data feed to build a system that allows Defendants to compete for Sentry's customers.  Defendants also obtained access to Sentry's internal customer list.

158.    Plaintiff maintains control and ownership over its internal processes and operations that make up its core business model and its internal customer list.

159.    Plaintiff has taken reasonable steps to maintain the full scope of its proprietary process and procedure a secret, including through agreements with third parties that barred disclosure of related information, and internal security measures to prevent public disclosure or use.  The same is true for Sentry's internal customer list.

160.    Defendants accessed, reviewed, maintained and/or employed Sentry's internal process to, among other things, create a 340B software and technology platform that could operate seamlessly with Sentry customers' data feed.   Defendant then used this platform to attack Sentry's covered entity customers, telling the covered entities they could seamlessly switch to Defendants' 340B platform by using Sentry's data feed.

161.    Defendants knew that were using this trade secret information without Sentry's permission, including Sentry's internal customer list.

162.    Defendants knew they had an obligation to maintain the secrecy of the trade secrets and limit their use.

163.    Sentry derives major economic value from its internal operational procedures and best practices, and they are not generally known to, and not readily ascertainable by, other persons who may be able to obtain economic value from their disclosure.  The same is true for Sentry's customer list.

164.    As a result of Defendants' use of the trade secrets, Plaintiff has suffered and continues to suffer damages.

## **PRAYER FOR RELIEF**

165.    To remedy these illegal acts, Plaintiff requests the Court:

a.      Enter an injunction permanently enjoining the Defendants from the other unlawful conduct of the Defendants as alleged herein;

b.      Award actual, compensatory and trebled damages, as applicable, in favor of the Plaintiff and against all Defendants, jointly and severally, and punitive damages, including all interest thereon;

c.      Award Plaintiff reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

d.      Any such further relief as the Court deems appropriate.

Sentry hereby demands a trial by jury on all issues so triable.

/S/ CARL E. GOLDFARB

Stephen N. Zack, Esq.
100 SE Second Street, Suite 2800
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:  (305) 539-1307
Email:  szack@bsfllp.com

Carl E. Goldfarb, Esq.
Travis Robert-Ritter, Esq.
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile:  (954) 356-0022
Email: cgoldfarb@bsfllp.com
Email: tritter@bsfllp.com

Christopher G. Renner, Esq.
(pro hac vice)
1401 New York Ave., NW

Washington, DC 20005
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email: crenner@bsfllp.com

Attorneys for Plaintiff Sentry Data Systems, Inc.