UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-cv-60257

SENTRY DATA SYSTEMS, INC.,

    Plaintiff,


CVS HEALTH, CVS PHARMACY, INC.,
WELLPARTNER INC., and
WELLPARTNER, LLC,

    Defendants.

_____/


**DEFENDANTS' MOTION AND INCORPORATED MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
<u>COUNTS ONE, FOUR, AND FIVE IN PLAINTIFF'S AMENDED COMPLAINT</u>**

# TABLE OF AUTHORITIES

**Page(s)**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

I.     OVERVIEW OF THE LAWSUIT ........................................................... 2

     A.     The 340B Drug Program ............................................................ 2

     B.     The Parties ................................................................................ 2

     C.     CVS Develops An Integrated Model By Acquiring Wellpartner ......... 2

II.     PROCEDURAL HISTORY ..................................................................... 3

     A.     The Original Complaint ............................................................ 3

     B.     Plaintiff's Opposition to Defendants' Motion to Dismiss ................. 4

     C.     The Court's Motion To Dismiss Ruling ......................................... 4

     D.     The Amended Complaint .......................................................... 5

STANDARD OF REVIEW ................................................................................... 5

ARGUMENT ..................................................................................................... 6

I.     SENTRY FAILS TO ALLEGE A PLAUSIBLE CLAIM FOR UNLAWFUL
TYING UNDER SECTION 1 OF THE SHERMAN ACT ........................... 6

     A.     Plaintiff Still Fails To Define The Relevant Geographic Markets ......... 7

           1.     Plaintiff Cannot Allege That The Relevant Geographic Market Is
Both National and Local ............................................... 8

           2.     Plaintiff's Belated National Market Theory Is Contradicted By Its
Own Allegations Regarding Customer Behavior ................. 9

           3.     Plaintiff Still Fails to Define Even a Single Relevant "Local"
Market ................................................................... 12

     B.     Plaintiff Still Fails To Plead Market Power In Any Relevant Market ....... 15

           1.     Plaintiff Does Not Allege National Market Power ................. 15

           2.     Plaintiff Does Not Allege Market Power In Any Local Market ..... 16

II.     PLAINTIFF FAILS TO STATE CLAIMS FOR TORTIOUS INTERFERENCE ........ 19

CONCLUSION .................................................................................................. 20

**Cases**

*Am. Channel, LLC v. Time Warner Cable, Inc.*,
No. 06-2175, 2007 WL 142173 (D. Minn. Jan. 17, 2007) ................................. 8, 13

*In re Am. Online, Inc.*,
168 F. Supp. 2d 1359 (S.D. Fl. 2001) ........................................................... 8

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
  300 F.3d 620 (5th Cir. 2002) ................................................................................7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................5

*Bral Corp. v. Johnstown Am. Corp.*,
  919 F. Supp. 2d 599 (W.D. Pa. 2013) ................................................................20

*Cacique, Inc. v. Gonzalez*,
  No. 03-C-5430, 2004 WL 609278 (N.D. Ill. Mar. 26, 2004) ..............................20

*Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*,
  878 F. Supp. 1389 (W.D. Wash. 1993), *aff'd*, 37 F.3d 1504 (9th Cir. 1994) ...........................8

*Clark Memorials of Alabama Inc. v. SCI Alabama Funeral Services LLC*,
  991 F. Supp. 2d 1151 (N.D. Ala. 2014) .......................................................13, 17

*Discon Inc. v. NYNEX Corp.*,
  86 F. Supp. 2d 154 (W.D.N.Y. 2000) .................................................................17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ...........................................................................................6, 15

*Evac, LLC v. Pataki*,
  89 F. Supp. 2d 250 (N.D.N.Y. 2000) ...................................................................8

*Ill. Tool Works, Inc. v. Independent Ink, Inc.*,
  547 U.S. 28 (2006) .............................................................................................6, 7

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ............................................................................7

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ..............................................................................................6, 16

*Kaufman v. Time Warner*,
  836 F.3d 137 (2d Cir. 2016) ..........................................................................6, 7, 16

*Mathias v. Daily News, L.P.*,
  152 F. Supp. 2d 465 (S.D.N.Y. 2001) ..................................................................8

*Metzler v. Bear Auto. Serv. Equip. Co.*,
  19 F. Supp. 2d 1345 (S.D. Fl. 1998) ..............................................................16, 20

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
   458 F. Supp. 2d 474 (E.D. Mich. 2006), *aff'd*, 524 F.3d 726 (6th Cir. 2008) .................... 8, 17

*Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Assn.*,
   524 F.3d 726 (6th Cir. 2008) ........................................................................................ 18

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018) .................................................................................................. 7

*Philips Elecs. N. Am. Corp. v. BC Tech., Inc.*,
   No. 08-639, 2009 WL 2381333 (D. Utah Aug. 3, 2009) ............................................. 7

*Q Club Resort & Residences Condo. Ass'n v. Q Club Hotel, LLC*,
   No. 09-60911, 2010 WL 11454483 (S.D. Fla. Jan. 6, 2010) .................................... 7

*Ragner Tech. Corp. v. Berardi*,
   No. 15-7742, 2018 WL 1420490 (D.N.J. Mar. 3, 2018) ........................................... 11

*Randall v. Scott*,
   610 F.3d 701 (11th Cir. 2010) ...................................................................................... 6

*Republic Tobacco, L.P. v. N. Atl. Trading Co.*,
   254 F. Supp. 2d 1007 (N.D. Ill. 2003) ........................................................................ 20

*Sheridan v. Marathon Petroleum Co. LLC*,
   530 F.3d 590 (7th Cir. 2008) ........................................................................................ 18

*Sidibe v. Sutter Health*,
   4 F. Supp. 3d 1160 (N.D. Cal. 2013) ........................................................................... 13

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
   376 F.3d 1065 (11th Cir. 2004) .................................................................................... 7

*T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.*,
   931 F.2d 816 (11th Cir. 1991) ................................................................................. 9, 10

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) ...................................................................................... 17

**Statutes**

Florida Uniform Trade Secrets Act, Fla. Stat. § 688.01 *et seq.* .................................... 20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities**

ABA Section of Antitrust Law,
*Antitrust Law Developments (Seventh)* (7th ed. 2012) ..........................................................16

*Federal Antitrust Law* § 10.15 (2013) ..................................................................................................9

Office of Management & Budget, OMB Bulletin No. 15-01, Revised Delineations
of Metropolitan Statistical Areas, Micropolitan Statistical Areas, and
Combined Statistical Areas, and Guidance on Uses of the Delineations of
These Areas (July 15, 2015) ..................................................................................................13

*Restatement (Second) of Torts* § 768 ..................................................................................................19

U.S. Census Bureau, Geographic Terms and Concepts – Core Based Statistical
Areas and Related Statistical Areas, https://www.census.gov/geo/reference/
gtc/gtc_cbsa.html ..................................................................................................................13

U.S. House Comm. on Energy & Commerce, *Review of the 340B Drug Pricing
Program* (2018) ..................................................................................................................17

## <u>INTRODUCTION</u>

Last month, this Court dismissed without prejudice Plaintiff's claim for illegal tying under Section 1 of the Sherman Act because Plaintiff failed to plead a relevant geographic market.  *See* Aug. 28, 2018 Order at 10–12 (ECF No. 115).  The Court explained that Plaintiff's allegation that the relevant markets are "local" was not sufficient because it did "little to clarify exactly what geographic market Sentry is alleging is relevant to its Section 1 claim."  *Id*. at 12.  Plaintiff has now amended its complaint to add a series of new allegations and exhibits—all purportedly to show that CVS has market power in the 340B contract pharmacy services market.  But rather than clarifying the contours of the relevant geographic markets, the Amended Complaint further obscures the relevant geographic markets by contradictorily and incoherently alleging both a nationwide market *and* an undefined number of "local" markets.

Plaintiff's newly minted theory of a national market is at war with Plaintiff's own allegations.  Plaintiff alleges repeatedly that covered entities seek to do business with local pharmacies, not with pharmacies located across the country.  As Plaintiff's allegations make plain, it is implausible that a hospital located in, for instance, St. Louis would consider a pharmacy located in Honolulu to be a substitute for a pharmacy located just down the street.

Moreover, Plaintiff's new allegations regarding "local" markets fare no better than Plaintiff's original flawed allegations.  Even now, Sentry fails to identify the number of local markets that are at issue.  And it fails to identify the geographic boundaries for *even a single* "local" market.  Thus, even after the Court's ruling and the amendment of the Complaint, Defendants still have no idea where the local geographic markets are located and how many markets are at issue.  Given that the identification of geographic markets is a "threshold requirement," *id.*, Plaintiff's tying claim fails as a matter of law and should be dismissed.

In addition, Plaintiff's tortious interference claims should be dismissed.  These claims are (1) premised on the same inadequate allegations as Plaintiff's failed antitrust claim, or (2) preempted by the Florida Uniform Trade Secrets Act.

## BACKGROUND

### I.  OVERVIEW OF THE LAWSUIT

#### A.  The 340B Drug Program

The 340B Drug Pricing Program allows eligible healthcare providers ("covered entities") to buy prescription drugs at discounted prices.  Am. Compl. ¶ 12.  When a 340B drug is dispensed, the patient's insurance company pays for the drug according to its usual pricing plan.  The covered entity receives the difference between the insurer-paid drug price and the 340B drug price, minus the costs of carrying out the 340B program and dispensing the drug.  *Id.* ¶ 15.  Covered entities often enter into contracts with (1) pharmacies ("contract pharmacies") to dispense 340B drugs, and (2) 340B administrators to provide administrative services, such as identifying 340B-eligible prescriptions and managing 340B drug inventories.  *Id.* ¶¶ 18, 25, 67–68.

#### B.  The Parties

Plaintiff Sentry Data Systems, Inc. ("Sentry") is a 340B program administrator.  *Id.* ¶ 69.  Defendant Wellpartner, LLC ("Wellpartner") is a competing 340B program administrator.  *Id.* ¶ 85.  Defendant CVS Pharmacy, Inc. ("CVS") is a pharmacy business.  Some of CVS's pharmacy locations serve as contract pharmacies.  *Id.* ¶ 34.  CVS has a smaller number of contract pharmacy locations than Walgreens and is one of six retail pharmacy chains that account for only two-thirds of the approximately 20,000 contract pharmacy locations nationwide.  *Id.*

#### C.  CVS Develops An Integrated Model By Acquiring Wellpartner

In December 2017, CVS announced that it had acquired Wellpartner and that the

companies would offer contract pharmacy and 340B administration services on an integrated basis for CVS contract pharmacy locations.  *Id.* ¶ 89.  As CVS explained in the announcement, its new integrated solution offers many benefits to covered entities, including the potential for increased 340B savings through expanded access to CVS pharmacy locations.  *Id.* Ex. F.  The new integrated offering applies only to CVS pharmacy locations.  Covered entities remain free to obtain contract pharmacy services from other pharmacies and to use other 340B administrators in connection with other pharmacies.  *See id.* ¶ 89; *see also id.* Ex. F.

## II.   PROCEDURAL HISTORY

### A.   The Original Complaint

Threatened by Defendants' new integrated solution and hoping to block competition, Plaintiff filed suit alleging that Defendants are unlawfully forcing covered entities to use Wellpartner for CVS pharmacies and that Defendants have misappropriated Plaintiff's trade secrets.  Compl. ¶ 1 (ECF No. 1).  Plaintiff asserted nine causes of action:  unlawful tying in violation of Section 1 of the Sherman Act (Count I); violation of Florida's Deceptive and Unfair Trade Practices Act (Count II); breach of contract (Count III); tortious interference with contract (Count IV) and business relationships (Count V); misappropriation of trade secrets (Counts VI–VII); conversion of confidential information (Count VIII); and unfair competition (Count IX).

With respect to its antitrust tying claim, Plaintiff alleged that CVS has market power in the provision of 340B contract pharmacy services "in local relevant geographic markets across the country."  *Id.* ¶ 75.  But Plaintiff failed to identify the number of "local" markets at issue or define those "local" markets.  Instead, Plaintiff alleged, without drawing any geographic boundaries, that CVS has market power because it makes up 30 percent or more of the contract pharmacy networks of 180 covered entities—a mere 3 percent of the 6,000 covered entities that Sentry alleges participate in the 340B program.  *Id.* ¶¶ 14, 35; *id.* Ex. A.  Further obscuring the

scope of the "local" markets at issue, Plaintiff inconsistently pointed to a state (Maryland), a city (Washington D.C.), and a large swath of Pennsylvania where CVS allegedly has more than 30 percent of the contract pharmacies.  *Id.*  ¶¶ 30, 35; *id.* Ex. A.  Plaintiff similarly bounced between national, regional, and city data with respect to its irrelevant allegations regarding CVS's market share in the *retail* (not 340B) pharmacy market.  *Id.* ¶ 29.

**B.     Plaintiff's Opposition to Defendants' Motion to Dismiss**

In opposing Defendants' Motion to Dismiss Plaintiff's antitrust tying claim, Plaintiff argued unequivocally that "the relevant markets in this case are local, *not national*."  Pl.'s Opp. Mot. Dismiss at 7 (ECF No. 56).[1]  Sentry doubled down on this position at oral argument:

> [W]e allege in great detail in the complaint why it is that these markets are *local in nature*.  If you're a hospital, and you want to provide outpatient pharmaceuticals to your patients, and you're a hospital in Miami, a contract pharmacy in Tampa is not a good substitute because your customers are probably in the Miami area . . . .  They're going to want to go to a pharmacy that's convenient for them.  They're not going to go to Tampa to pick up their medication.  *So these markets are inherently local in nature . . . .*

Mot. Dismiss Hr'g Tr. at 52 (ECF No. 112).

**C.     The Court's Motion To Dismiss Ruling**

On August 28, 2018, the Court issued its ruling.  ECF No. 115.  In dismissing Plaintiff's antitrust claim, the Court held that Plaintiff failed to satisfy the "threshold requirement" to define the relevant geographic market.  *Id.* at 12.  The Court rejected Plaintiff's allegations regarding "local" markets or markets for particular covered entities, concluding that they did "little to clarify exactly what geographic market Sentry is alleging is relevant to its Section 1 claim" and "[did] not plausibly suggest the contours of the relevant geographic market as required for a tying claim."  *Id.* at 11–12.  The Court granted Sentry leave to replead.  *Id.* at 21.

---

[1]     All emphasis is added unless otherwise noted.

### D.     The Amended Complaint

Plaintiff filed its Amended Complaint on September 10, 2018.  ECF No. 121.  In a dramatic departure from the original Complaint and Plaintiff's opposition to Defendants' Motion to Dismiss, Sentry now inconsistently alleges that the relevant geographic markets are *both national and local*.  *Id.* ¶¶ 112–14.  Plaintiff's new national market theory is contradicted by its own allegations that "covered entities seek to deal with contract pharmacies located in close proximity to their patient population," *id.* ¶ 37, and that the "median distance between covered entities and their contract pharmacies as of July 1, 2017, was 4.2 miles."  *Id.* ¶ 115.

With respect to "local" markets, Plaintiff still fails to identify a single local market.  The closest it comes is to identify 22 non-local core-based statistical areas ("CBSA")—urban centers along with adjacent counties that are socioeconomically tied to the urban center—where CVS's share of contract pharmacies is allegedly 30 percent or more.  *Id.* ¶ 114.  But even with respect to these CBSAs, Plaintiff alleges only that "there are local geographic markets relevant to this action that are *no broader than* each of the 22 individual CBSAs."  *Id.*  In other words, Plaintiff refuses to say that (1) these 22 CBSA *are the relevant geographic markets*, or (2) there are no relevant geographic markets outside these 22 CBSAs.  Because Plaintiff has failed, once again, to allege a relevant geographic market, its tying claim is fatally flawed and should be dismissed.

### STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must "'state a claim to relief that is plausible on its face,'" meaning it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to

relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  Moreover, "conclusory allegations . . . are
not entitled to an assumption of truth—legal conclusions must be supported by factual
allegations." *Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir. 2010).

<u>ARGUMENT</u>

## I.   SENTRY FAILS TO ALLEGE A PLAUSIBLE CLAIM FOR UNLAWFUL TYING UNDER SECTION 1 OF THE SHERMAN ACT

Plaintiff asserts a claim under Section 1 of the Sherman Act for alleged illegal tying of
340B contract pharmacy services and 340B program administration services.  This claim fails
because the Amended Complaint, like Plaintiff's original Complaint, lacks factual allegations
plausibly showing that CVS has market power in a properly defined relevant market.

The Supreme Court has recognized that many tying arrangements are "procompetitive"
and "fully consistent with a free, competitive market." *Ill. Tool Works, Inc. v. Independent Ink,
Inc.*, 547 U.S. 28, 36, 45 (2006); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12
(1984), *abrogated in part by Ill. Tool Works*, 547 U.S. 28 (2006).  Thus, tying is unlawful only
where a seller has "sufficient power in the tying product market to restrain competition in the
market for the tied product." *Ill. Tool Works*, 547 U.S. at 36; *see also Kaufman v. Time Warner*,
836 F.3d 137, 141 (2d Cir. 2016).  Market power is the "ability of a single seller to raise price
and restrict output." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992).
Absent market power, "a seller's inefficient tie-in will fail because a rational consumer will buy
the tying product from the seller's competitor." *Kaufman*, 836 F.3d at 143.  To plead market
power, a plaintiff must (1) properly define the relevant markets, and (2) allege facts plausibly
showing market power in the tying market.  Plaintiff has done neither.

## A.      Plaintiff Still Fails To Define The Relevant Geographic Markets

A plaintiff asserting a claim under Section 1 of the Sherman Act must define the relevant market. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).[2]  The relevant market is "a distinct market, with a specific set of geographical boundaries and a narrow delineation of the products at issue." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1074 (11th Cir. 2004).  Moreover, where a plaintiff is alleging more than one geographic market, it needs to allege facts plausibly defining each such market. *Kaufman*, 836 F.3d at 147.  "Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement." *Q Club Resort & Residences Condo. Ass'n v. Q Club Hotel, LLC*, No. 09-60911, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010).  Indeed, the Supreme Court recently held that the threshold requirement to establish market power in a relevant market cannot be bypassed where, as here, a plaintiff is challenging an alleged vertical restraint of trade.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018).  As this Court has already recognized in dismissing Plaintiff's Section 1 claim once before, "Rule 12(b)(6) dismissal is appropriate where the plaintiff's description of the geographic market is legally inadequate and/or wholly conclusory." Aug. 28, 2018 Order at 10 (quoting *Q Club Resort*, 2010 WL 11454483, at *2).[3]

---

[2]      Plaintiff challenges Defendants' conduct as "a *per se* unlawful tying arrangement" or "[a]lternatively . . . under the rule of reason." Am. Compl. ¶ 107.  "[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product," and this conclusion "must be supported by proof of power in the relevant market rather than by a mere presumption thereof." *Ill. Tool Works*, 547 U.S. at 43, 46.  Thus, Plaintiff cannot escape the requirement to establish CVS's market power in a properly defined market.

[3]      Courts routinely grant motions to dismiss where antitrust plaintiffs fail to allege proper geographic markets. *See*, *e.g.*, *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628–33 (5th Cir. 2002); *Q Club Resort*, 2010 WL 11454483, at *2–3; *Philips Elecs. N. Am. Corp. v. BC Tech., Inc.*, No. 08-639, 2009 WL 2381333, at *1 (D. Utah Aug. 3,

Plaintiff continues to allege that the "tying product" market is 340B contract pharmacy services.  Am. Compl. ¶ 106.  Plaintiff, however, once again fails to allege properly defined and coherent geographic markets.  Instead, Plaintiff wavers back and forth between alleging a nationwide market and undefined "local" markets.  Both market definitions fail.

### 1.    Plaintiff Cannot Allege That The Relevant Geographic Market Is Both National and Local

Plaintiff alleges that there is both "a relevant geographic market that is nationwide," as well as "local relevant geographic markets."  *Id.* ¶ 113.  Plaintiff cannot have it both ways.  *See Am. Channel, LLC v. Time Warner Cable, Inc.*, No. 06-2175, 2007 WL 142173, at *9 (D. Minn. Jan. 17, 2007) (dismissing claim for failure to allege a relevant geographic market where the plaintiff "pled three separate geographic markets—local, regional, and national"); *Mathias v. Daily News, L.P.,* 152 F. Supp. 2d 465, 483 (S.D.N.Y. 2001) (dismissing claim for failure to define a "precise geographic market" where plaintiffs made "contradictory" allegations of "a narrow, 'tri-state area' market" and "a broader national market"); *Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*, 878 F. Supp. 1389, 1394 (W.D. Wash. 1993) (dismissing claim that inconsistently referred to "a northwest market, a national market, an Alaska market, an Oregon and Eastern Washington market, and a Western Washington market"), *aff'd*, 37 F.3d 1504 (9th Cir. 1994).  The Court should reject Plaintiff's belated attempt to hedge its bets by combining hopelessly contradictory definitions of the relevant geographic market.

---

2009); *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 458 F. Supp. 2d 474, 483 (E.D. Mich. 2006), *aff'd*, 524 F.3d 726 (6th Cir. 2008); *In re Am. Online, Inc.*, 168 F. Supp. 2d 1359, 1375–76 (S.D. Fl. 2001); *Evac, LLC v. Pataki*, 89 F. Supp. 2d 250, 261 (N.D.N.Y. 2000).

**2.      Plaintiff's Belated National Market Theory Is Contradicted By Its Own Allegations Regarding Customer Behavior**

Having previously represented to the Court that the relevant geographic markets "are inherently local in nature," and "local, not national," Plaintiff now contradicts itself and attempts to tack on allegations regarding a purported "national" market.  But Plaintiff's allegations concerning a nationwide geographic market should be rejected because they are implausible in light of Plaintiff's own allegations concerning covered entities' and their patients' preferences to use contract pharmacies located close to those covered entities.

The geographic market "is the area in which the product or its reasonably interchangeable substitutes are traded."  *T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991).  As explained in the Court's prior ruling, a plaintiff must plead a geographic market that "correspond[s] to the commercial realities of the industry," is "economically significant," and "include[s] the area in which consumers can practically seek alternative sources of the product."  Aug. 28, 2018 Order at 10 (quoting *Q Club Resort*, 2010 WL 11454483, at *2).  Thus, in determining the relevant geographic market, "customer convenience and preference" must be considered."  *T. Harris Young*, 931 F.2d at 823.  In addition, "[m]arkets involving services that can only be offered from a particular location, like those provided by hospitals, theaters, and ski areas, will often be defined by how far consumers are willing to travel."  Earl W. Kintner, *Federal Antitrust Law* § 10.15 (2013).

Plaintiff's allegations regarding customer behavior flatly contradict any purported national market.  Plaintiff alleges that "covered entities draw patients from the local markets surrounding their physical locations, and seek to contract with contract pharmacies located in the same geography as their patient population."  Am. Compl. ¶ 113.  Plaintiff makes this type of allegation time and time again.  *See, e.g.*, *id.* ¶ 34 (covered entities "look for relationships with

pharmacies with the . . . most convenient locations for their patients"); *id.* ¶ 37 ("covered entities seek to deal with contract pharmacies located in close proximity to their patient population[s]"); *id.* ¶ 114 ("covered entities draw patients from local markets that are limited by the desire of patients to access health care close to where they live and work, and contract for contract pharmacy services to serve that local patient population").

Numerous additional allegations further demonstrate that Plaintiff's theory of a purported nationwide market is incoherent and not supported by plausible allegations. Although the Eleventh Circuit holds that the geographic market is the area in which consumers will look for "substitutes," *T. Harris Young*, 931 F.2d at 823, Plaintiff flatly admits that "more distant contract pharmacies" are not "a substitute for[] the service of more proximate contract pharmacies." Am. Compl. ¶ 115. Plaintiff further alleges, for instance, that "the median distance between covered entities and their contract pharmacies as of July 1, 2017, was 4.2 miles." *Id.* Having made this allegation, Plaintiff cannot plausibly allege that every contract pharmacy in the entire country—an area of over 3 million square miles—competes for the business of every covered entity across the nation.

Further inconsistent with a purported national market, Plaintiff includes a chart of 22 CBSAs. *Id.* ¶ 114. Obviously, if the market were truly national, then these smaller areas would be beside the point. Worse yet, Plaintiff alleges that covered entities "need contract pharmacies located in close proximity to where their patients live and work, *and could not turn to contract pharmacies with locations only outside these CBSAs* in response to a price increase for contract pharmacy services located within those CBSAs." *Id.* ¶ 115. Such allegations regarding the close proximity of contract pharmacies to covered entities and the impracticability of patients venturing outside those areas are the antithesis of a national market.

-10-

Plaintiff seems to base its nationwide market allegations on the fact that CVS is a national chain pharmacy and competes with other national chain pharmacies.  *Id.* ¶ 112.  Such allegations are irrelevant, however, because "the relevant geographic market is not defined by the market in which the defendant conducts business.  Rather, the relevant geographic market is where customers would rationally look for the goods or services he or she seeks."  *Ragner Tech. Corp. v. Berardi*, No. 15-7742, 2018 WL 1420490, at*10 (D.N.J. Mar. 3, 2018).  Moreover, covered entities contract with individual pharmacy locations, not pharmacy chains as a whole.[4]

Plaintiff tries to save its incoherent national market allegations by relying on allegations relating to the specialty pharmacy context.  Am. Compl. ¶ 112.  Plaintiff, for instance, makes a number of allegations regarding exclusive or preferred contracts that CVS has signed with particular insurers with respect to the provision of specialty pharmaceuticals.  *Id.* ¶¶ 46–61.  But other than one governmental benefit plan, none of these contracts is national in scope.  Some relate to insurers serving an entire state.  *See, e.g.*, *id.* ¶ 45 ("California").  Some relate to a region.  *See, e.g.*, *id.* ¶ 46 ("Maryland, the District of Columbia, and parts of Northern Virginia").  Some relate to counties.  *See, e.g.*, *id.* ¶ 59 ("eight counties in western New York").  And some are limited only to specific employers.  *See, e.g.*, *id.* ¶ 52 ("Sharp Memorial Hospital").

Plaintiff also alleges that CVS has 13 specialty mail order pharmacies (as compared to 9,800 CVS retail locations) that "typically fill prescriptions from a central location and then

---

[4]     Even if CVS's footprint were relevant, Plaintiff fails to make allegations of market power in all fifty states.  Plaintiff's Exhibit A, which purports to capture those covered entities over which CVS allegedly has market power, references covered entities located in just 36 states and the District of Columbia.  Am. Compl. ¶ 65; *id.* Ex. A.  Likewise, Plaintiff identifies only 22 CBSAs out of a total of 933 CBSAs across the United States.  *Id.* ¶ 114.  The 22 CBSAs that Plaintiff lists cover portions of only 18 states and the District of Columbia.

deliver the products directly to the consumer's home." *Id.* ¶ 112.[5]  But Plaintiff nowhere articulates any distinction in the 340B contract pharmacy market for specialty pharmacies versus retail pharmacies.  To the contrary, Plaintiff alleges that "covered entities select specialty pharmacies for inclusion in their network of contract pharmacies based on *inherently local considerations*, namely the number of the covered entities' patients covered by third-party payers with whom a specialty pharmacy has contracted with and entered into an exclusive or preferred relationship." *Id.* ¶ 116.  Moreover, Plaintiff alleges that "approximately half of CVS's specialty pharmaceuticals are dispensed to patients through CVS's *retail* pharmacy locations, giving patients easy, *local* access to specialty pharmaceuticals." *Id.* ¶ 40.

At bottom, Plaintiff's allegations are entirely inconsistent with the concept of a national market.  If the market were truly national, then each covered entity could look anywhere in the United States for a contract pharmacy to serve its patients, and contract pharmacies across the country would compete for the business of each covered entity.  Plaintiff's nationwide market definition would mean that a CVS pharmacy location in New York competes with a Walgreens pharmacy location in San Francisco for the business of a covered entity located in Miami.  This is surely not the case, and Plaintiff's allegations of a nationwide market fail.

### 3.    Plaintiff Still Fails to Define Even a Single Relevant "Local" Market

Plaintiff also fails to define the "local" geographic markets at issue.  This Court has already held that it is not enough to withstand a Rule 12(b)(6) motion for Plaintiff to allege that "'CVS has a high share of specific local markets around the country' and that for a select 180

---

[5]    Plaintiff's Exhibit G is a map purporting to show "more than 300 covered entities located around the country that have contracted with a single CVS specialty pharmacy in Pennsylvania to provide 340B contract pharmacy services."  Am. Compl. ¶ 112.  The Monroeville, Pennsylvania contract pharmacy featured in this map is not a brick and mortar pharmacy location, but rather one of CVS's specialty mail order pharmacies.

covered entities, CVS provides a high percentage of their contract pharmacy business," because "this does little to clarify exactly what geographic market Sentry is alleging is relevant to its Section 1 claim." Aug. 28, 2012 Order at 12 (quoting Pl.'s Opp. Mot. Dismiss at 7).

Other courts have rejected similar conclusory allegations. In *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160 (N.D. Cal. 2013), the court dismissed tying claims alleging that the relevant geographic markets for hospital services were "local," because (1) the complaint failed to identify the specific local markets at issue, and (2) to the extent that the complaint identified particular counties, it failed to provide "factual support" with respect to each county "for drawing boundaries at the county lines." *Id.* at 1175. In *Clark Memorials of Alabama Inc. v. SCI Alabama Funeral Services LLC,* 991 F. Supp. 2d 1151 (N.D. Ala. 2014), the court held that a geographic market in burial lots limited to the "Birmingham metropolitan area" was not plausibly alleged where the complaint contained no "facts regarding consumer behavior." *Id.* at 1161–62. And as another court summed up the issue when dismissing a complaint, "the terms local and regional refer to nothing" where the complaint "fails to define that place or region to which the adjectives local and regional apply." *Am. Channel*, 2007 WL 142173, at *9.

Despite the dismissal of its original "local" allegations, Plaintiff still has not identified a single specific "local" market—not one. Nor does Plaintiff even allege how many local geographic markets are at issue. Instead, the best Plaintiff does is to include a chart purporting to show that CVS has 30 percent or more of the 340B contract pharmacies in 22 of the 933 CBSAs in the country, *i.e.*, in approximately 2 percent of the CBSAs.[6] Even then, however, Plaintiff

---

[6]     CBSAs comprise metropolitan statistical areas and micropolitan statistical areas. *See* U.S. Census Bureau, Geographic Terms and Concepts – Core Based Statistical Areas and Related Statistical Areas, https://www.census.gov/geo/reference/gtc/gtc_cbsa.html. There are 933 CBSAs in the United States. *See* Office of Management & Budget, OMB Bulletin No. 15-01, Revised Delineations of Metropolitan Statistical Areas, Micropolitan

does not contend that these 22 CBSAs comprise relevant markets.  Rather, Plaintiff hedges by saying that there is some unspecified number of "local geographic markets relevant to this action that are *no broader than* each of the 22 individual CBSAs identified below."  Am. Compl. ¶ 114.  This allegation still does nothing to satisfy Plaintiff's threshold legal requirement to define the precise boundaries of the purported local markets.  The CBSAs listed on the chart include regions of varying sizes and characteristics:  for instance, some are individual cities (*e.g.*, Tallahassee, FL), while others include portions of as many as three different states and the District of Columbia (*e.g.*, Washington-Arlington-Alexandria, DC-VA-MD-WV).  *Id.*

Plaintiffs' other allegations demonstrate that this chart of 22 CBSAs apparently does not even capture all of the purported unidentified "local" markets.  Exhibit A is a list of 365 covered entities—not geographic locations—for which CVS comprises 30 percent or more of the contract pharmacy network, out of an alleged universe of 6,000 total covered entities.  *Id.* ¶¶ 12, 65.  Although Plaintiff's allegations should be consistent, Exhibit A includes covered entities that are not located in the 22 CBSAs.  *See id.* Ex. A at 27 (listing, for instance, covered entities in Corpus Christi, Texas and Medford, Oregon).  Thus, Plaintiff's inconsistent charts serve only to drive home the fact that Plaintiff has failed to allege the relevant geographic markets.

These are hardly the only inconsistencies.  Although Plaintiff relies upon the 22 CBSAs, Plaintiff says that "covered entities seek to contract with contract pharmacies located in *close geographic proximity*."  *Id.* ¶ 112.  Plaintiff also highlights CVS's alleged "footprint of retail pharmacies located *within 10 miles or less of covered entities' patient populations*."  *Id.* ¶ 113.  And, as noted above, Plaintiff pleads that the median distance between a covered entity and its

_____

Statistical Areas, and Combined Statistical Areas, and Guidance on Uses of the Delineations of These Areas, at 2, 5 (July 15, 2015), *available at* https://obamawhitehouse.archives.gov/sites/default/files/omb/bulletins/2015/15-01.pdf.

contract pharmacies is 4.2 miles.  *Id.* ¶ 115.  Despite these allegations, Plaintiff is unwilling to actually define any local market or to say that the markets are, in fact, smaller than the CBSAs.  *See id.* ¶ 114 (alleging that the "local geographic markets relevant to this action . . .  are no broader than each of the 22 individual CBSAs identified below").  This is just another example of the internal inconsistencies that plague Plaintiff's allegations regarding "local" markets.

Because Plaintiff has failed to allege any viable geographic market, the Court should once again dismiss Plaintiff's tying claim.  Having already given Plaintiff the opportunity to amend this claim, this time, the Court should dismiss the claim with prejudice.

### B.    Plaintiff Still Fails To Plead Market Power In Any Relevant Market

Even if Plaintiff had identified coherent geographic markets, Plaintiff fails to plead facts plausibly supporting the existence of market power.  Market power "ordinarily is inferred from the seller's possession of a predominant share of the market."  *Eastman Kodak*, 504 U.S. at 464.  Here, Plaintiff fails to plead that CVS had market power in any geographic market.

### 1.    Plaintiff Does Not Allege National Market Power

Even if Plaintiff had properly alleged a national geographic market—and it did not—it fails to allege market power in a purported national 340B contract pharmacy market.  Plaintiff does not make any allegations regarding CVS's market share of the national 340B contract pharmacy market.  Rather, it alleges only that six retail pharmacy chains (Walgreens, CVS, Walmart, Rite Aid, Kroger, and Albertsons) "account for two-thirds of 340B contract pharmacy locations."  Am. Compl. ¶ 34.  But allegations concerning the *combined national* market share of six pharmacy chains say nothing about CVS's *individual* market share.  Moreover, Plaintiff admits that Walgreens—not CVS—is the largest contract pharmacy.  *Id.*

Unable to demonstrate market power in the 340B contract pharmacy market, Plaintiff instead alleges that, as of December 31, 2017, CVS "held approximately 23.8% of the United

States retail pharmacy market." *Id.* ¶ 37. This allegation involves the wrong product market: retail pharmacies rather than 340B contract pharmacies. Moreover, Plaintiff fails to allege that CVS's market share in the 340B contract pharmacy services market can be derived from its market share in the overall retail pharmacy market. As such, the allegations regarding retail market share fail to allege market power. *See Kaufman,* 836 F.3d at 147 ("The plaintiffs cannot plausibly derive Time Warner's market power over Premium Cable Services from broad allegations about the nationwide market for basic cable.").

In any event, CVS's alleged market share in the retail pharmacy market—23.8%—is insufficient as a matter of law. In *Jefferson Parish*, the Supreme Court found that a market share of 30% did not demonstrate the requisite market power. 466 U.S. at 26–29. "Since *Jefferson Parish*, no court has inferred the requisite market power from a market share below 30 percent." ABA Section of Antitrust Law, *Antitrust Law Developments (Seventh)* at 192 (7th ed. 2012); *see also Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1361 (S.D. Fl. 1998).

### 2.    Plaintiff Does Not Allege Market Power In Any Local Market

As discussed above, Plaintiff has not alleged any proper local markets. As such, it is impossible to assess the question of market power on a local level. But even if Plaintiff did allege local markets, its allegations of market power fail as a matter of law.

Where, as here, a plaintiff alleges that illegal tying occurred in many local geographic markets, the plaintiff is "required to allege facts supporting an inference that [the defendant] possessed market power . . . in each specified geographic market." *Kaufman*, 836 F.3d at 147. Here, Plaintiff fails to identify—let alone allege market power for—each local market.

For instance, Plaintiff relies on Exhibit A to the Amended Complaint, a chart identifying 365 covered entities that use CVS for at least 30% of the contract pharmacies in their 340B networks. Am. Compl. ¶ 65. Plaintiff previously attached a similar exhibit, listing 180 covered

entities, to its original Complaint.  Compl. Ex. A.  Plaintiff's addition of more covered entities to its chart changes nothing.  For multiple reasons, Plaintiff's reliance on Exhibit A still fails.

First, Exhibit A, if anything, demonstrates that CVS lacks market power.  Plaintiff alleges that there are approximately 6,000 covered entities participating in the 340B program.  Am. Compl. ¶ 12.  Exhibit A, however, identifies just 365 covered entities, *i.e.*, 6.1% of the total.[7] Thus, rather than establishing market power in any relevant product market, Exhibit A merely shows that CVS has earned favorable positions at a small subset of hospitals.  This unremarkable showing based on incomplete information can be made for multiple other competitors by picking the hospital where they do best.

Second, Exhibit A's focus on particular hospitals—rather than geographic markets—is improper.  As numerous courts have recognized, a single customer is not a market.  *See, e.g.*, *Tanaka v. Univ. of S. Cal.,* 252 F.3d 1059, 1065 (9th Cir. 2001); *Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 160–61 (W.D.N.Y. 2000).

Third, Exhibit A improperly ignores alternatives and substitutes for CVS.  *See*, *e.g.*, *Clark Memorials,* 991 F. Supp. 2d at 1161–62; *Mich. Div.-Monument Builders*, 458 F. Supp. 2d at 483.  For example, if a hospital chose to use only CVS in its 340B program when two Walgreens and a Rite Aid are located even closer than CVS to the hospital, Exhibit A would show CVS as being 100% "dependent upon CVS" for its "contract pharmacy network," even though CVS would not have anywhere near that level of power.  Am. Compl. ¶ 65.

---

[7]     The total number of covered entities alleged by Plaintiff in its Amended Complaint is actually a gross underestimate of the total number of covered entities participating in the 340B program.  According to a congressional report, as of October 1, 2017, there were actually 12,722 covered entities participating in the program.  U.S. House Comm. on Energy & Commerce, *Review of the 340B Drug Pricing Program*, at 12 (2018), *available at* https://energycommerce.house.gov/wp-content/uploads/2018/01/20180110Review_of_ the_340B_Drug_Pricing_Program.pdf.

The prior version of Exhibit A demonstrated that alternatives and substitutes were wholly ignored.  For instance, it showed that CVS provides 100% of the contract pharmacies to the State of Hawaii Department of Health in Honolulu, even though only one CVS pharmacy served as a contract pharmacy (and there are obviously numerous other pharmacies in Honolulu).  Compl. Ex. A at 1.  Plaintiff's revised version of Exhibit A deletes the number of CVS and total pharmacies used by particular covered entities.  Plaintiff presumably made this deletion in an attempt to circumvent CVS's argument that Exhibit A fails to show CVS's market power.[8]

Unable to plead market share, Plaintiff falls back on the notion that CVS purportedly has market power because it is "must have" pharmacy because of its "unique product offerings, unmatched access to specialty pharmaceuticals, [and] payer contracts."  Am. Compl. ¶¶ 1, 111. These allegations do not cure the Amended Complaint's deficiencies.  First, allegations that a defendant offers products that are "unique" do not relieve a plaintiff of having to allege proper geographic markets.  *See Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Assn.*, 524 F.3d 726, 736 (6th Cir. 2008).  Moreover, the hard facts refute Plaintiff's hyperbole.  Based on Plaintiff's own allegations, CVS has more than 30 percent of the contract pharmacy network for only *6.1 percent* of covered entities.  Am. Compl. ¶¶ 12, 65.  Similarly, it allegedly has 30 percent or more of the contract pharmacies in only 22 of 933 CBSAs, *i.e.*, approximately *2 percent*.  *Id.* ¶ 114.  Accordingly, CVS is hardly a "must have" contract pharmacy.  *See Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 595 (7th Cir. 2008) (explaining that a plaintiff's

---

[8]       As noted above, while Plaintiff refers to 22 CBSAs, it does not allege that they are, in fact, the relevant geographic markets.  Accordingly, any alleged market share data regarding these 22 CBSAs does not satisfy Plaintiff's requirement to plead market power in a properly defined relevant market.

"naked assertion of . . . 'appreciable economic power'—an empty phrase—cannot save the complaint.").

* * *

Despite having the opportunity to try to cure the deficiencies articulated by the Court, Plaintiff still fails to allege relevant geographic markets.  It also fails to allege market power in any such markets.  Accordingly, Count One should be dismissed with prejudice.

## II.    PLAINTIFF FAILS TO STATE CLAIMS FOR TORTIOUS INTERFERENCE

In Counts Four and Five of its Amended Complaint, Plaintiff alleges claims for tortious interference with contract and tortious interference with business relationships.  Plaintiff's claims fail because tortious interference claims cannot be based on the same conduct underlying a failed antitrust claim.  Moreover, to the extent that Count Five is also based upon the alleged theft of confidential information, it is preempted by the Florida Uniform Trade Secrets Act ("FUTSA").

Plaintiff bases Count Four entirely—and Count Five mostly—on allegations that Defendants improperly used economic pressure in the 340B contract pharmacy market to interfere with Plaintiff's 340B administration contracts.[9]  Am. Compl. ¶¶ 138; 142.  In making these allegations, Plaintiff is presumably attempting to rely upon the *Restatement (Second) of Torts*, Section 768, Comment e, which provides that "economic pressure on the third person in matters unrelated to the business in which the actor and the other compete is treated as an improper interference."  Florida courts, however, have flatly refused to hold that a defendant can be liable for tortious interference under this theory absent proof that the defendant committed a violation of the antitrust laws.  In *Metzler*, the plaintiff, like Plaintiff here, alleged that the

---

[9]    In prior briefing, Plaintiff conceded that the purportedly "wrongful" conduct underlying its tortious interference claims is "the same conduct [as] is the basis for Sentry's antitrust and misappropriation of trade secrets claims."  *See* Pl.'s Opp. Mot. Dismiss at 10.

defendants' conduct constituted illegal tying under the federal antitrust laws, as well as tortious interference with contract under Florida law. 19 F. Supp. 2d at 1352. After granting summary judgment to defendants on the tying claim, the court rejected the tortious interference claim, explaining: "where the tort is grounded on precisely the same 'anticompetitive' behavior alleged in the failed antitrust claim, it cannot as a matter of law constitute tortious interference with a business relationship." *Id.* at 1364.[10] Likewise, although this Court did not address this argument in its August 28 decision, during the oral argument, the Court "accept[ed defendants'] argument that it [the tortious interference claim] rises and falls on the tying claim." Mot. Dismiss Hr'g Tr. at 20. Accordingly, because Plaintiff's Sherman Act claim fails, its tortious interference claims likewise fail.

The fact that Court Five is also based upon the alleged theft of confidential information does not save it from dismissal. As the Court previously recognized, Section 688.008 of the FUTSA preempts claims that are based upon the alleged theft of confidential information. Aug. 28, 2018 Order at 19–20. Given that Count Five cannot be based upon tying allegations, the only allegations that remain relate to the alleged misuse of confidential information. As a result, Count Five should be dismissed because it is preempted by the FUTSA.

## CONCLUSION

For the foregoing reasons, CVS's Motion to Dismiss Counts One, Four, and Five in Plaintiff's Amended Complaint should be granted, and Plaintiff's tying claims and claims for tortious interference should be dismissed with prejudice.

---

[10] Numerous courts have held that, to be actionable as tortious interference, the underlying wrongful conduct must itself be independently actionable. *See, e.g.*, *Bral Corp. v. Johnstown Am. Corp.*, 919 F. Supp. 2d 599, 615–16 (W.D. Pa. 2013); *Cacique, Inc. v. Gonzalez*, No. 03-C-5430, 2004 WL 609278, at *2–3 (N.D. Ill. Mar. 26, 2004); *Republic Tobacco, L.P. v. N. Atl. Trading Co.*, 254 F. Supp. 2d 1007, 1012 (N.D. Ill. 2003).

Dated:  September 24, 2018

**KOZYAK TROPIN THROCKMORTON LLP**
2525 Ponce de Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508

By: /s/ *Gail A. McQuilkin*
    Gail A. McQuilkin, Esq.
    Florida Bar No. 969338
    Harley S. Tropin, Esq.
    Florida Bar No. 241253

**DECHERT LLP**

Michael S. Doluisio
Stuart T. Steinberg
2929 Arch Street
Philadelphia, PA 19104

Michael G. Cowie
1900 K Street, NW
Washington, D.C. 20006

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Gail A. McQuilkin*
    Gail A. McQuilkin, Esq.