UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-cv-60257-BLOOM-VALLE

SENTRY DATA SYSTEMS, INC.,

       Plaintiff,

v.

CVS HEALTH, CVS PHARMACY, INC.,
WELLPARTNER INC., and
WELLPARTNER, LLC,

       Defendants.

_____/

**PLAINTIFF SENTRY DATA SYSTEMS, INC.'S REDACTED OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COUNTS ONE, FOUR AND FIVE OF THE
AMENDED COMPLAINT[1]**

---

[1] A non-redacted version has been filed under seal pursuant to court order.  *See* D.E. 138.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

I.     THE AMENDED COMPLAINT ....................................................................... 1

II.    LEGAL STANDARD ..................................................................................... 4

III.   ARGUMENT ................................................................................................ 5

       A.    Sentry Has Plausibly Alleged a Violation of Section One of the Sherman Act ..... 5

             1.     Sentry Has Plausibly Alleged Relevant Geographic Markets ................... 5

             2.     Sentry's Geographic Markets Allegations are Not Inconsistent ................ 6

             3.     Sentry Has Plausibly Alleged A National Geographic Market ................. 8

             4.     Sentry Has Plausibly Alleged Local Geographic Markets ...................... 11

             5.     Sentry Has Plausibly Alleged CVS's Market Power ............................... 13

       B.    Sentry Has Plausibly Alleged Tortious Interference Claims ............................... 19

REQUEST FOR HEARING ........................................................................................ 20

CONCLUSION ......................................................................................................... 20

CERTIFICATE OF SERVICE ................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Am. Channel, LLC v. Time Warner Cable, Inc.*,
  2007 WL 142173 (D. Minn. Jan. 17, 2007).................................................................. 7

*Audiology Distribution, LLC v. Simmons*,
  2014 WL 7672536 (M.D. Fla. May 27, 2014)............................................................. 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................................... 5

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
  140 F.3d 494 (3d Cir. 1998).......................................................................................... 19

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)........................................................................................................ 6

*Burger King Corp. v. Ashland Equities, Inc.*,
  181 F. Supp. 2d 1366 (S.D. Fla. 2002) ........................................................................ 19

*Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*,
  878 F. Supp. 1389 (W.D. Wash. 1993)........................................................................... 7

*Clark Memorials of Alabama Inc. SCI Alabama Funeral Services LLC*,
  991 F. Supp. 2d 1151 (N.D. Ala. 2014) ...................................................................... 13

*Daniel v. Am. Bd. of Emergency*,
  Med., 802 F. Supp. 912 (W.D.N.Y. 1992)...................................................................... 6

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*,
  797 F.3d 1248 (11th Cir. 2015) .................................................................................... 19

*E.I. Du Pont de Nemours v. Kolon Indus. Inc.*,
  637 F.3d 435 (4th Cir. 2011) .......................................................................................... 6

*Fortner Enterprises v. U.S. Steel Corp.*,
  394 U.S. 495 (1969)................................................................................................ 15, 16

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) ....................................................................................... 11

*FTC v. OSF Healthcare System*,
  852 F. Supp. 2d 1069 (2012) ....................................................................................... 11

ii

*FTC v. Penn State Hershey Med. Ctr.*,
185 F. Supp. 3d 552 (M.D. Pa. 2016) ................................................. 12

*FTC v. Penn State Hershey Medical Center*,
838 F. 3rd 327 (3rd Cir. 2016) ......................................................... 12

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) ................................................ 6, 10, 11

*Hear-Wear Techs., LLC v. Oticon, Inc.*,
551 F. Supp. 2d 1272 (N.D. Okla. 2008) ............................................... 6

*Illinois Tool Works, Inc. v. Independent Ink, Inc.*,
547 U.S. 28 (2006) ................................................................. 14

*In re Blue Cross Blue Shield Antitrust Litig.*,
2017 WL 2797267 (N.D. Ala. June 28, 2017) .................................... 6, 11, 12

*In re Pool Prods. Dist. Mkt. Antitrust Litig.*,
940 F. Supp. 2d 367 (E.D. La. 2013) ................................................... 9

*Jacobs v. Tempur-Pedic International, Inc.*,
626 F.3d 1327 (11th Cir. 2010) .................................................... 5, 12

*Jay v. Mobley*,
783 So. 2d 297 (Fla. 4th DCA 2001) .................................................. 19

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ................................................................ 14, 17

*Kaufman v. Time Warner*,
836 F.3d 137 (2d Cir. 2016) ......................................................... 16

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996) ....................................................... 13

*Manufacturing Research Corp. v. Greenlee Tool Co.*,
693 F.2d 1037 (11th Cir. 1982) ...................................................... 20

*Mathias v. Daily News, L.P.*,
152 F. Supp. 2d 465 (S.D.N.Y. 2001) .................................................. 7

*Metzler v. Bear Auto. Serv. Equip. Co.*,
19 F. Supp. 2d 1345 (S.D. Fl. 1998) ............................................... 15, 19

*Mich. Div.-Monument Builders of N. Am. V. Mich. Cemetery Assn*,
524 F.3d 726 (6th Cir. 2008) ........................................................ 18

*Nat'l Ath. Trainers' Ass'n v. Am. Physical Therapy Ass'n,*
   2008 U.S. Dist. LEXIS 70131 (N.D. Tex. Sept. 9, 2008)...........................................9

*Ragner Tech. Corp. v. Berardi,*
   2018 WL 1420490 (D.N.J. Mar. 3, 2018)..............................................................10

*Sidibe v. Sutter Health,*
   4 F. Supp. 3d 1160 (N.D. Cal. 2013) ....................................................................13

*T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.,*
   931 F. 2d 816 (11th Cir. 1991) .............................................................................18

*Tampa Elec. Co. v. Nashville Coal Co.,*
   365 U.S. 320 (1961)...........................................................................................5, 8

*Thompson v. Metro. Multi-List, Inc.,*
   934 F.2d 1566 (11th Cir. 1991) ..............................................................................5

*Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.,*
   815 F.2d 1407 (11th Cir. 1987) .................................................................15, 16, 17

*Todd v. Exxon Corp.,*
   275 F.3d 191 (2d Cir. 2001)..................................................................................13

*Toys R' Us v. FTC,*
   221 F.3d 928 (7th Cir. 2000) ................................................................................13

*U.S. v. Grinnell Corp.,*
   384 U.S. 563 (1966)..........................................................................................8, 9

*United States v. Baker Hughes Inc.,*
   908 F.2d 981 (D.C. Cir. 1990) ..............................................................................13

*United States v. Blue Cross Blue Shield of Michigan,*
   809 F. Supp. 2d 665 (E.D. Mich. 2011)..................................................................12

*United States v. Conn. Nat'l Bank,*
   418 U.S. 656 (1974).............................................................................................5

*United States v. Dean Foods Co.,*
   2010 U.S. Dist. LEXIS 34137 (E.D. Wis. Apr. 7, 2010).............................................12

*United States v. Pabst Brewing Co.,*
   384 U.S. 546 (1966)..........................................................................................5, 6

*Universal Hospital Services, Inc. v. Hill–Rom Holdings, Inc.,*
   2015 WL 6994438 (W.D. Tex. Oct. 15, 2015)................................................7, 10, 11

iv

*WA Butler Co. v. Colgate-Palmolive Co.*,
    1992 WL 278008 (E.D. Pa. Sept. 30, 1992) ............................................................... 6

*Weiss v. York Hospital*,
    745 F.2d 786 (3d Cir. 1984)............................................................................................ 12

## **Rules**

FED. R. CIV. P. 8 .................................................................................................................... 6

FED. R. CIV. P. 8(a)(2).......................................................................................................... 4

## INTRODUCTION

Plaintiff Sentry Data Systems, Inc. ("Sentry") respectfully submits this memorandum in opposition to Defendants' Motion to Dismiss Counts One, Four and Five of the Amended Complaint (D.E. 127).

The Amended Complaint alleges that CVS has market power in both a relevant national geographic market and in 22 identified local relevant geographic markets.  The relevant geographic markets alleged in the Amended Complaint are defined with specificity and are supported with detailed allegations of fact regarding the economic realities confronting covered entities seeking to purchase 340B contract pharmacy services.  These national and local markets exist in tandem and without contradiction because many covered entities require both national and local 340B contract pharmacy services.  The Amended Complaint amply alleges CVS's market power in the relevant national and local markets, both with direct evidence of CVS's actual, demonstrated ability to force covered entities to deal with Wellpartner against their will and at prices substantially above competitive levels, and also with circumstantial evidence of high market shares and barriers to entry.  Nothing more is required at this stage, and Defendants' motion to dismiss Sentry's antitrust claims should be denied.

Defendants' motion to dismiss Sentry's tortious interference claims is actually a motion for reconsideration in disguise, and simply repeats arguments already rejected by this Court.  In any event, Defendants' argument is without merit.

## I.    THE AMENDED COMPLAINT

The Amended Complaint supplements Sentry's pleading with detailed factual allegations of CVS's market power as a 340B contract pharmacy and the relevant geographic markets that in turn provide additional support for Sentry's tortious interference claims.  With respect to market power, the Amended Complaint alleges that CVS is a "must have" contract pharmacy for over

1

300 identified covered entities located across the country.  D.E. 123 ¶¶ 65-66, 110-111 and Exhibit A.  The Amended Complaint substantially amplifies Sentry's allegations of CVS's market power as a 340B contract pharmacy, which rests on CVS's unique and market-leading suite of assets relevant to covered entities seeking to dispense outpatient pharmaceuticals.  *Id.* ¶ 36.  First, CVS's "large and growing market share" of the retail pharmacy market in markets around the country makes contracting with CVS a necessity for covered entities seeking to dispense outpatient pharmaceuticals in many markets.  *Id.* ¶ 37.  CVS's leading position as a retail pharmacy is protected by barriers to entry for new competitors.  *Id.* ¶ 38.  The second pillar of CVS's market power is its leading market share as a pharmacy benefits manager ("PBM") for health insurance plans, which allows CVS to steer patients to fill their prescriptions through CVS pharmacies.  *Id.* ¶ 39.  The third—and most significant—pillar of CVS's market power is its leading market share as a dispenser of rare and expensive specialty pharmaceuticals.  *Id.* ¶ 40.  CVS's leading position as a specialty pharmacy is protected by substantial barriers to entry, including the difficulty rivals face in gaining access to the specialty pharmaceuticals dispensed by CVS (and sometimes only by CVS), and the more than 1,000 agreements that CVS has with health plan sponsors and health insurers making CVS the preferred or exclusive provider of specialty pharmaceuticals for approximately 35 million Americans.  *Id.* ¶¶ 41-63.  These agreements, identified with specificity in the Amended Complaint, include agreements with some of the largest health insurers in identified state insurance markets around the country.  *Id.* ¶¶ 45, 52 (California); ¶ 46 (Maryland, the District of Columbia, and Northern Virginia); ¶ 47 (South Carolina); ¶ 48 (Massachusetts); ¶ 49 (Indiana); ¶ 50 (Minnesota); ¶ 51 (Iowa and South Dakota); ¶ 54 (Florida); ¶¶ 57, 59 (New York).  CVS also has preferred or exclusive agreements with insurers operating nationwide, including with Aetna (the nation's third-largest health

insurer) and with the Government Employees Health Association.  *Id*. ¶¶ 44, 56.  CVS's status as the exclusive or preferred supplier of specialty pharmaceuticals for major insurers and employers across the country enhance CVS's status as a "must have" contract pharmacy and give it market power over those covered entities seeking to dispense pharmaceuticals to patients insured through parties to these agreements with CVS.  *Id*. ¶ 42.  Finally, CVS's pending merger with Aetna will further enhance CVS's market power, as post-merger Aetna's substantial patient population will be steered to CVS pharmacies.  *Id*. ¶ 64.  CVS's market power as a 340B contract pharmacy is protected by substantial barriers to entry.  *Id*. ¶ 110.

The Amended Complaint also provides powerful direct evidence of CVS's actual, demonstrated ability to coerce covered entities to deal with Wellpartner against their will, despite the fact that Wellpartner charges supra-competitive prices for its services.  D.E. 123 ¶¶ 94-96, 120-121.  Because CVS's tying arrangement is an aberrant departure from industry practice, many covered entities have attempted to resist CVS's mandate to use Wellpartner.  *Id*. ¶¶ 90, 96.  However, because covered entities are unable to "steer" their outpatient population towards or away from specific contract pharmacies, covered entities whose patients tend to fill their prescriptions at CVS retail or specialty pharmacies have no good substitutes for access to CVS, and accede to the onerous terms imposed by Defendants.  *Id*. ¶¶ 16-17, 30-31, 96.  The ability of CVS and Wellpartner to overcome and suppress customer resistance to their onerous terms is direct evidence of market power, both nationally and in the specified local markets.  *Id*. ¶¶ 96, 108.

The Amended Complaint alleges the relevant geographic markets in which CVS has market power with factual specificity. One relevant geographic market is the United States.  *Id*. ¶ 112.  That is a relevant market because CVS operates and competes nationwide, sets prices and

other contract terms nationwide, and because covered entities generally seek to deal with contract pharmacies with a national footprint. *Id*. ¶¶ 30, 112. CVS contracts for the provision of 340B contract pharmacy services nationwide through its specialty and mail order pharmacies that serve the entire country from centralized locations often located thousands of miles away from its covered entity customers. *Id.* ¶ 112. Covered entities contract for the provision of these services nationwide. More than forty-five percent of disproportionate share hospitals retain contract pharmacies located more than 1,000 miles away. *Id*. CVS specialty pharmacies in particular serve covered entities nationwide, typically serving more than 200 covered entities geographically dispersed around the country. *Id*. Exhibit G to the Amended Complaint shows a single CVS pharmacy has contracted with more than 300 covered entities around the country. *Id*. ¶ 112 and Exhibit G.

In addition to the national market, the Amended Complaint alleges 22 specific, local, geographic markets. *Id.* ¶¶ 113-117. Covered entities located in these local markets have no good alternatives to CVS because covered entities seek to prescribe pharmaceuticals to their patient population through pharmacies located in those local geographic markets. *Id*. ¶¶ 115-116. The 340B contract pharmacy services provided by CVS on a nationwide basis (*i.e.*, specialty and mail order pharmaceuticals) are a complement to, not a substitute for, contract pharmacy services CVS provides on a regional basis (*i.e.*, retail contract pharmacy services), and many contract pharmacies need access to both CVS's national offering and its local offering. *Id*. ¶ 115. The Amended Complaint alleges that CVS has market power over covered entities in the national market (¶ 112) and in the identified local markets (¶¶ 113-116).

## II.    LEGAL STANDARD

A complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The complaint must contain factual

4

allegations that, taken as a whole, render the plaintiff's entitlement to relief plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept as true the complaint's allegations, drawing all reasonable inferences in favor of the plaintiff. *Id*. at 555-56.

## III.   ARGUMENT

### A.   Sentry Has Plausibly Alleged a Violation of Section One of the Sherman Act

Defendants do not contend that Sentry lacks antitrust standing, that Sentry has failed to allege a relevant product market, or that Sentry has failed to allege the existence of a tying arrangement.  Defendants argue only that Sentry has failed to allege plausible relevant geographic markets or CVS's market power as a 340B contract pharmacy.  Because Defendants' arguments fail as to both market definition and market power, their motion should be denied.

#### 1.   Sentry Has Plausibly Alleged Relevant Geographic Markets.

When considering relevant geographic markets under the antitrust laws, the Supreme Court has held that courts should look at "the area of effective competition," which is "the area in which the seller operates and to which buyers can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).  Geographic markets need not be alleged or proven with "scientific precision," nor be defined "by metes and bounds as a surveyor would lay off a plot of ground." *United States v. Conn. Nat'l Bank,* 418 U.S. 656, 669 (1974); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966).  At the pleading stage, the complaint need only present sufficient information "to plausibly suggest the contours of the relevant geographic … markets." *Jacobs v. Tempur-Pedic International, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010).

"The parameters of a given [geographic] market are questions of fact." *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1573 (11th Cir. 1991) (reversing summary judgment on disputed scope of relevant geographic market).  Because "determining the relevant geographic

market is a fact-intensive exercise centered on the commercial realities of the market and competition," dismissal on the pleadings is "relatively rare." *E.I. Du Pont de Nemours v. Kolon Indus. Inc.*, 637 F.3d 435, 443-444 (4th Cir. 2011).

### 2.      Sentry's Geographic Markets Allegations are Not Inconsistent.

Defendants' claim (Mot. at 8) that Sentry cannot allege both local and national geographic markets has no support in the case law.[2]  As the Supreme Court has explained, within "[a] broad market, well-defined submarkets may exist which, in themselves, constitute [separate] markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Both a broader national market and narrower regional submarkets are cognizable, and neither negates the existence or integrity of the other.  *Id.* at 337 ("[A]lthough the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area."); *Pabst Brewing Co.*, 384 U.S. at 552 (reversing dismissal of an antitrust violation alleged in a national market, a three state market comprised of Wisconsin, Illinois and Michigan, and in a market limited to Wisconsin); *In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 2797267, at *11 (N.D. Ala. June 28, 2017) (denying motion to dismiss relevant geographic market alleged to be the State of Alabama and relevant submarkets contained therein); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 49-52 (D.D.C. 2015) (finding

---

[2] Even if this were not the case, courts permit the pleading of geographic markets in the alternative pursuant to FED. R. CIV. P. 8.  *See, e.g., Hear-Wear Techs., LLC v. Oticon, Inc.*, 551 F. Supp. 2d 1272, 1279 (N.D. Okla. 2008) ("The Court notes that both market definitions, as they stand, are facially plausible because they are pled in the alternative."); *Daniel v. Am. Bd. of Emergency Med.*, 802 F. Supp. 912, 925 (W.D.N.Y. 1992) ("Plaintiff's use of factually inconsistent market definitions (assuming for the sake of this discussion that they are inconsistent) does not render his complaint inadequate"); *WA Butler Co. v. Colgate-Palmolive Co.*, 1992 WL 278008, at *2 (E.D. Pa. Sept. 30, 1992) ("The complaint sets forth various alternative definitions of relevant geographic markets.  These allegations suffice to withstand dismissal at this stage.").

antitrust violation in a national market and in local geographic markets); *Universal Hospital Services, Inc. v. Hill–Rom Holdings, Inc.*, 2015 WL 6994438, at *2-4 (W.D. Tex. Oct. 15, 2015) (denying motion to dismiss antitrust claims alleging both national and local geographic markets).

The cases cited by Defendants do not question the viability of alleging in tandem national and local geographic markets.  Instead, Defendants cite cases where the plaintiff alleged both national and smaller markets, and failed to adequately support either.[3]  Defendants' cases do not support the proposition that there is an inherent inconsistency in tandem allegations of national and smaller markets.  As the federal agencies tasked with enforcing the antitrust laws of the United States have recently stated:

> [C]onduct may harm consumers in multiple geographic markets.  Both Antitrust Agencies have encountered matters in which they have concluded that it is appropriate to analyze geographic markets both from a national and from a local perspective, determining that national markets and local markets may exist in tandem.

*See* U.S. Submission on Geographic Market Definition to the Organization for Economic Co-operation and Development, at ¶ 12 (Nov. 8, 2016).[4]  Nor do Defendants identify any inconsistency between the alleged national and local markets.  It is simultaneously true that covered entities seek to contract with pharmacies located close to their patients, and also (often for specialty pharmaceuticals) with pharmacies located over a thousand miles away.

---

[3] In *Am. Channel, LLC v. Time Warner Cable, Inc.*, 2007 WL 142173, at *9 (D. Minn. Jan. 17, 2007), the complaint generally alleged regional or local markets but "fail[ed] to define that place or region to which the adjectives local and regional apply."  In *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 483 (S.D.N.Y. 2001), the plaintiffs did not adequately define the geographic market and offered only a "vague delineation" of it.  *Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*, 878 F. Supp. 1389, 1394 (W.D. Wash. 1993), was decided at summary judgment after discovery, and the plaintiff still did "not even attempt[] to define the relevant geographic market."

[4] Available at https://www.ftc.gov/system/files/attachments/us-submissions-oecd-other-international-competition-fora/geographic_market_definition_united_states.pdf.

### 3.    Sentry Has Plausibly Alleged A National Geographic Market.

Relevant geographic markets are defined by where sellers operate and compete, and where buyers may practicably turn for supplies.  *Tampa Elec.*, 365 U.S. at 327.  Here, there is a relevant national market because CVS operates on a national scale, competes most closely with other prominent pharmacy chains, contracts with national and regional health insurers for provision of specialty pharmaceuticals, and contracts with covered entities for the provision of 340B contract pharmacy services on a national basis.  D.E. 123 ¶¶ 33, 112.  Covered entities seek to purchase from contract pharmacies located across the country, often contracting with contract pharmacies, including CVS pharmacies, located over a thousand miles away.  *Id*. ¶ 112.

Defendants contend that the United States cannot be a relevant market because covered entities seek to contract with pharmacies located in close proximity to their patient population, and do not regard the services of more distant contract pharmacies as good substitutes for the services of more proximately located pharmacies.  (Mot. at 9-10.)  Defendants' arguments misread the Amended Complaint and ignore binding precedent to the contrary.  What Sentry has alleged is that many covered entities purchase 340B contract pharmacies in both national and local markets.  For those customers, there is a relevant national geographic market.

Relevant markets are national when suppliers compete nationally across many local geographic markets, even when suppliers deliver those products to consumers locally.  *Tampa Electric*, 365 U.S. at 331-32 (relevant geographic market was area in which coal producers operated and were willing to compete for customers, not where product was delivered).  In *U.S. v. Grinnell Corp.*, 384 U.S. 563, 575-76 (1966), the Supreme Court determined that the relevant geographic market for fire and burglary protection services provided by defendants' central stations was a national market, although the individual stations served customers only in areas within a twenty-five mile radius.  The Court reasoned that "the business of providing such

services is operated on a national level" and that the "national market . . . reflects the reality of the way . . . [defendants] built and conduct their services." *Id*. at 575-76. In reaching this conclusion, the Court looked to the existence of national planning, agreements covering activities in many States, the multistate nature of the business, and the provision of nationwide certification, inspection and rate-making services. *Id.* at 575. As in *Grinnell*, while some (but not all) of CVS's contract pharmacy operations are local, the presence of other factors knits these local units together to constitute a national footprint that is relevant for antitrust purposes, including the competitive advantages that CVS derives from its national footprint, the provision by CVS of contract pharmacy services to covered entities located across the country from out-of-state distribution facilities for specialty pharmaceuticals, ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████. D.E. 123 ¶ 112. Similarly, the court in *In re Pool Prods. Dist. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 381-82 (E.D. La. 2013), denied a motion to dismiss allegations that a distributor of swimming pool products competed in a relevant nationwide market despite the fact that the relevant products were physically distributed through distribution outlets located in close geographic proximity to customers. In *Pool Products*, as in this case, a relevant national market existed because the defendant operated on a national scale, its nationwide operations provided it a competitive advantage, and its anticompetitive conduct was felt nationwide. *Id.*; *see also Nat'l Ath. Trainers' Ass'n v. Am. Physical Therapy Ass'n*, 2008 U.S. Dist. LEXIS 70131, at *38-39 (N.D. Tex. Sept. 9, 2008) (denying motion to dismiss when the alleged anticompetitive conduct took place nationwide and stood to affect competitors and consumers nationwide).

Defendants rely on *Ragner Tech. Corp. v. Berardi*, 2018 WL 1420490, at *10 (D.N.J. Mar. 3, 2018) for the proposition that the relevant geographic market is defined by where customers seek to purchase services, rather than the market "in which the defendant conducts business." (Mot. at 11.) But the Amended Complaint alleges that many covered entities seek to purchase contract pharmacy services nationally, D.E. 123 ¶ 112, just as *Ragner* required.

Relevant markets are also national when customers in the relevant markets need access to services provided nationally as well as locally. In *Sysco*, 113 F. Supp. 3d at 49, the court found both national and local markets for food service distribution. Although "the physical act of delivering food products occurs locally," a relevant national market existed for customers who needed nationwide service when the defendants contracted on a nationwide basis, competed most closely with other national suppliers, and "tout[ed] their nationwide distribution" to customers seeking nationwide service. *Id.* In this case, the Amended Complaint alleges that CVS competes most closely with other national and regional chain pharmacies, offers contract pharmacy services to customers located thousands of miles away from its distribution facilities, and touts its nationwide footprint of retail pharmacy locations as a competitive advantage. D.E. ¶¶ 33-40; 112. The same customers can purchase services in both national and local markets. In *Hill-Rom*, the customers were hospitals and other health care providers that sought to rent durable medical equipment. 2015 WL 6994438 at *2. When the hospitals needed the equipment quickly, the relevant markets were local, and when demand was not time-sensitive, the relevant market was national. *Id.* In this case, similarly, there is a national market for the purchase of specialty pharmaceutical services through mail-order pharmacies, and the same hospitals that contract for the provision of those services nationwide also contract for the provision of locally-delivered services.

Defendants claim that a national relevant market implies that "each covered entity could look anywhere in the United States for a contract pharmacy to serve its patients, and contract pharmacies across the country would compete for the business of each covered entity." (Mot. at 12.) This argument misstates the Amended Complaint and the law. There is no requirement that every covered entity seek to purchase contract pharmacy services nationwide, only that some do. As in *Sysco* and *Hill-Rom*, many covered entities seek nationwide services, and for those customers there is a national market. No case cited by Defendants stands to the contrary.

### 4.       Sentry Has Plausibly Alleged Local Geographic Markets.

The Amended Complaint specifically alleges as relevant geographic markets 22 specific local markets where CVS has a 30% or greater share of contract pharmacy locations. D.E. 123 ¶¶ 113-16. These markets are local in nature because covered entities seek to contract with pharmacies located near where their outpatient population works and lives, which is generally in close proximity to the covered entities' locations. *Id.* ¶¶ 36-37, 113.[5] The outer boundaries of the relevant geographic markets are defined by Core Based Statistical Areas ("CBSAs"), statistical areas established by the federal Office of Management and Budget "by grouping counties that have close economic and social links with a particular urban center." *In re Blue Cross*, 2017 WL 2797267 at *11; D.E. 123 ¶ 114. CBSAs are appropriate here to delineate the relevant geographic markets because CBSAs are used to approximate patient flows, and covered entities seek to contract with pharmacies located where their patients work and live.

---

[5] Consumers generally seek health care near their home. In a number of merger challenges involving disproportionate share hospitals participating in the 340B program, the Federal Trade Commission has proven that those covered entities' patient populations were travelling 30 minutes or less to access health care. *FTC v. Advocate Health Care Network*, 841 F.3d 460, 474 (7th Cir. 2016) (twenty minutes or less); *FTC v. OSF Healthcare System*, 852 F. Supp. 2d 1069, 1077 (2012) (thirty minutes or less).

Allegations of antitrust violations in the healthcare industry routinely define the outer boundaries of relevant geographic markets by reference to CBSAs (which include Metropolitan Statistical Areas ("MSAs")), because the methodology used to establish CBSAs is relevant to the same issues of patient flows as the geographic market inquiry in healthcare cases. *Weiss v. York Hospital*, 745 F.2d 786, 825 (3d Cir. 1984) (jury finding that the appropriate geographic market in antitrust case concerning hospital services was the York, Pennsylvania, MSA); *In re Blue Cross*, 2017 WL 2797267 at *11 (denying motion to dismiss relevant geographic markets defined by the outer boundaries of CBSAs); *United States v. Blue Cross Blue Shield of Michigan*, 809 F. Supp. 2d 665, 673 (E.D. Mich. 2011) ("The use of statistical metropolitan data, such as the MSA, is plausible to establish the geographical area alleged in the Complaint.").

Contrary to Defendants' claim that Sentry must "define the precise boundaries of the purported local markets" (Mot. at 14), Sentry's obligation under binding precedent is only to "plausibly suggest the contours" of the relevant local markets. *Jacobs*, 626 F.3d at 1336. Defendants cite no case requiring Sentry to allege the metes and bounds of the local markets with the precision of a surveyor. *See United States v. Dean Foods Co.*, 2010 U.S. Dist. LEXIS 34137, at *11-12 (E.D. Wis. Apr. 7, 2010) ("the court simply has no basis to impose the type of highly specific pleading standard advocated by the defendant" in demanding greater specificity about intrastate scope of relevant markets); *see also FTC v. Penn State Hershey Medical Center*, 838 F. 3rd 327, 341 (3rd Cir. 2016) (reversing denial of preliminary injunction for failure to prove a relevant geographic market defined as "roughly equivalent" to the Harrisburg, PA MSA).[6]

---

[6] The district court opinion describing the relevant market allegations is reported at *FTC v. Penn State Hershey Med. Ctr.*, 185 F. Supp. 3d 552, 556 (M.D. Pa. 2016).

The cases cited by Defendants are not to the contrary. In *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1175 (N.D. Cal. 2013) and *Clark Memorials of Alabama Inc. SCI Alabama Funeral Services LLC*, 991 F. Supp. 2d 1151, 1161-62 (N.D. Ala. 2014), the plaintiff failed to either identify the relevant markets or to explain why the outer boundaries of the alleged markets were economically sensible. Sentry has done both by alleging specific facts about the geographic scope of the markets in which covered entities seek to purchase 340B contract pharmacy services. Defendants' claim that Sentry has failed to even identify the relevant geographic markets in the Amended Complaint (Mot. at 13-14) simply ignores the allegations in the Amended Complaint, which plainly identify the 22 CBSAs in Paragraph 114 as relevant geographic markets. And Defendants make no effort at all to engage with the detailed allegations of fact in the Amended Complaint that show that covered entities' patients are located close to those covered entities, and for that reason covered entities seek to contract with pharmacies located in the same areas.

### 5.     Sentry Has Plausibly Alleged CVS's Market Power.

In the Eleventh Circuit, market power may be alleged either directly, through actual anticompetitive effects, or circumstantially, by alleging market share and barriers to entry. *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (evidence of "an actual adverse effect on competition ... arguably is more direct evidence of market power than calculations of elusive market share figures"); *Toys R' Us v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (market power can be proved "through direct evidence of anticompetitive effects"); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 992 (D.C. Cir. 1990) ("'[M]arket share is just a way of estimating market power, which is the ultimate consideration,' and ... '[w]hen there are better ways to estimate market power, the court should use them.'") (citation omitted).

Market power in a tying case is "the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006). When a consumer is forced to purchase the tied product and would not do so in a competitive market, a tying arrangement is unlawful. *Id*. at 13-14. A seller may not use its market power in one market "to impair competition on the merits in another market." *Id*. at 14. The consumer is injured when her freedom to select the best bargain in the tied market is impaired by her need to purchase the tying product. *Id*. at 15.

The Amended Complaint alleges direct evidence of CVS's market power as a contract pharmacy in both the national market and 22 local markets by showing specific customers being forced to purchase the tied product from Defendants against their will and only to gain access to the tying product. D.E. 123 ¶¶ 94-95, 108-111, 120-21. Sentry's customers have stated that "they had no choice but to switch to using Wellpartner as their new 340B Solutions Provider…" and that they "were forced to curtail their business with Sentry due to CVS's status as a 'must have' contract pharmacy[.]" *Id*. ¶ 94. Covered entities not only regard Defendants' conduct as an unwelcome and aberrant departure from prevailing industry practices (*id*. ¶ 90), the Amended Complaint also alleges examples of specific, identifiable customers who felt "handcuffed" by CVS's mandate, "really hate that we must make the change but at this point we have little choice" and said "CVS is our only profitable Contract Pharmacy, we cannot lose them or our program may as well not exist." *Id*. ¶ 94. Another covered entity confronted with the mandate to use Wellpartner breached its contract with Sentry, without justification, stating only that "we do not want to change our [340B Solutions Provider], [but] we feel that in the short run we really

14

do not have another option," that "the necessity to switch to another administrator to keep the CVS pharmacy contract has forced us to make this change," and that "we agree that CVS should not be allowed to do this, [but] we did not feel that [we] had another option at this time." D.E. 123 ¶ 95. This is market power: the power to force an onerous tie on unwilling buyers.

Defendants' ability to impose an unwanted tie is especially significant evidence of market power here because "Covered entities have described Wellpartner's fees as 'excessive' and substantially in excess of Sentry's fees for comparable services," and the price charged for the bundle of services offered by CVS and Wellpartner is alleged to be higher than the competitive price of those services purchased separately. D.E. 123 ¶¶ 120-21. The inference of power in the tying market is especially strong when purchasers are forced to take the tied product from the defendant at higher prices than they would otherwise pay. *Fortner Enterprises v. U.S. Steel Corp.*, 394 U.S. 495, 504 (1969). Defendants' own case shows that the Amended Complaint plausibly alleges market power: "Market power can also be demonstrated by direct evidence that defendants raised prices and drove out competition in the tied product market." *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1361 n.17 (S.D. Fl. 1998).

Defendants argue that Sentry has failed to allege market power in the relevant national market. (Mot. at 15-16.) Defendants are wrong for two reasons. First, the direct evidence of market power described above shows that CVS has market power over at least some covered entities in the national market. D.E. 123 ¶¶ 90, 94-96, 120-121. This is all that is required in a tying case, where "market power over the tying product can be sufficient even though the seller does not dominate the market or the seller only exercises the power with respect to some of the buyers in the market." *Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1420 (11th Cir. 1987). Market power exists when "despite the freedom of some or many buyers from

15

the seller's power, other buyers—whether few or many, whether scattered throughout the market or part of some group within the market—can be forced to accept the higher price because of their stronger preferences for the product, and the seller could therefore choose instead to force them to accept a tying arrangement that would prevent free competition for their patronage in the market for the tied product." *Fortner*, 394 U.S. 503-04.  There is no requirement that Sentry show that CVS has market power nationwide, only that (i) there is a well-defined relevant national geographic market and (ii) that CVS has market power over some covered entities in that market.  In *Tic-X-Press*, 815 F.2d at 1419-20, a single coerced customer in the tied product market entitled the plaintiff to judgment; the Amended Complaint's allegations, when reduced to admissible evidence, will do the same for Sentry.

Exhibit A to the Amended Complaint lists 365 covered entities over which CVS has market power in the relevant national market, using Defendants' preferred measure of market power (market share) and threshold for demonstrating power (shares of 30 percent or higher). Defendants claim to believe that Exhibit A relates to Sentry's pleading of relevant local markets, but the Amended Complaint plainly alleges otherwise.  D.E. 123 ¶¶ 65, 111.  Defendants argue that there aren't enough covered entities listed in Exhibit A to show CVS's market power (Mot. at 17), but that argument fails under *Fortner* and *Tic-X-Press*.  Defendants accuse Sentry of defining single customer markets using Exhibit A (Mot. at 17), but again that argument ignores the allegations that Exhibit A lists customers over whom CVS has market power in the relevant national market (D.E. 123 ¶ 111), rather than attempting to define single-customer markets.[7]

---

[7] Exhibit A, along with the Amended Complaint's abundant allegations of demonstrably coerced customers (*i.e.* direct evidence of market power), distinguish this case from *Kaufman v. Time Warner*, 836 F.3d 137, 147 (2d Cir. 2016), where the plaintiff relied entirely on vague and entirely circumstantial allegations of market power.

16

Second, the Amended Complaint contains substantial circumstantial evidence of national market power.  CVS is alleged to have at least a 30 percent revenue share of the market for all specialty pharmaceuticals dispensed nationwide, a share which understates CVS's importance as a prescriber of specialty pharmaceuticals in the 340B contract pharmacy market.  D.E. 123 ¶ 40. The Defendants urge the Court to adopt a 30 percent share threshold for plausibly inferring market power.  (Mot. at 16.)  The Amended Complaint also contains detailed factual allegations of the unique suite of market-leading assets wielded by CVS, and how those assets allow CVS to offer contract pharmacy services that rivals cannot duplicate.  D.E. 123 ¶¶ 36-43, 112-13.  CVS has a national footprint of retail pharmacies, has the largest PBM (which steers patients towards CVS pharmacies), is the largest dispenser of specialty pharmaceuticals, has exclusive or preferred contracts with insurers and plan sponsors, and has access to specialty pharmaceuticals available nowhere else.  *Id.*  A high market share is only one way to show market power in a tying case: leverage exists when "the seller's share of the market is high … or when the seller offers a unique product that competitors are not able to offer."  *Jefferson Parish*, 466 U.S. at 17; *see also Tic-X-Press*, 815 F.2d at 1420 ("Economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes.")  CVS is not distinguishable from the arena found in *Tic-X-Press* to have market power: there were many other arenas in Atlanta (just as there are other contract pharmacies), but none of the unique combination of size and configuration that made that arena a "must have" for a single promoter seeking to stage a concert in that market.  *Id.*

Defendants' contention (Mot. at 16-19) that Sentry has failed to allege market power in the 22 identified local markets similarly fails.  Sentry has plausibly alleged market power in each and every identified local market, again using Defendants' preferred measure of market power

(market share) and threshold for demonstrating power (shares of 30 percent or higher).  The Amended Complaint alleges CVS' market share in each of the relevant geographic markets, and that CVS's share is between 54 percent and 30 percent in each.  D.E. 123 ¶¶ 111, 120-21.  The Amended Complaint also alleges (*id*. ¶ 115) that a hypothetical monopolist within the identified CBSAs could profitably impose a price increase in the identified CBSAs, which is sufficient to define a relevant market.  *T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.*, 931 F. 2d 816, 823 (11th Cir. 1991) (relevant geographic market is one where "consumers within the geographic areas cannot realistically turn to outside sellers should prices rise within the defined area").[8]  Indeed, the Amended Complaint's extensive allegations of actual coercion of covered entities forced to deal with Wellpartner at supra-competitive prices is direct evidence of market power.  D.E. 123 ¶¶ 90, 94-96, 120-121.  The Amended Complaint also alleges that CVS's agreements with health insurers and plan sponsors to serve as the exclusive or preferred supplier of specialty pharmaceuticals enhance its market power in these local geographic markets.  *Id.* ¶ 116.  Defendants argue that the identified CBSAs are a fraction of the CBSAs located nationwide (Mot. at 18), but this is not relevant to whether those local geographic markets are alleged with plausibility.

Defendants cite *Mich. Div.-Monument Builders of N. Am. V. Mich. Cemetery Assn*, 524 F.3d 726, 736 (6th Cir. 2008), and claim that the defendant's ability to provide unique services unmatched by rivals does not relieve the plaintiff of the burden of alleging a plausible relevant geographic market.  (Mot. at 18.)  Sentry does not disagree.  The uniqueness of CVS's offering as a 340B contract pharmacy shows market power in the well-defined national and local relevant

---

[8] The Amended Complaint makes a similar allegation supporting the definition of the relevant national market.  D.E. 123 ¶ 112.

markets, markets which are properly defined based on the contracting practices of CVS and the

purchasing habits of covered entities and without reference to CVS's market power.

**B.      Sentry Has Plausibly Alleged Tortious Interference Claims**

Defendants' renewed attempt to dismiss Sentry's tortious interference claims (Mot. at 19-

20) should be summarily rejected because the Court has already determined that those claims are

viable even if Sentry's antitrust claims are not.  Defendants ask the Court to reconsider its prior

Order denying their motion to dismiss the tortious interference claims without citing or

attempting to satisfy the standard for a motion for reconsideration, which they cannot meet.  *Cf.,*

*e.g.*, *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002).

Defendants also misstate Florida law as to whether the wrongful conduct necessary to

support a tortious interference claim must be independently actionable.  *Duty Free Americas,*

*Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1280 n.9 (11th Cir. 2015) ("illegal

conduct, threats of illegal conduct" or "***other improper conduct***" may establish improper means

under Florida law) (citing Fla. Std. Jury Instructions) (emphasis added).  *Metzler* is not to the

contrary.  There, the court found no evidence that customers had been coerced, in violation of

antitrust law or otherwise (*see Metzler*, 19 F. Supp. 2d at 1359-61, 64), and in any event *Duty*

*Free*, and not the out of circuit precedent recited in *Metzler*, should guide the Court in

interpreting Florida tort law.  Notwithstanding Defendants' statement, Florida courts follow

Section 768 of the Second Restatement of Torts, and would likely follow comment (e) to Section

768 if presented with the compelling evidence that covered entities regard Defendants' conduct

as an aberrant and unwelcome departure from prevailing industry norms.  *See Jay v. Mobley*, 783

So. 2d 297, 299 (Fla. 4th DCA 2001) (following Section 768 & cmt. e); *see also Brokerage*

*Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 531-32 (3d Cir. 1998) (finding that

Pennsylvania courts follow § 768 and that the exercise of economic pressure in one market to

19

force purchases in an adjacent market to be actionable, without antitrust violation or other independently actionable tort).  In any event, whether interference is "improper" is a jury question.  *Manufacturing Research Corp. v. Greenlee Tool Co*., 693 F.2d 1037, 1040 (11th Cir. 1982); *see also* D.E. 56 at 9-13.

Defendants also recycle their preemption argument—already rejected by the Court. Sentry's tortious interference claims are not preempted by FUTSA because the crux of those claim is not the misappropriation but rather the use of the misappropriation to interfere with Sentry's contracts.  *Audiology Distribution, LLC v. Simmons*, 2014 WL 7672536, at *10 (M.D. Fla. May 27, 2014) (rejecting preemption challenge where "the crux of Count V is not the misappropriation of trade secrets, but the use of that information to interfere with Audiology's business relationships").

## **REQUEST FOR HEARING**

Sentry respectfully requests one hour for oral argument because of the number and importance of Sentry's federal and state claims, and to answer any questions the Court may have.

## **CONCLUSION**

For these reasons, Sentry respectfully requests that the Court deny Defendants' motion.

Dated:  October 5, 2018

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By:*/s/ Christopher G. Renner*

Stephen N. Zack, Esq.
Florida Bar No. 145215
100 SE Second Street, Suite 2800
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:   (305) 539-1307
Email:   szack@bsfllp.com

Carl E. Goldfarb, Esq.
Florida Bar No. 125891
Travis Robert-Ritter, Esq.
Florida Bar No. 103936
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile:  (954) 356-0022
Email: cgoldfarb@bsfllp.com
Email: tritter@bsfllp.com

Christopher G. Renner, Esq.
(pro hac vice)
1401 New York Ave., NW
Washington, DC 20005
Telephone:  (202) 237-2727
Facsimile:   (202) 237-6131
Email: crenner@bsfllp.com

*Counsel for Plaintiff Sentry Data Systems, Inc.*

21

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the court's CM/ECF System on October 5, 2018.

By: <u>*/s/ Christopher G. Renner*</u>
Christopher G. Renner

22