UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-cv-60257-BLOOM/Valle

SENTRY DATA SYSTEMS, INC.,

    Plaintiff,
v.

CVS HEALTH, CVS PHARMACY, INC.,
WELLPARTNER INC., and
WELLPARTNER, LLC,

    Defendants.
_____/

ORDER ON MOTION TO DISMISS
COUNTS ONE, FOUR, AND FIVE IN PLAINTIFF'S AMENDED COMPLAINT

**THIS CAUSE** is before the Court upon Defendants CVS Pharmacy, Inc. ("CVS") and Wellpartner, LLC's ("Wellpartner") (together, "Defendants") Motion to Dismiss Counts One, Four, and Five in Plaintiff's Amended Complaint, ECF No. [127] (the "Motion"). Plaintiff Sentry Data Systems, Inc. ("Sentry" or "Plaintiff") filed a response, ECF No. [139] ("Response"), to which Defendants filed a reply, ECF No. [147] ("Reply"). The Court has carefully considered the Motion, all opposing and supporting submissions, the record in this case and the applicable law, and is otherwise fully advised.[1] For the reasons set forth below, the Motion is denied.

### I.    BACKGROUND

The Court set forth a detailed factual background in its previous Order on Defendants' first Motion to Dismiss, ECF No. [115] ("Order"). For purposes of the instant Motion, the relevant facts are set forth below. Plaintiff is a developer and provider of information technology systems that assist certain hospitals and hospital-like entities—which the parties refer to as "covered

---

[1] In the Response, Plaintiff requests oral argument. However, because the Court previously heard argument on Defendants' first motion to dismiss, further argument on the issues involved is not necessary.

entities"—in monitoring compliance with a federal drug pricing program, the 340B Program. ECF No [121] ¶ 1[2]; *see also* Public Health Services Act, 42 U.S.C. § 256b. Sentry has developed tracking software to assist covered entities in managing their prescription inventory, tracking reimbursements and rebates, and maintaining records of eligible drugs and patients. *Id.* ¶¶ 69-71. Sentry's products further help covered entities comply with self-auditing requirements of the 340B Program, as well as respond to reporting inquiries from the Health Resources and Services Administration ("HRSA"). This case arises as a result of CVS's acquisition of Wellpartner, one of Sentry's competitors, and the subsequent announcement by CVS that all covered entities seeking to maintain CVS as a contract pharmacy generally, whether for retail or specialty drugs, must use Wellpartner for their 340B tracking and program administration.

In the initial Complaint, ECF No. [1], Sentry asserted nine causes of action: unlawful tying in violation of 15 U.S.C. § 1 (Count I); violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count II); breach of contract (Count III); tortious interference with contract (Count IV); tortious interference with business relationships (Count V); misappropriation of trade secrets in violation of 18 U.S.C. § 1836 and Fla. Stat. § 688.002 (Counts VI-VII); Florida common law conversion of confidential information and proprietary information (Count VIII); and Florida common law unfair competition (Count IX). CVS moved to dismiss the entire Complaint, ECF No. [43], and following full briefing and oral argument, ECF No. [111], the Court granted the first motion to dismiss in part. *See* Order, ECF No. [115]. In pertinent part, the Court determined that Plaintiff had failed to clearly allege a relevant geographic market with respect to its unlawful tying claim and dismissed Plaintiff's Sherman Act claim asserted in Count I. *Id*. Accordingly, the Court granted Plaintiff leave to replead the Sherman Act claim. *Id.* The Court denied the motion to

---

[2] With leave of Court, Plaintiff filed an unredacted version of the Amended Complaint under seal. ECF No. [123].

2

dismiss with respect to Plaintiff's tortious interference claims, finding that they were not preempted by the Florida Uniform Trade Secrets Act ("FUTSA") and otherwise adequately pled.

Plaintiff filed its Amended Complaint, ECF No. [121], on September 10, 2018, asserting seven causes of action, including unlawful tying in violation of 15 U.S.C. § 1 (Count I); breach of contract (Count III); tortious interference with contract (Count IV); tortious interference with business relationships (Count V); and misappropriation of trade secrets in violation of 18 U.S.C. § 1836 and Fla. Stat. § 688.002 (Counts VI-VII).[3] In the instant Motion, Defendants seek dismissal of the unlawful tying claim asserted in Count I of the Amended Complaint, and Counts IV and V for failure to state a claim, and the tortious interference claim in Count V for the additional reason that it is preempted by FUTSA.

## II. LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept well-pleaded factual allegations as true, "conclusory allegations . . . are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010). "[T]he pleadings are construed broadly," *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint are viewed in the light most favorable to the plaintiff, *Bishop v. Ross*

---

[3] The Court previously dismissed Plaintiff's claims asserted in Counts II, VIII, and IX based on preemption, and therefore, Plaintiff does not reassert those claims in the Amended Complaint. *See* Order, ECF No. [115].

3

*Earle & Bonan, P.A.*, 817 F.3d 1268, 1270 (11th Cir. 2016). In addition, a court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *see Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)). Overall, the question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

## III. ANALYSIS

### A. Unlawful tying

As previously stated, the Court dismissed Plaintiff's original Sherman Act claim because it failed to articulate a relevant geographic market. While the Court previously noted that Plaintiff was not alleging a *per se* tying claim in its original complaint, Plaintiff now contends that Defendants' conduct constitutes a *per se* unlawful tying arrangement or, in the alternative, is unlawful under the rule of reason. ECF No. [121] ¶ 107. Regardless, under either theory, Plaintiff must sufficiently allege market power in a relevant geographic market. In the Motion, Defendants argue that the Amended Complaint lacks sufficient factual allegations to plausibly show that CVS has market power in a properly defined relevant geographic market.

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992) (citation and internal quotation marks omitted). "A tying

4

arrangement violates § 1 of the Sherman Act if the seller has market power and the tying arrangement affects a substantial volume of commerce in the tied product market." *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1296 n.4 (11th Cir. 2010).

The Eleventh Circuit has noted that "the essence of illegality in a tying arrangement is the wielding of monopolistic leverage [by which] a seller exploits his dominant position in one market to expand his empire into the next." *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1284 (11th Cir. 1982) (citation omitted) (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953)). Thus, the plaintiff must demonstrate that the seller of the products "forced or coerced the buyer into purchasing the tied product" that "he did not want or would have preferred to buy elsewhere on other terms." *Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1415-16 (11th Cir. 1987); *see also Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (noting the "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all or might have preferred to purchase elsewhere on different terms").

However, not every tying arrangement violates the Sherman Act's prohibition against restraint of trade. *Jefferson*, 466 U.S. at 9; *see also* 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal."). "Courts have long recognized that Congress intended to prohibit only unreasonable restraints." *Metzler v. Bear Auto. Serv. Equip. Co.*, 19 F. Supp. 2d 1345, 1360 (S.D. Fla. 1998) (citing *Southern Card & Novelty, Inc. v. Lawson Mardon Label*, 138 F.3d 869, 874 (11th Cir. 1998)). "Certain tying arrangements, however, pose a predictable and unacceptable risk of stifling competition and therefore are unreasonable per se

Case 0:18-cv-60257-BB Document 175 Entered on FLSD Docket 04/03/2019 Page 6 of 15

Case No. 18-cv-60257-BLOOM/Valle

. . . [but i]n the Eleventh Circuit, the per se rule is applied reluctantly, and only when experience with a particular type of restraint enables the court to predict with confidence that the rule of reason will condemn it." *Id*. (citations omitted); *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1334 (11th Cir. 2010) ("Examples of such per se illegality include horizontal price fixing among competitors, group boycotts, and horizontal market division—business relationships that, in the court's experience, virtually always stifle competition."). Therefore, most antitrust claims are analyzed using a "rule of reason," which requires a determination as to the reasonableness of the restraint imposed on competition by the practice at issue. *Id*. (citation omitted).

In support of their claims, Section One plaintiffs must define both (1) a geographic market and (2) a product market. *Jacobs*, 626 F.3d at 1336. Although the parameters of the relevant market are generally considered a question of fact, a plaintiff "still must present enough information in [its] complaint to plausibly suggest the contours of the relevant geographic and product markets." *Id.* (citing *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1573 (11th Cir. 1991). These considerations are tempered by the Eleventh Circuit's determination that "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004) (citing *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., C.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983)); *see In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2017 WL 2797267, at *2 n.1 (N.D. Ala. June 28, 2017) (noting that courts in the Eleventh Circuit continue to apply this rule even after *Twombly*).

Defendants do not challenge the sufficiency of the allegations in the Amended Complaint regarding product market. Rather, Defendants argue that Plaintiff fails to adequately allege a relevant geographic market. With respect to the geographic market, a plaintiff must plead a

geographic market that "correspond[s] to the commercial realities of the industry, [is] economically significant . . . and include[s] the area in which consumers can practically seek alternative sources of the product." *Q Club Resort & Residences Condo. Ass'n, Inc v. Q Club Hotel, LLC*, No. 09-CV-60911, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010) (citations omitted).

The Court previously found that while the allegations in the Complaint demonstrated CVS's power, leverage, and influence over some covered entities, some contract pharmacy markets, and some retail pharmacy markets in certain cities, they nevertheless did not plausibly suggest the contours of a relevant geographic market as required for a tying claim.

### i. Plaintiff sufficiently alleges a national market

In the instant Motion, Defendants first argue that Plaintiff's allegations are again insufficient because the relevant geographic market cannot be both national and local, and that in any event, Plaintiff's national market theory is contradicted by allegations regarding customer behavior. Upon review, the Court disagrees and finds the allegations are sufficient with respect to a national market.

In the Amended Complaint, Plaintiff alleges that there is a relevant national market because CVS operates nationally, competes with other national pharmacy chains, contracts with national and regional health insurers, and contracts with covered entities for provision of 340B contract pharmacy services nationally. ECF No. [121] ¶¶ 33, 112. Plaintiff also alleges that CVS operates an extensive nationwide retail pharmacy, specialty pharmacy, and pharmacy benefits manager operation. *Id*. ¶ 36. In addition to Plaintiff's allegations regarding CVS's nationwide footprint, Plaintiff also alleges that covered entities seek to contract with contract pharmacies located both in close geographic proximity to their locations and across the country. *Id*. ¶ 112. Plaintiff alleges

7

Case 0:18-cv-60257-BB Document 175 Entered on FLSD Docket 04/03/2019 Page 8 of 15

Case No. 18-cv-60257-BLOOM/Valle

further that services of contract pharmacies distant from covered entities' physical locations are complementary, and not substitutes for, contract pharmacies in closer proximity, but that covered entities need contract pharmacies located in close proximity to their patients' location and they cannot turn to contract pharmacies located outside the relevant local markets. *Id*. ¶ 115. Defendant contends that these allegations are contradictory, but the Court finds that they are not.

In *United States v. Grinnell Corporation*, 384 U.S. 563, 575 (1966), the Supreme Court found that the relevant geographic market for the services involved was national, noting that despite the local nature of the actual provision of services, "the broader national market [ ] reflects the reality of the way in which [the defendant companies] built and conduct their business." *Id*. at 575-76. Similarly here, there is not a discrete product involved, but a service—namely 340B contract pharmacy services. As such, Plaintiff contends that some of CVS's contract pharmacy operations are local and that covered entities for practical reasons may prefer to deal with contract pharmacies close to their patient populations. Nevertheless, the alleged competitive advantages that CVS enjoys from its national presence in retail, pharmacy benefits management, provision of contract pharmacy services for specialty pharmaceuticals to covered entities located across the country, and CVS's contracts for provision of pharmacy services across state lines with generally applicable price and service terms, serve to knit the alleged local markets together into a relevant national market. Thus, the allegations of a national market are not incongruous with allegations regarding local markets. At this juncture, construed in the light most favorable to Plaintiff, the allegations regarding a relevant national market are sufficient.

        **ii.**      **Plaintiff sufficiently alleges local markets**

Defendants argue next that the Amended Complaint fails to define relevant local markets. The Court disagrees. Indeed, relevant geographic markets need not be defined by "metes and

bounds" and "cannot [ ] be defined with scientific precision . . . ." *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974). As the Court has already noted, "the parameters of a given market are questions of fact, . . . [and] antitrust plaintiffs . . . must present enough information . . . to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs*, 626 F.3d at 1336 (internal citation and quotations omitted). Here, Plaintiff specifically alleges that the twenty-two core-based statistical areas or "CBSAs" it identifies in which CVS has a 30% or greater share of contract pharmacy locations as the relevant local markets. ECF No. [121] ¶ 114. In addition, Plaintiff alleges that the "local geographic markets relevant to this action [ ] are no broader than each of the 22 individual CBSAs" that Plaintiff identifies, and "Sentry has existing covered entity customers in more than half of the identified CBSAs, and potential customers in all of the identified CBSAs." *Id.* ¶¶ 114, 117. As such, construed in the light most favorable to Plaintiff, the allegations are sufficient to state relevant local markets.

### iii. Market power

Defendants contend that Plaintiff fails to plead market power in any relevant market. "[I]n all cases involving a tying arrangement, the plaintiff must prove that defendant has market power in the tying product." *Ill. Tool Works Inc.*, 547 U.S. at 46. Here, the tying product or services is contract pharmacy services. In order to state a Sherman Act claim based upon unlawful tying, a plaintiff must allege five elements to state a tying agreement: "(1) a tying and a tied product; (2) evidence of actual coercion by the seller that in fact forced the buyer to purchase the tied product; (3) that the seller [has] sufficient market power in the tying product market to force the buyer to accept the tied product; (4) anticompetitive effects in the tied market; and (5) involvement of a not insubstantial amount of interstate commerce in the tied product market." *Amey, Inc. v. Gulf*

*Abstract & Title, Inc.*, 758 F.2d 1486, 1502-03 (11th Cir. 1985).[4] "In order to prove this anticompetitive effect on the market, the plaintiff may either prove that the defendants' behavior had an actual detrimental effect on competition, or that the behavior had the potential for genuine adverse effects on competition." *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1072 (quoting *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996)) (quotations omitted). "At a minimum, [showing potential for genuinely adverse effects on competition] requires a plaintiff to define the relevant market and establish that the defendants possessed power in that market." *Id.* (quoting *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1213 (11th Cir. 2002)) (quotations omitted).

"Market power is the ability to raise price significantly above the competitive level without losing all of one's business." *Jacobs*, 626 F.3d at 1339 (citation omitted). However, "[m]arket power, while necessary to show adverse effect indirectly, alone is insufficient. A plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market . . . ." *Spanish Broad. Sys. of Fla., Inc.*, 376 F.3d at 1073 (citation omitted). In addition, "market share is frequently used in litigation as a surrogate for market power." *Id.* at 1340 (citation omitted). The relevant markets in the instant case are a national and local 340B contract pharmacy services markets. The Court considers the sufficiency of the allegations with respect to each in turn.

Defendants argue specifically that Plaintiff has not sufficiently alleged CVS's market share of the national 340B contract pharmacy market, and that Plaintiff's allegations regarding retail market share are insufficient to establish market power in the relevant market. In response,

---

[4] The Court notes that Defendants' challenge to the sufficiency of the allegations regarding market power appears to relate to the third element of an unlawful tying claim, while Plaintiff appears to understand the challenge as one relating to the fourth element. However, analysis of both elements requires a showing of market power. As such, the distinction is without a difference for purposes of the instant Motion.

Plaintiff contends that the Amended Complaint alleges direct evidence of CVS's market power as a contract pharmacy nationally and locally, demonstrated by Plaintiff's allegations regarding specific customers who felt they were forced to purchase the tied product, 340B solutions provider services, from Defendants to gain access to the tying product, contract pharmacy services. *See* ECF No. [121] ¶¶ 94-95, 108-11, 120-21. Plaintiff also argues that it need only allege that CVS has market power over some covered entities, relying upon *Tic-X-Press, Inc.*

However, the court in *Tic-X-Press* also noted that "[i]n addition, market power requires a showing that would-be competitors in the tied market cannot themselves offer the tying product on competitive terms: that is, that the seller has some cost advantage over rivals in producing the tying product or that there are substantial entry barriers into the tying product market." 815 F.2d at 1420. With respect to market power, Plaintiff alleges that CVS is the second largest contract pharmacy and has increased its contract pharmacy locations by 281% since 2013. ECF No. [121] ¶ 34. Plaintiff alleges further that CVS is a dominant firm in the 340B contract pharmacy market due to its leading position in three related markets—retail pharmacy, specialty pharmacy, and pharmacy benefits manager ("PBM") markets. *Id*. ¶ 36. According to Plaintiff, CVS held approximately 23.8% of the United States retail pharmacy market, *id*. ¶ 37, and CVS's dominance in the dispensing of specialty pharmaceuticals is growing. *Id*. ¶ 40. Plaintiff then provides numerous allegations regarding CVS's status as a preferred or exclusive provider of specialty pharmaceuticals for various insurers. *Id*. ¶¶ 44-61. Furthermore, Plaintiff attaches a list of 365 covered entities, that as of September 2018, are dependent upon CVS for 30% or more of their contract pharmacy network, and states that CVS has market power over each one listed. *See id*. ¶ 65; Exhibit A, ECF No. [121-1]. Thus, the inference Plaintiff would have the Court draw from the allegations is that because of CVS's position in the retail pharmacy, specialty pharmacy, and

pharmacy benefits manager ("PBM") markets, it necessarily possesses requisite market power in the contract pharmacy services market nationally.

However, the inference is belied by other allegations in the Amended Complaint. Plaintiff alleges that CVS competes on a national level to offer 340B contract pharmacy services with other national chain pharmacies, *id*. ¶ 112, and acknowledges that six retail pharmacy chains, including CVS, Walgreens, Walmart, Rite Aid, Kroger, and Albertsons collectively account for two thirds of 340B contract pharmacy locations. ECF No. [121] ¶ 34. In addition, Plaintiff concedes that Walgreens "is the single largest contract pharmacy" and that covered entities view Walgreens, in addition to CVS, as a "must have" 340B contract pharmacy services provider. *Id*. ¶¶ 34-35. These affirmative allegations conflict with Plaintiff's contention that CVS wields superior market power in the contract pharmacy market nationally. Indeed, the Amended Complaint contains no allegations giving rise to any plausible barriers to entry given that five other pharmacy chains, along with CVS, dominate a total of two-thirds of the relevant market nationally.

In addition, Plaintiff's reliance on Exhibit A does not lead to the plausible inference that CVS possesses the requisite market share specifically in a national 340B contract pharmacy services market. Exhibit A to the Amended Complaint does not inform whether CVS holds a significant share of the relevant market—merely because CVS possesses a large proportion of contract pharmacy locations in a contract pharmacy network in any given locality, especially where there are no allegations that 340B contract pharmacy services are provided on an exclusive basis. Indeed, Plaintiff affirmatively alleges that more than 6,000 covered entities participated in the 340B program in 2017, *see* ECF No. [121] ¶ 12, but the information in Exhibit A pertains to only 365 covered entities nationwide, or a little over 6% of covered entities participating in the 340B program, which belies Plaintiff's assertion that CVS possesses market power nationally. *See*

*Jefferson*, 466 U.S. at 26-29 (finding 30% market share to be insufficient).

Similarly, considering the disparate allegations in the aggregate do not plausibly allege national market power.  For example, while CVS may enjoy a dominant position in the specialty pharmaceutical business, the allegations in the Amended Complaint acknowledge that four of its competitors also have access to significant numbers of FDA-approved limited distribution drugs.  *See id.* ¶ 41.

Market power can also exist where sellers possess unique products that competitors are unable to offer.  *Jefferson*, 466 U.S. at 17.  But, for similar reasons, the allegations regarding CVS's unique position in the market that allows CVS to offer contract pharmacy services that rivals cannot offer are not sufficient to allege the requisite market power in a national market.  The "question is whether the seller has some advantage not shared by his competitors in the market for the tying product.  Without any such advantage differentiating his product from that of his competitors, the seller's product does not have the kind of uniqueness considered relevant . . . ."  *United States Steel Corp. v. Fortner Enterps., Inc.*, 429 U.S. 610, 620-21 (1977).  While Plaintiff alleges CVS's superior market power in three related markets, the inference Plaintiff would have the Court draw regarding a national market relevant to its antitrust claim is undercut by Plaintiff's affirmative allegations with respect to the other pharmacy chains specifically in the context of contract pharmacy services.  Thus, the Amended Complaint fails to plausibly allege that CVS possesses the requisite market power in a national market.

Nevertheless, the Court finds that at this juncture, the allegations regarding market power in the local contract pharmacy services markets are sufficient.  Specifically, Plaintiff alleges that in the twenty-two CBSAs identified in the Amended Complaint, CVS possesses at least 30% of the 340B contract pharmacies.  ECF No. [121] ¶ 114.  In addition, Plaintiff alleges that covered

entities draw from local markets that are limited by their patients' desire to access healthcare in proximity to their homes and workplaces, and therefore contract with contract pharmacies that can serve local patient populations, and more specifically, that covered entities within the CBSAs draw a substantial majority of their patients from within a thirty-mile radius. *Id*. ¶¶ 114-15. Moreover, Plaintiff asserts that even though covered entities may also deal with contract pharmacies across the country, these services are not a substitute for the local contract pharmacy services, and therefore covered entities need contract pharmacies in close proximity to their patient populations. *Id*. ¶ 115. Collectively, these allegations are sufficient to plausibly state that CVS possesses market power in the twenty-two local markets identified in the Amended Complaint.

### B. Tortious interference

Finally, Defendants argue that Plaintiff's claims for tortious interference asserted in Counts IV and V should be dismissed for failure to state a claim because tortious interference claims cannot be based on the same conduct underlying a failed antitrust claim,[5] and that Count V is preempted by FUTSA to the extent that it is based upon the alleged theft of confidential information. Defendants previously sought dismissal of Plaintiff's tortious interference claims for failure to state a claim, which the Court rejected. The Court expressly held that because the claims of tortious interference are not comprised of allegations of trade secret misappropriation alone, they are not preempted by FUTSA. *See* ECF No. [115]. Similarly, in the Amended Complaint, the tortious interference claims are not premised solely upon Defendants' purported violations of antitrust law, and in any event, the antitrust claim here survives.

As such, Defendants' Motion improperly raises arguments which the Court has already

---

[5] The Court acknowledges that it accepted Defendants' argument at oral argument on the first motion to dismiss that the tortious interference claim rises and falls on the tying claim, *see* ECF No. [112] at 20; however, the Court did not base its ruling upon this argument, and therefore did not address it in its previous order, ECF No. [115].

considered and rejected, and Defendants' arguments on this point are not well-taken.

## IV. CONCLUSION

For the reasons set forth, the Motion, **ECF No. [127]**, is **DENIED**. Defendants shall file their Answer to the Amended Complaint **on or before April 15, 2019**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 3, 2019.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record