## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-cv-60257-ALTMAN-HUNT

SENTRY DATA SYSTEMS, INC.,

        Plaintiff,

v.

CVS PHARMACY, INC. and
WELLPARTNER, LLC,

        Defendants.

_____/

      Plaintiff Sentry Data Systems, Inc. ("Sentry") submits this memorandum in opposition to Defendants' Expedited Motion to Amend the Scheduling Order, D.E. 214 ("Mot.").

### <u>Introduction</u>

      This is a complex antitrust case.  The parties are represented by sophisticated, experienced counsel.  In late 2018, and again in early 2019, counsel attempted to reach agreement on a methodology for the review and production of documents.  There was an agreement to exchange search terms and to assess the volume of documents that would need to be reviewed, which was performed by both sides.  (Exhibit A, Declaration of Christopher G. Renner ("Renner Decl.") ¶¶ 3-4 (attached hereto along with supporting exhibits).)  Both sides found the results unacceptable, with use of the search terms proposed by either side requiring the other to manually review nearly one million documents.  (*Id.* ¶¶ 8, 10-12.)  The two sides parted ways at that point.  Defendants unilaterally cut and cut again Sentry's desired search terms, without seeking or receiving Sentry's agreement, until those terms yielded an arbitrary number of documents that Defendants were willing to review manually.  (*Id.* ¶¶ 18-23.)  For its part, Sentry transparently and promptly disclosed in April 2019 its intent to use predictive coding

1

software, or Technology Assisted Review ("TAR"), to identify responsive documents. (*Id.* ¶¶ 9, 13.)  Neither side filed a motion to compel, despite mutual disagreement with the path chosen by the other.  These are the sorts of tactical decisions that make up the quotidian tissue of complex civil litigation.  Both sides assessed the costs and benefits of bringing their dispute to the Court, and opted for their own reasons not to do so.

All of this happened more than four months ago.  But now Defendants want a "do over" on the months of fact discovery they have whiled away, sitting passively as Sentry took ten third-party depositions and noticed eight more while Defendants took one.  Defendants seek an extension of discovery and trial because Sentry produced ***more*** responsive documents ***faster*** than Defendants.  Defendants brought this Motion because they are dissatisfied with the progress of fact discovery and dislike their chances in the expert discovery and dispositive motion practice that is coming, and not because there is good cause to amend the Scheduling Order.  Not only have Defendants failed to justify an extension of the schedule and trial, but such an extension would significantly prejudice Sentry.  Although Sentry has a claim for damages, the primary relief it is seeking is an injunction to protect its business and to protect the safety net hospitals and health clinics that Defendants are trying to coerce into abandoning Sentry and retaining Wellpartner.  Defendants' misconduct is continuing and their motion should be denied.

## **Factual Background**

Sentry filed this action in February 2018, along with a motion for preliminary injunction on Sentry's tortious interference claims.  After Defendants agreed to cease and desist from the most egregious forms of tortious interference, Sentry withdrew the motion.  The parties turned to the task of negotiating a discovery framework, which included at that time the exchange of search terms and an agreement to use those terms if they could be part of a reasonable and

mutually-agreeable discovery protocol.  (Renner Decl. ¶¶ 3-5.)  Both sides reserved their rights

in the event that the others' search terms yielded unreasonable volumes of potentially responsive

documents, which (as described above) is what happened in the end.  (*Id.* ¶ 3.)

Sentry began training its TAR algorithm promptly upon disclosing to Defendants its

intent to use TAR.  (Renner Decl. ¶ 14.)  As of approximately May 13, 2019, the TAR model

achieved an estimated recall rate of 75%.  (Exhibit B, Declaration of Konstantin Mertsalov, PhD

("Mertsalov Decl.") ¶ 14 (attached hereto).)[1]  However, when Sentry had earlier proposed to the

Defendants a 75% recall rate as a target, the Defendants rejected that and expressed a preference

for recall rates of 85% or even higher.  (Renner Decl. ¶ 15.)  Consistent with Defendants'

instructions, Sentry continued in June and July to train its TAR algorithm to achieve

progressively higher rates of recall.   (Mertsalov Decl. ¶¶ 15-16.)

Defendants' productions of custodial documents, using the search terms proposed by

Sentry but then unilaterally edited by Defendants, began on July 3, 2019.  (Renner Decl. ¶ 28.)

Defendants' counsel contacted counsel for Sentry on July 15, 2019, to express concern with the

timing of Sentry's document production.  (*Id.* ¶ 32.)  At this time, Sentry was still in the process

of validating the performance of the TAR algorithm, as it had agreed to do with Defendants.  (*Id.*

¶ 33.)  In an attempt to address Defendants' concerns while continuing to validate its TAR,

Sentry made on July 22, 2019, a substantial production, over 113,000 pages, of documents that

---

[1] "Recall" is a measure of the percentage of the responsive documents in a data set classified correctly by the TAR model.   If recall is 100%, the model has correctly identified all of the responsive documents in a collection.  A recall rate of 75% indicates that 75% of the actually responsive documents in the data set have been correctly identified by the TAR model as responsive.  A low recall score suggests that the model has incorrectly marked responsive documents as non-responsive.  (Mertsalov Decl. ¶ 9.)  "Precision" is a measure of the percentage of actual responsive documents contained in the set of documents identified by the TAR model as responsive, i.e., of those documents identified by the TAR model as responsive, what percentage is actually responsive.  (*Id.* ¶ 12.)

were among those being scored as highly responsive by Sentry's TAR algorithm.  (*Id.* ¶¶ 34-35.)

Sentry substantially completed its production of custodial documents on July 31, 2019, other

than documents from 2015 relevant to Sentry's trade secret and breach of contract claims, which

were produced on August 17, 2019. [2]  (*Id.* ¶ 37.)   Fact discovery is scheduled to run through

October 7, 2019.  D.E. 182.

## Legal Standard

Under the Federal Rules of Civil Procedure, a case management and scheduling order

"may be modified only for good cause and with the judge's consent."  FED. R. CIV. P. 16(b)(4).

"Rule 16(b)'s good cause standard 'precludes modification [of the scheduling order] unless the

schedule cannot be met despite the diligence of the party seeking the extension.'"  *Oravec v.*

*Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (quotation omitted).

"The burden of establishing the requisite good cause/diligence rests on … the party seeking relief

from the Scheduling Order."  *Allstate Ins. Co. v. Regions Bank*, 2014 WL 4162264, at *2 (S.D.

Ala. Aug. 19, 2014) (citation omitted).

The burden to show an entitlement to a continuance of the trial date is especially high.

"A continuance of any trial, pretrial conference, or other hearing will be granted only on

exceptional circumstances … supported by affidavit setting forth a full showing of good cause."

S.D. FLA. LOCAL RULE 7.6.

---

[2] Defendants' assertion that Sentry failed to retain documents for four custodians is simply
wrong. (Mot. at 5-6.)  As Defendants know, because it was explained to them, these custodians
left the company *before* the conduct at issue in this case began, and their documents were
disposed of in the normal course operation of Sentry's document retention policy, also *before* the
conduct at issue in this case began or any litigation was reasonably foreseeable.  (Renner Decl.
¶ 7.)  Sentry first informed the Defendants of this issue in February of 2019, not in April of 2019,
as the Defendants' brief suggests.  (*Id.*)

## Argument

### I.    Defendants Have Not Established Good Cause.

Defendants have not shown good cause.  Defendants have made literally no effort to

show, rather than simply assert, that they cannot meet the deadlines in the existing schedule.

They have not pointed to any deposition that they are unable to prepare for, or any document

discovery they have been unable to take.  *See Outsource Services Mgmt., LLC v. Lake Austin*

*Properties I, Ltd.*, 2011 WL 13137975, at *2 (M.D. Fla. June 22, 2011) (denying motion to

reopen discovery where the "motion is devoid of any argument that an extension of the discovery

period is necessary for a *specific reason*" and "the motion fails to specify whose deposition

would be taken or what additional document discovery would be anticipated during an extended

discovery period").  Defendants put before the Court no evidence of how many contract or staff

attorneys they have reviewing the documents produced by Sentry or how much time it would

take Defendants to review the documents.  There is nothing but attorney argument supporting the

requested extension, which should be denied for that reason alone.

Defendants make no attempt to carry their burden to show good cause because they

cannot do so.  Sentry—the party with far fewer resources and the burden of proof—is ready,

willing and able to live within the existing schedule and has made extraordinary efforts to meet

those deadlines.  CVS, one of the largest corporations in the United States, surely can do the

same.  Defendants introduce no evidence, and make no non-conclusory argument, to establish

that they cannot meet the deadlines in the schedule.  *See People for Ethical Treatment of*

*Animals, Inc. v. Miami Seaquarium*, 2016 WL 7540433, at *1 (S.D. Fla. Jan. 21, 2016) (denying

motion for four-month extension of discovery deadline even though several depositions and

much document review needed to be completed in a short time and counsel represented that the

remaining discovery could not be completed by the deadline where, among other things, motions to compel had not been filed, the parties had long been aware of the deadline, and where "the Court finds it difficult to believe that with the small army of attorneys who have made appearances in this case, that the deadlines could not be met").  Defendants' memorandum in support of their motion is a laundry list of alleged grievances with Sentry, but the Court may search Defendants' papers in vain for any sign that they cannot meet the deadlines in the existing schedule.

## II.      Defendants Have Not Been Diligent In Discovery.

Defendants have not been diligent in taking discovery.  Sentry has taken ten third-party depositions and noticed eight more.  Since the entry of the Protective Order over a year ago, the Defendants have taken a grand total of one deposition (which backfired spectacularly when the third-party witness resoundingly confirmed Sentry's theory of the case).  To the extent that Defendants claim that they are unable to defend this case, that is a function of the strength of the evidence against them and their own passivity in the face of a deadline for fact discovery that has been largely unchanged for six months, rather than any discovery misconduct by Sentry. Defendants make no attempt to explain why they have sat on their hands for six months.

Defendants also claim that they need an extension because Sentry is litigating too hard. (*See* Mot. at 15-16.)  It is true that Sentry's counsel has zealously represented its client.  But there has been no unresolved objection by Defendants or any third party to the discovery propounded by Sentry, no discovery dispute brought to the Court since 2018, and there is no obvious reason to think that Williams & Connolly, which touts itself on its web page "as one of the nation's premier litigation firms,"[3] is incapable of representing its client effectively.  This is

---

[3] *Firm*, Williams & Connolly LLP, https://www.wc.com/Firm.

not a case where Defendants do not have the resources they need to adequately prepare for trial. Defendants have a small army of attorneys working for them on this case; the signature block on their motion to amend the scheduling order lists ten attorneys from three law firms, including seven from Williams & Connolly.  And there are almost certainly more attorneys working on this matter for Defendants behind the scenes.

This litigation is of existential significance to Sentry and to many of the safety-net hospitals that are being victimized by CVS's anticompetitive conduct.  Sentry has litigated the case accordingly; Defendants have not.  But that was a tactical choice by Defendants and they should not be given a "do over" on discovery they effectively chose not to take.  The fact that Sentry has taken numerous third-party depositions should not surprise Defendants because the parties negotiated a limit on third party depositions of twenty per side.  (Renner Decl. ¶ 31.) Defendants complain about the number of Rule 45 subpoenas served by Sentry, but there is no burden imposed on Defendants by these third-party subpoenas, no recipient of a subpoena served by Sentry has filed a motion to quash, and it is to be expected that the pace of discovery will accelerate substantially as the parties near the deadline for the close of discovery.  That is almost an inevitable fact of complex litigation.

**III.    Sentry Would Be Prejudiced by An Extension of the Trial Date.**

Sentry would be gravely prejudiced by the extension Defendants seek.  Sentry has made extraordinary efforts to meet the deadlines in the scheduling order, incurring costs that Defendants have avoided by sitting on their hands either assuming the case would settle because Sentry would not have the resources and gumption to stay the course or hoping that the Court would bail them out.  The requested extension of the trial date—which under the Local Rules should be granted "only in exceptional circumstances" and when "supported by affidavit setting

forth a full showing of good cause," S.D. FLA. L.R. 7.6—is especially prejudicial. Defendants

claim that this case is all about money damages, but that is manifestly untrue. If Sentry were

primarily seeking money damages rather than injunctive relief it would have filed later rather

than sooner, allowing its damages to compound. Instead, Sentry filed suit within 45 days of

Defendants' announcement of their anticompetitive conduct, seeking permanent and preliminary

injunctive relief, because it is trying to protect its business and those of the safety-net hospitals

that it serves. D.E. 1 at ¶ 58 (dating CVS announcement of mandate to use Wellpartner as of

December 18, 2017) (filed February 5, 2018). Sentry has suffered damages and will show an

entitlement to relief for compensation. But the injunctive relief Sentry seeks is the core of its

case, and a delay of the trial date will prejudice Sentry by delaying the relief from Defendants'

continuing anticompetitive conduct that a jury verdict on liability and the subsequent entry of an

injunction will bring.

Defendants' cases are easily distinguishable. In *Se. Metals Mfg. Co. v. Millennium

Metals, Inc.*, 2012 WL 983767, at *2 (M.D. Fla. Mar. 21, 2012), the plaintiff had waited five

years before filing suit (unlike Sentry here), and discovery was in its early rather than final

stages. In *Tomco Equip. Co. v. Se. Agri-Sys., Inc.*, 542 F. Supp. 2d 1303, 1308 (N.D. Ga. 2008),

for "all intents and purposes, discovery [was] still in the early stages," no trial date had been set,

and the party opposing the stay was simultaneously seeking an extension of discovery. And in

both *Se. Metals* and *Tomco*, a stay pending the outcome of other proceedings could have

streamlined the remaining issues to be litigated, while no such factor is present here.

### IV.    Sentry's Use of TAR Does Not Justify an Extension.

Sentry's decision to use TAR rather than search terms and manual review upon learning

of the volume of hits from Defendants' search terms was reasonable and proper under the

Federal Rules.[4]  "'Responding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information.'"  *Hyles v. New York City*, 2016 WL 4077114, at *3 (S.D.N.Y., Aug. 1, 2016) (citing THE SEDONA PRINCIPLES: SECOND EDITION, BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DOCUMENT PRODUCTION, Principle 6).  And TAR is now recognized as a presumptively reasonable methodology.  "[T]he case law has developed to the point that it is now black letter law that where the producing party wants to utilize TAR for document review, courts will permit it." *Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 127 (S.D.N.Y. 2015); *Bridgestone Americas, Inc. v. Int'l Bus. Machines Corp.*, 2014 WL 4923014, at *1 (M.D. Tenn. July 22, 2014) (permitting the use of TAR over defendant's objections that the request was an "unwarranted change in the original case management order" that had contemplated the use of search terms).  To the extent that Defendants believed that Sentry's decision to use TAR was improper, either standing alone or against the backdrop of a prior willingness to consider Defendants' search terms, Defendants' waived those concerns by failing to raise them within 30 days of learning (no later than April 30, 2019) of Sentry's fully-disclosed, fully-transparent decision to use TAR, as required under Local Rule 26.1(g)(1).   (Mot. at 6, citing Ex. 7.)

Having waived their right to contest Sentry's use of TAR, the Defendants must instead find fault with the application of TAR.  But no fault is identified.  The 85-percent recall rate

---

[4] Defendants misleadingly suggest that Sentry failed to consider Defendants' search terms. (Mot. at 6.)  To the contrary, Sentry ran hit reports for every set of search terms provided by Defendants.  (Renner Decl. ¶ 8, 10-12.)  The first set of search terms was obviously unreasonable, calling for manual review of approximately 71% of the one million, four hundred thousand documents gathered by Sentry.  (*Id.* ¶ 8.)  When Sentry asked the Defendants to try again, current counsel (not past counsel, as the Motion misleadingly suggests), specified a list of terms that was not meaningfully better.  (*Id.* ¶ 12.)

achieved by Sentry's TAR is above industry-standard recall rate for TAR and **well above**

scientific estimates of the upper-bound of recall rates consistently achieved by human reviewers

using search terms and manual review.  *Independent Living Center v. City of Los Angeles*, No.

2:12-cv-00551, slip op. at 3 (C.D. Cal. June 26, 2014) (Renner Decl. Ex. 14) (specifying recall

rate of 75% through TAR).[5]  One study summarized in *Moore v. Publicis Groupe & MSL Grp.*,

287 F.R.D. 182, 191 (S.D.N.Y. 2012), found that the average recall rate based on a keyword

review of the sort used by Defendants was only 20%.  Indeed, the recall rate achieved by

Sentry's TAR appears to be **superior** to the recall rate achieved by Defendants' protocol of

search terms and manual review.  (Mertsalov Decl. ¶¶ 21-27.)  Defendants are seeking an

extension because Sentry has outperformed them in discovery—producing more responsive

documents, and doing so faster—an irony that is apparently lost on them.  *Rio Tinto*, 306 F.R.D.

at 129 ("One point must be stressed—it is inappropriate to hold TAR [technology assisted

review] to a higher standard than keywords or manual review. Doing so discourages parties from

using TAR for fear of spending more in motion practice than the savings from using from using

TAR for review.").

     Defendants make much of the lower precision rate achieved by Sentry's TAR, but that

precision rate in no way compares unfavorably to precision rates achieved by manual review.

Defendants make no effort to substantiate their *ipse dixit* attack on Sentry's TAR by establishing

the precision rate of their own search term and manual review methodology or citing to the Court

---

[5] *See also Technology Assisted Review (TAR) Guidelines*, EDRM & Bolch Judicial Institute at 23 (Jan. 2019), *available at* https://www.edrm.net/wp-content/uploads/2019/02/TAR-Guidelines-Final.pdf ("[g]eneral experience has shown that achieving a recall rate of 75% to 85% has been a good balance in many cases") (last visited September 2, 2019); *In re Broiler Chicken Antitrust Litig.*, 2018 WL 1146371, at *6 (N.D. Ill. Jan. 3, 2018) ("recall estimate on the order of 70% to 80% is consistent with, but not the sole indicator of, an adequate (i.e., high-quality) review").

any authority for their naked assertion that the precision rate of Sentry's TAR is unacceptably low. The attack on the precision rate achieved by Sentry's TAR is the centerpiece of Defendants' motion but there is nothing but conclusory attorney argument to support their position on this issue.

Defendants' claim that Sentry has somehow admitted that it "dumped" irrelevant documents is false. (Mot. at 13.) This is false. Each of the custodial documents that Sentry produced was assigned a responsiveness score of over 50% by Sentry's TAR, meaning that it was individually evaluated by the predictive coding software and found to be responsive by a preponderance standard. No document was produced without electronic review for responsiveness and privilege. (Renner Decl. ¶ 39.) Defendants again and again claim that Sentry produced these documents without reviewing them but that claim is simply and knowingly false. (Mot. at 12-13 & n.3.) The fact that Sentry's TAR makes mistakes at the margin in administering this preponderance standard does not mean that Sentry is dumping clearly irrelevant documents on the Defendants.[6] Human reviewers make mistakes too, and lots of them, as the literature amply demonstrates. Nicholas M. Pace & Laura Zakaras, RAND Corp., WHERE THE MONEY GOES: UNDERSTANDING LITIGANT EXPENDITURES FOR PRODUCING ELECTRONIC DISCOVERY (2012) at 55-58.[7] In any event, perfection is not the standard by which to measure a document production; reasonableness and proportionality are. *See Da Silva Moore v. Publicis Groupe*, 287 F.R.D. 182, 191 (S.D.N.Y. 2012) ("the Federal Rules of Civil Procedure do not require perfection"); THE SEDONA CONFERENCE, COMMENTARY ON DEFENSE OF PROCESS:

---

[6] Defendants never requested that Sentry manually review the set of documents identified as responsive by TAR. (Renner Decl. ¶ 17.)
[7] Available at
https://www.rand.org/content/dam/rand/pubs/monographs/2012/RAND_MG1208.pdf (last visited September 1, 2019)

PRINCIPLES AND GUIDELINES FOR DEVELOPING AND IMPLEMENTING A SOUND E-DISCOVERY PROCESS, PUBLIC COMMENT VERSION (2016), Principle 1 ("An e-discovery process is not required to be perfect, or even the best available, but it should be reasonable under the circumstances.").[8] Defendants make no effort at all to show that Sentry's use of TAR fails this standard of reasonableness and proportionality, given that the alternative proposed by Defendants was manual review of over 950,000 documents.[9]

Moreover, even if Sentry's TAR was unreasonable, Defendants got exactly what they asked for. Sentry reached agreement with Defendants on a validation protocol and performed the terms of that agreement. (Renner Decl. ¶¶ 8-9, 40.) Defendants do not attempt to establish otherwise.[10] In their litany of complaints Defendants omit to mention that Sentry disclosed at the beginning of its TAR process the validation methodology it proposed to use, including the recall rate that Sentry would attempt to achieve: 75%, the standard blessed by the case law. Defendants rejected this 75% recall rate and demanded a higher one, at or above 85%. (*Id.* ¶ 15.)

---

[8] Available at https://www.ediscoverycouncil.com/sites/default/files/The%20Sedona%20Conference%20Commentary%20on%20Defense%20of%20Process_Public%20Comment%20Version_Sept%202016.pdf (last visited September 1, 2019).

[9] Defendants' cases are easily distinguishable. Neither *Michael K. Sheils Trust v. Kuhn*, 2009 WL 10670734, at *1 (M.D. Fla. July 10, 2009), nor *Williams v. Taser Intern., Inc.*, 2006 WL 1835437, at *7 (N.D. Ga. June 30, 2006), nor *Bd. of Ed. v. Admiral Heating & Ventilating, Inc.*, 104 F.R.D. 23, 26 (N.D. Ill. 1984), related to the use TAR to identify responsive documents or even involved Rule 16's good cause standard, and in any event the "needle in a haystack" problem identified in these cases is not at issue here because, as explained below, Sentry gathered and produced many of the most responsive documents and sent them to Defendants separately, identifying them as such.

[10] Defendants' conclusory claim that Sentry failed to provide "the promised updates or insight into its process" (Mot. at 7) is simply false. All information promised by Sentry in the April 4, 2019, email setting forth Sentry's TAR methodology was in fact delivered to Defendants. Sentry never promised additional "updates", but would have provided additional information had Defendants ever asked for it, which they did not between April 2, 2019, and July 2019, when Sentry made its production of custodial emails.

It is a normal and inexorable feature of TAR that higher recall rates will drive lower precision rates.  (Mertsalov Decl. ¶ 13.)  For this reason, lower precision rates than that achieved by Sentry have been accepted as reasonable when coupled with a high recall rate, as Sentry also achieved. *Dynamo Holdings Ltd. P'ship v. Comm'r of Internal Revenue*, 2016 WL 4204067, at *4 (T.C. July 13, 2016) ("Those numbers are often in tension with each other: as the predictive coding model is instructed to return a higher percentage of responsive documents, it is likely also to include more nonresponsive documents. Thus, when setting the recall rate at 95%, the Commissioner likewise chose a model that would return more nonresponsive documents (in this case, a precision rate of 3%).").  Defendants never specified a specific precision target for Sentry's TAR, nor expressed even generalized interest in that metric.  (*Id.* ¶ 16.)  Instead, Defendants wanted more responsive documents, and Sentry gave them that.  In this context, Defendants got exactly what they asked for.  Defendants should not be granted an extension based on the precision rate in Sentry's TAR when that precision rate is objectively reasonable, causally connected to the recall rate that Defendants specified and that Sentry achieved, and when Defendants never once articulated a preference for any specific precision rate at all.

Moreover, Sentry has the same burden as the Defendants in terms of understanding which of the documents produced by Sentry, the Defendants, and the third parties are of importance in this case.  Sentry has worked diligently to do so, and is prepared for the party and third-party depositions scheduled for September and October.  There is no good reason Williams & Connolly cannot be prepared as well.  Indeed, if the Defendants are so certain that their overbroad search terms rejected by Sentry in April 2019 were the best way to identify responsive documents, nothing stops them from running those search terms in the documents produced by

Sentry pursuant to TAR, and they could have begun this process no later than July 22, 2019, or eleven weeks before the close of discovery

Sentry delivered the documents sooner than specified by the Defendants, who for their part contended it was reasonable to produce documents to Sentry at least through the end of August, about five weeks before the deadline for Sentry's expert report(s).  (Renner Decl. ¶¶ 25-26.)  Defendants do not claim that Sentry defaulted on any agreement as to the timing of production.[11]  In fact, Sentry proposed that the parties agree to a substantial completion date of July 15, and Defendants declined that offer.  (*Id*.)  Ironically, Defendants' demand for a high recall rate not only caused the lower precision that they now complain of, but also caused the delay in Sentry's production that they complain of as well.  Sentry had a TAR that would have passed muster under the case law as of May 13, 2019, but was forced to undertake additional rounds of training and review to achieve the artificially elevated recall rates demanded by the Defendants.  (Mertsalov Decl. ¶ 14.)  Defendants' repeated claim that Sentry "decided" to withhold the majority of its document production until July 30 is not true.  Sentry was working diligently through July to achieve the recall rate specified by Defendants in May.  (*Id*. ¶ 16.)  There was no bad faith, no cunning, no deceit, no scienter; there were only good-faith efforts to produce precisely what the Defendants asked for.  Moreover, Sentry produced more responsive documents, faster, than did Defendants.

Defendants then complain about the use by Sentry of TAR to designate documents under the Protective Order.  Defendants never asked how Sentry would be identifying materials for

---

[11] The closest pass to this is the Defendants' poorly substantiated claim that there was some agreement that Sentry would produce documents "quickly."  (Mot. at 7.)  Sentry absolutely worked diligently through the summer to get the Defendants the documents, but Defendants never requested and Sentry never agreed to produce the documents by any specific date.

designation under the Protective Order, and having known since April 2019 of Sentry's plans to use TAR in its review Defendants cannot credibly claim to be surprised now. Defendants' apparent belief that there is something improper with use of TAR for purposes of designating materials under a protective order is misplaced. To the contrary, the use of TAR for this purpose is well-recognized. *See, e.g.*, THE SEDONA CONFERENCE COMMENTARY ON DEFENSE OF PROCESS: PRINCIPLES AND GUIDELINES FOR DEVELOPING AND IMPLEMENTING A SOUND E-DISCOVERY PROCESS (2016) at 34 ("Principle 10. A party may use any reasonable process, including a technology-assisted process, to identify and withhold privileged or otherwise protected information," including "information that is . . . sensitive and entitled to protection as highly confidential or 'attorney-eyes-only,' pursuant to a confidentiality agreement or protective order.").[12]  When Defendants complained about the high proportion of documents coded as Highly Confidential, Sentry promptly investigated the concern and addressed it.[13]  (Renner Decl. ¶ 42.)  Defendants have never articulated any concrete, substantiated prejudice from any errors at the margin in Sentry's now-remedied confidentiality designations, and it is still not clear why Defendants think that a few dinner menus out of a production of one million pages erroneously coded for confidentiality entitles them to an extension of any deadline, let alone an extension of the trial date.  Where is the prejudice from the inaccurately coded dinner menu?  There is none.

---

[12] Available at https://thesedonaconference.org/sites/default/files/publications/The%2520Sedona%2520Conference%2520Commentary%2520on%2520Defense%2520of%2520Process_Public%2520Comment%2520Version_Sept%25202016.pdf (last visited September 2, 2019).

[13] Sentry reproduced its production with adjusted confidentiality designations to address the concerns of the Defendants, despite the fact that Defendants failed to articulate, let alone substantiate, any prejudice from the initial confidentiality designations.

Defendants are grasping at straws, desperate to avoid judgment on the merits, and wasting the Court's time in the process.[14]

Apparently intent on ensuring that no good deed goes unpunished, Defendants next attack Sentry's extraordinary efforts to remedy the entirely self-inflicted problems the Defendants had caused from their (apparently) poorly-informed insistence on an artificially high recall rate. When Defendants began (after months of silence) inquiring of the status of Sentry's TAR production, the algorithm was performing well, but still required validation to ensure it was achieving the specified recall rate. (Renner Decl. ¶ 33.) In a good faith effort to get the Defendants some reading material, Sentry produced on July 22 more than 113,000 pages of documents that were receiving high scores for relevance from Sentry's TAR as it then existed. (Renner Decl. ¶ 34.) In short, Sentry sent the Defendants a set of "hot documents." Far from burying a needle in a haystack, as Defendants allege, Sentry included *only* high scoring documents in this production; Sentry hid nothing. Sentry could easily have included a countervailing volume of low scoring, or even obviously irrelevant, documents in this production, but Sentry did nothing of the sort, and there is no evidence or argument to the contrary. (*Id*.) And then, to eliminate any doubt as to what Sentry had done, and so that Defendants would understand what they had received and could allocate discovery resources accordingly, counsel for Sentry told counsel for Defendants that these documents were among the highest scoring, most relevant documents identified by Sentry's TAR. (*Id*. ¶ 35.) This is not

---

[14] Defendants' Motion asserts without support that "Sentry trained its predictive coding software to default to designating approximately 80% of its custodial production "Highly Confidential – Attorney's Eyes Only." (Mot. at 9.) This is not true. Each document was reviewed and received an individualized score for confidentiality; there was no default or preset target for the percentage of documents that would receive a designation of Highly Confidential. (Renner Decl. ¶ 41.)

the conduct of a party attempting to evade its discovery obligations.  Undersigned counsel is aware of no instance where party to a closely-fought civil action affirmatively and voluntarily called opposing counsel's attention to a specific portion of a document production as the place where "hot" documents could be found.  This is extraordinary cooperation in discovery.

Defendants ignore all of this.  Instead, they claim to have been misled as to whether these were all of the hot documents or just some of them.  But Sentry's counsel never represented to Defendants' counsel that all of the non-privileged, highly-highly scoring documents were in this initial production, and the affidavit filed by Defendants' counsel does not actually aver that Sentry's counsel made such a representation.  Sentry <u>never</u> expressly or impliedly asserted, in any way, that all of the highly-scoring custodial documents were in this initial production. (Renner Decl. ¶ 35.)  Defendants misleadingly suggest that all of the documents of Mr. Leonardi and Ms. Rodriguez-Hupp were excluded from the July 22 production but that is not true: over 2,300 emails to or from these two custodians were produced. (*Id*. ¶ 36.)   Even if there was a *bona fide* misunderstanding as to what Sentry was producing, metadata sufficient to search for the documents of specific custodians was provided with both productions, and in any event all of the (non-2015, non-privileged) Leonardi and Rodriguez-Hupp custodial documents were produced eight days later and well before Defendants completed their production of custodial documents from their key employees. (*Id*. ¶ 37.)  Defendants make no attempt to explain how the eight day delay in getting all of these documents prejudiced them or why it entitles them to additional months of discovery and a continuance of the trial.  Again, Defendants are requesting an extension because Sentry produced responsive documents for the custodians on Sentry's Initial Disclosures *faster* than the Defendants did.

**V.       Discovery on Sentry's Trade Secret Claim Does Not Justify an Extension.**

Defendants complain that Sentry's service of amended interrogatory responses relating to its trade secret claim came too late.  (Mot. at 10-11.)  But once again, while there was an agreement to update interrogatory responses during discovery, there was no agreement to exchange any amended interrogatory responses on any particular date, and Defendants neither inquired from Sentry when amended interrogatory responses by both parties would be exchanged at any time in June or July nor themselves produced amended interrogatory responses before August.  If the Defendants wanted to exchange amended interrogatory responses before August, and believed that failure to do so would necessitate extending discovery and continuing the trial, nothing stopped them from notifying Sentry of that fact.  As with the decision of the parties not to file motions to compel relating to their respective document review methodologies, the parties assessed the costs and benefits of deferring an exchange of amended interrogatory responses and individually reached the same conclusion: other discovery, and other disputes, were more important.  Absent any evidence that Defendants showed a scintilla of interest in these amended responses before Sentry proposed their exchange, there is no "good cause" under Rule 16 to be found here.

In any event, Sentry agreed to produce the amended interrogatory response on its trade secret claim and did so on August 1, 2019, thereby discharging its obligation under the only agreement that ever existed between the parties on the subject.  Defendants cannot claim to be prejudiced by receiving this more than five weeks before Sentry's opening expert report on a claim where Sentry has the burden of proof.

Defendants also claim that they have been prejudiced because 14,000 documents from 2015 relating to Sentry's trade secrets claim were not produced until August 17, 2017.  (Mot. at 11.)  This is silly.  Wellpartner produced on ***September 1, 2019***, some 68,000 pages, most of

which likely relate to Sentry's trade secret claims due to the job responsibilities of the custodians of these documents.  (Renner Decl. ¶¶ 27, 43.)  If the plaintiff with the burden of proof is willing to live with the parties' arrangement of producing documents relating to Sentry's trade secret claim near the expert report deadline, there is no good cause for the Court to intervene.

**VI.    The Existing Schedule for Expert Reports Does Not Justify an Extension.**

Defendants complain at great length about the fact that the current schedule sets the deadline for rebuttal reports two weeks after the deadline for opening reports, and allows fact discovery to continue after both opening and rebuttal expert reports are due.   They fail to note that the sequencing of expert reports and of expert and fact discovery has been set in four different scheduling order by two different federal court judges.  *See* D.E. 54, 125, 160, and 182. They also fail to note that the cadence of expert reports and fact discovery to which they object so vociferously has remained unchanged since the first scheduling order was issued on March 21, 2018.  *See* D.E. 54.  Not only have Defendants had more than ample time to prepare for expert work, their real beef is with the schedule the Court repeatedly set, not with anything Sentry has done.  The fact that Sentry at times has joined the Defendants in seeking differently-structured scheduling orders is now irrelevant.  The preference of the Court is clear and Sentry has conformed itself to the scheduling order entered by the Court.

Their claim also rings hollow.   For the antitrust tying claim, which is at the heart of this litigation, the key issues of whether CVS has market power and whether CVS and Wellpartner have coerced Sentry's customers, do not turn on information in Sentry's exclusive possession. Rather, they turn on public information, information in CVS and Wellpartner's possession, and the impact of Defendants' conduct on covered entities, the third-parties that are the target of Defendants' strong-arming tactics.  That is precisely why Sentry has taken and noticed numerous

third party depositions and sought documents through subpoenas duces tecum on other third parties.  That reality belies Defendants' contention about how the schedule prejudices them. Defendants have almost certainly been working on their expert report(s) based on key information in their possession, information to which they have had access for far longer than Sentry has.   While it is true that fact discovery does not end until Oct. 7, after both the September 9 deadline for initial reports and the September 23 deadline for rebuttal reports, that sequencing is likely to have more adverse impact on Sentry than on Defendants, because Sentry bears the burden of persuasion and has to submit a substantive expert report on September 9.

### Conclusion

Defendants have waived their challenge to Sentry's use of TAR and fail to identify any breach by Sentry of any agreement as to the performance of Sentry's TAR or the timing of that production.  In any event, Defendants are complaining about a production by Sentry that began on July 22, 2019, and largely completed on July 30, 2019, more than two months before the close of discovery.  Since that time, Defendants have not asked for a meet and confer to raise substantive concerns with Sentry's production, identified any missing documents, requested additional documents, or requested that Sentry's TAR production be redone with a higher precision rate.  (Renner Decl. ¶ 38.)  They have noticed the depositions of three Sentry employees and of Sentry itself pursuant to Rule 30(b)(6).  There is literally no evidence of any prejudice to Defendants caused by Sentry rather than by the Defendants' lassitude and their insistence on a high recall rate from Sentry's TAR.  Defendants have failed to demonstrate good cause for an extension, having failed to explain how they have been prejudiced by any misconduct of Sentry, what discovery the Defendants need to take but now cannot, or how Sentry's conduct has prevented them from taking that discovery.  Their motion should be denied.

Dated:  September 2, 2019

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By:*/s/ Carl E. Goldfarb*
    Stephen N. Zack, Esq.
    Florida Bar No. 145215
    100 SE Second Street, Suite 2800
    Miami, Florida  33131
    Telephone:  (305) 539-8400
    Facsimile:   (305) 539-1307
    Email:  szack@bsfllp.com

    Carl E. Goldfarb, Esq.
    Florida Bar No. 125891
    Johnathan Lott, Esq.
    Florida Bar No. 0116423
    401 East Las Olas Boulevard, Suite 1200
    Fort Lauderdale, Florida 33301
    Telephone: (954) 356-0011
    Facsimile:  (954) 356-0022
    Email: cgoldfarb@bsfllp.com
    Email: jlott@bsfllp.com

    Christopher G. Renner, Esq.
    (pro hac vice)
    1401 New York Ave., NW
    Washington, DC 20005
    Telephone:  (202) 237-2727
    Facsimile:   (202) 237-6131
    Email: crenner@bsfllp.com

*Counsel for Plaintiff Sentry Data Systems, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the

court's CM/ECF System on September 2, 2019.


By: *<u>/s/ Carl E. Goldfarb</u>*
Carl E. Goldfarb